UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | S4:14-cr-00272-JSR |
| | : | |
| | : | |
| ANTHONY ALLEN, et al | : | |
| | : | |
| Defendants. | : | |
| | : | |

### UNITED STATES'S SENTENCING MEMORANDUM REGARDING ANTHONY ALLEN

ANDREW WEISSMANN
Chief, Fraud Section

CAROL SIPPERLY
Senior Litigation Counsel
BRIAN R. YOUNG
Assistant Chief
U.S. Department of Justice
Criminal Division
1400 New York Ave., N.W.
Washington, D.C. 20005
(202) 616-3114

JEFFREY D. MARTINO
Chief, New York Office

MICHAEL T. KOENIG
Trial Attorney
U.S. Department of Justice
Antitrust Division
450 5th Street, N.W.
Washington, D.C. 20001
(202) 616-2165

## <u>TABLE OF CONTENTS</u>

BACKGROUND ...............................................................................................................1

ARGUMENT ..................................................................................................................1

I.      THE NATURE AND CIRCUMSTANCES OF THE OFFENSE .......................1

II.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT............3

III.    THE NEED FOR THE SENTENCE IMPOSED (1) TO REFLECT THE
SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE
LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE; (2)
TO AFFORD ADEQUATE DETERRENCE; (3) TO PROTECT THE PUBLIC
FROM FURTHER CRIMES OF THE DEFENDANT; AND (4) TO PROVIDE
THE DEFENDANT WITH APPROPRIATE EDUCATION OR
VOCATIONAL TRAINING ..........................................................................5

IV.    THE KINDS OF SENTENCES AVAILABLE ...................................................7

V.     THE RANGE ESTABLISHED BY THE SENTENCING
GUIDELINES ....................................................................................................7

        a.   There is no dispute that the defendants' base offense level is seven ............7

        b.   Although the loss caused by the defendants' conduct is difficult to
calculate and is, under the unique circumstances of this case, of
limited value in assessing their culpability, the government
estimates that the defendants intended for their scheme to cause
a loss of between \$500,000 and \$1.5 million under § 2B1.1(b)(1)(H) .........7

        c.   The Court should apply a two-level enhancement under section
2B1.1(b)(2)(A) because the defendants' scheme involved ten or
more victims ...............................................................................................15

        d.   The Court should apply a four-level aggravating role enhancement
under section 3B1.1(a) ...............................................................................17

        e.   The Court should impose a two-level enhancement for abuse of
trust under § 3B1.3 ....................................................................................19

VI.    THE NEED TO AVOID SENTENCING DISPARITIES
AMONG DEFENDANTS WHO HAVE BEEN FOUND
GUILTY OF SIMILAR CONDUCT ..............................................................21

i

VII.   A FINE IS WARRANTED BECAUSE THE NATURE
AND BREADTH OF MR. ALLEN'S CRIME RENDERS
CALCULATION OF RESTITUTION IMPRACTICABLE ............................22

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*United States v. Adelson*,
    441 F.Supp. 2d 506 (S.D.N.Y. 2006)......................................................... 9

*United States v. Barrett*,
    178 F.3d 643 (2d Cir. 1999)...................................................................... 19

*United States v. Broderson*,
    67 F.3d 452 (2d Cir. 1995)........................................................................ 19

*United States v. Contorinis*,
    692 F.3d 136 (2d Cir. 2012)...................................................................... 24

*United States v. Friedberg*,
    558 F.3d 131 (2d Cir. 2009)...................................................................... 20

*United States v. Gallant*,
    537 F.3d 1202 (10th Cir. 2008) ................................................................. 22

*United States v. Harris*,
    38 F.3d 95 (2d Cir. 1994).......................................................................... 14

*United States v. Hayes*,
    99 F.Supp. 3d 409 (S.D.N.Y. 2015).............................................................. 1

*United States v. McAlpine*,
    32 F.3d 484 (10th Cir. 1994) .................................................................... 14

*United States v. Ojemen*,
    465 Fed. App'x 69 (2d. Cir. 2012)............................................................. 21

*United States v. Roberts*,
    660 F.3d 149 (2d Cir. 2011)............................................................... 19, 21

*United States v. Uddin*,
    551 F.3d 176 (2d Cir. 2009)........................................................................ 9

*United States v. Wolfe*,
    71 F.3d 611 (6th Cir. 1995) ...................................................................... 14


**Foreign Authorities**

*R. v. Hayes*,
    [2015] ECWA Crim. 1944, Court of Criminal Appeal (Dec. 21, 2015)...................... 21

Anthony Allen and Anthony Conti are the first defendants to be sentenced in the United States for participating in a scheme to manipulate the London Interbank Offered Rate (LIBOR), a profoundly important benchmark to which was tied the value of hundreds of trillions of dollars in mortgage loans, consumer debt, derivative contracts, and other financial instruments.  As set forth herein, Mr. Allen's crime not only defrauded Rabobank's counterparties on interest rate swap contracts, but also severely damaged LIBOR's credibility and eroded public confidence in the integrity of the financial markets.  Under the United States Sentencing Guidelines, the United States calculates Mr. Allen's offense level as 29, which yields a sentencing range of 87-108 months in Zone D.  Given the unique circumstances of this case, however, the Sentencing Guidelines are an imperfect tool for evaluating Mr. Allen's culpability and the punishment he should ultimately receive.   As set forth herein, the United States submits that Mr. Allen should be sentenced to a substantial term of incarceration and the maximum available fine of $150,000.

Title 18, United States Code, § 3553(a) provides factors that the Court shall consider in sentencing Mr. Allen.  These factors are discussed in turn below.

## I.        THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Allen presided over a scheme to rig what could fairly be characterized as the two most important numbers in the financial world: the U.S. Dollar (USD) and Japanese Yen (JPY) LIBOR benchmarks.  *See United States v. Hayes*, 99 F.Supp. 3d 409, 411 (S.D.N.Y. 2015) ("LIBOR is the primary global benchmark for short-term interest rates") (internal quotation omitted).  He and his co-conspirators did so by submitting to the British Bankers' Association (BBA) borrowing estimates that were skewed to favor

1

Rabobank's trading positions instead of undertaking a good faith estimate of the rate at which Rabobank could borrow unsecured funds, which is what the BBA's guidance required them to do.  The scheme was not comprised of isolated instances of misconduct. Rather, Mr. Allen and subordinates on three different continents perpetrated a multi-year conspiracy to manipulate the LIBOR benchmark systematically.  The casual tone of the chats and telephone calls offered into evidence establishes that Mr. Allen, through his participation in the scheme, fostered an environment in which LIBOR rigging was a routine practice.

Beyond the losses sustained by Rabobank's counterparties, the defendants' scheme damaged the credibility of the world's most widely-referenced interest rate benchmark and undermined the public's confidence in the financial markets.  Because the utility of a benchmark depends on the market's perception that it faithfully reflects market conditions, the revelation that the defendants casually and routinely manipulated LIBOR for their own purposes severely damaged its usefulness.  As a result of the defendants' conduct, the countless traders, treasurers, investors, and financial professionals who relied on LIBOR with the mistaken understanding that it was what it purported to be – a good faith estimate of borrowing costs – made decisions based on inaccurate information.  And by abusing their privileged position on the LIBOR panel, the defendants' scheme fueled the public perception that the financial markets are rigged in favor of a handful of elite financial institutions concentrated mostly within a few blocks on Wall Street and Canary Wharf.  While it is true that the average investor does not trade interest rate swaps, it is easy to understand how a fraud of this magnitude could

color the public's perception of the integrity of the equities and commodities markets and of the global financial system.

According to a BBA document that Messrs. Allen and Conti both read, LIBOR "touches everyone from large international conglomerates to small borrowers" because, in 2008, approximately $350 trillion in interest rate swaps and $10 trillion in loans were indexed to the benchmark.  GX 108D.  According to the government's analysis, the movements in LIBOR that the schemers intended to accomplish would have caused hundreds of millions of dollars in losses throughout the financial markets.  As professional derivative traders, the defendants knew full well the reach of their fraud. That the defendants subordinated the integrity of such a vast and dynamic financial market to their own petty pecuniary interests reveals an astoundingly self-centered and cynical world view.

## II.    THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

After receiving a B.S. in mathematics and physics, Mr. Allen spent a career working for several broker-dealers before becoming Rabobank's Global Head of Liquidity and Finance.  As the manager who oversaw Rabobank's balance sheets and LIBOR submission process, Mr. Allen was in as good a position as anyone else at Rabobank to prevent the manipulation of the LIBOR rate.  Rather than using his authority as a check against subordinates who acted inappropriately, however, Mr. Allen, by participating personally in the manipulation scheme, sent the signal to everyone on the trading floor that it was acceptable to abuse Rabobank's position on the LIBOR panel for financial gain.  As Rabobank's representative to the BBA's FX and Money Market Committee, an advisory body that provided advice about the administration of the

LIBOR benchmark, Mr. Allen appreciated that the consequences of a scheme to rig LIBOR would be felt far beyond Rabobank's immediate counterparties.

Mr. Allen's trial testimony revealed a willingness to play fast and loose with the truth when it suits his interests.  Notwithstanding all of the evidence to the contrary, Mr. Allen testified that Rabobank did not consider trader positions when making LIBOR submissions.  Tr. 1266:25.  Mr. Allen also offered a number of absurd interpretations of written communications that were wildly incongruent with their plain language.  In GX 101AM, for example, Mr. Sliney asked Mr. Allen "can you please set tomorrow's 6ML as high as possible?  Have a large reset here in NY."  Mr. Allen forwarded the request to Mr. Conti, the LIBOR submitter, and Mr. Stewart, a trader who had interests in USD LIBOR.  Instead of admitting that he received a manipulation request and passed it along to Mr. Conti for the purpose of influencing the rate – which is clearly what happened – Mr. Allen offered the nonsensical explanation he was merely helping Mr. Sliney exit a large position and forwarded the email in an effort to identify another Rabobank trader who could help Mr. Sliney do so.  Tr. 1207:12-21.  Similarly, Mr. Allen denied that GX 101AJ ("I had to work my way out of an Ambass headlock to get those in") was a request for a LIBOR accommodation.  Tr. 1221:21-25.  That Mr. Allen made such incredible statements under oath does not favor him under the § 3553 analysis.

Although it is more difficult for the government to research the criminal history of a U.K. resident than for a U.S. citizen, the PSR identifies no criminal history for Mr. Allen, and the government has no reason to believe that Mr. Allen has a criminal record. While Mr. Allen has been unemployed since leaving Rabobank in March of 2009, there is no dispute that he meets his financial obligations to his family.  In addition, it should be

noted that the defendants' decision to waive extradition conserved substantial judicial resources in both the United States and United Kingdom and reduced the amount of time between the initiation and resolution of the case.[1]  The government anticipates that Mr. Allen will argue that that his waiver of extradition weighs in favor of a more lenient sentence.

### III.   THE NEED FOR THE SENTENCE IMPOSED (1) TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE; (2) TO AFFORD ADEQUATE DETERRENCE; (3) TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT; AND (4) TO PROVIDE THE DEFENDANT WITH APPROPRIATE EDUCATION OR VOCATIONAL TRAINING

The LIBOR and Foreign Exchange (FX) manipulation scandals have exposed a culture of cheating on the trading desks of many of the world's largest financial institutions that can be checked only by the incarceration of wrongdoers.  To date, eight LIBOR panel banks have entered into resolutions with U.S., U.K., European, and Asian regulators and prosecutors related to their traders' participation in schemes to rig interest rate benchmarks: UBS ($1.52 billion in 2012); Barclays ($453.6 million in 2012); Royal Bank of Scotland ($1.14 billion in 2013); Rabobank ($1.07 billion in 2013); Citigroup ($108.4 million civil settlement in 2013); Deutsche Bank A.G. ($2.5 billion in 2013 and 2015); Societe Generale ($604.7 million civil settlement in 2013); and Lloyds Bank

---

[1] While the Court may well choose to credit Mr. Allen for waiving extradition, it bears noting that the defendant's decision carried with it significant tactical benefits.  First, the defendant used his waiver of extradition as negotiating leverage with the government to secure a more favorable bond package, and further cited his waiver in support of a successful argument to remain on bond pending sentencing.  Tr. 1663:12.  Second, Mr. Allen testified to the jury that he waived extradition.  Tr. 1162:2-4.  And finally, Mr. Allen's waiver of extradition allowed him to devote resources to defending the merits of the case, rather than paying for a lengthy, costly, and probably futile extradition battle.

($370 million in 2014).  In May of 2015, Citicorp, JP Morgan Chase, Barclays, and the

Royal Bank of Scotland, pled guilty to conspiring to manipulate the price of U.S. Dollars

and Euros exchanged in the FX spot market and paid criminal fines totaling more than $6

billion.  Notably, UBS and Barclays admitted that their traders participated in this

conspiracy to rig the FX spot during the pendency of the non-prosecution agreements that

resolved allegations of LIBOR rigging.  The breadth of LIBOR and FX conspiracies

demonstrates that large numbers of traders worldwide have the means and incentive to

take advantage of others by rigging the markets in their favor and the imposition of

custodial sentences for Messrs. Allen and Conti will make those traders think twice

before doing so.[2]

   Only a considerable custodial sentence will reflect the seriousness of the offense

and promote respect for the law.  This was one of the most significant financial fraud

cases in recent history because it involved a select group of individuals entrusted with

setting a number that played such a fundamental and consequential role in the financial

system.  By the government's calculation, the scheme perpetrated by these defendants

caused market-wide losses of over $600 billion.  GX 226.  Knowing full well the

benchmark's importance, Messrs. Allen and Conti treated LIBOR like a joke, and the

sentences they receive should reflect the gravity of the betrayal of the trust that the

financial system placed in them.  Although his crime was extremely serious, the

government agrees with the defense that, as a result of this prosecution and other

enforcement actions, the defendants are unlikely to commit other financial crimes.

---

[2] The resolutions and guilty pleas listed above serve important and constructive purposes,
but they are not a substitute for individual accountability.

## IV.     THE KINDS OF SENTENCES AVAILABLE

Wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343 as well as conspiracy in violation of 18 U.S.C. § 1349 carry a maximum sentence of 30 years' incarceration per count; a period of supervised release of up to three years; a fine of $250,000; and a special assessment of $100 per count.

## V.     THE RANGE ESTABLISHED BY THE SENTENCING GUIDELINES

The United States submits that Mr. Allen's adjusted offense level is 29, representing seven levels for a base offense under § 2B1.1(b)(1); fourteen levels for loss under § 2B1.1(b)(1)(H); two levels for a scheme involving ten or more victims under § 2B1.1(b)(2)(A); four levels as a leader/organizer under § 3B1.1(a); and two levels for an abuse of trust under § 3B1.3.

### A.  There is no dispute that the defendants' base offense level is seven.

Because wire fraud affecting a financial institution carries with it a 30-year term of incarceration, the defendant's base offense level is seven under § 2B1.1(b)(1).

### B.  Although the loss caused by the defendants' conduct is difficult to calculate and is, under the unique circumstances of this case, of limited value in assessing their culpability, the government estimates that the defendants intended for their scheme to cause a loss of between $500,000 and $1.5 million under § 2B1.1(b)(1)(H).

Although the calculation of loss in this case is difficult, two things are abundantly clear: 1) the defendants intended to harm Rabobank's counterparties; and 2) they understood that their scheme would have collateral consequences for countless individuals and institutions who stood to gain or lose money from incremental movements in LIBOR.  As set forth in the declaration of FBI analyst Kyle Dornbos (marked as GX 226), the government's conservative estimate is that the defendants

7

intended to cause a loss of $1,139,952 to Rabobank's counterparties and that their conduct caused collateral losses of over $600 million throughout the markets.  Because the Guidelines define "intended loss" as the "pecuniary harm that the defendant purposely sought to inflict," the government agrees that loss for the purposes of section 2B1.1(b)(1) should be measured by the amount that the defendants sought to exact on Rabobank's counterparties, and not on the market *writ large*.  *See* U.S.S.G. § 2B1.1 Application Note 3(A)(ii).

But the Guidelines also recognize that "[t]here may be cases in which the offense level determined under [section 2B1.1(b)] substantially understates the seriousness of the offense . . . such as [where the offense creates] a risk of a significant disruption of a national financial market."  U.S.S.G. § 2B1.1 Application Note 20(A)(iv).  This is one of those cases because the loss amount measured by section 2B1.1(b) understates both the economic harm that the defendants caused and their culpability.  Because the methodology that yielded a loss number of $1,139,952 was based on Rabobank's trading positions on the days for which a trader requested a LIBOR manipulation, the government's loss estimate is limited to instances in which the conspirators rigged the rate on identifiable days (that is, either in writing or during recorded telephone calls). This excludes in-person manipulation requests, which, according to Lee Stewart, is how traders communicated their requests in the "vast" majority of instances. Tr. at 246-47; *see also* Tr. at 324 (Paul Robson testifying about in-person requests).  By tying loss to the impact that the scheme had on Rabobank's counterparties, the government's proposed loss calculation does not afford disproportionate weight to the fact that the impact of the defendants' crime was felt throughout a vast financial market.  *Contrast United States v.*

*Adelson*, 441 F.Supp. 2d 506, 507 (S.D.N.Y. 2006) (defendant's guideline range driven mainly by large loss amount reflecting widely dispersed impact on numerous shareholders).

Moreover, the guidelines understate the defendants' culpability by drawing a distinction between the harm that they "purposefully sought to inflict" on Rabobank's counterparties, *see* 2B1.1 Application Note 3(A)(ii), and collateral harm that they knew would result from the scam.  The evidence does not indicate that the defendants purposefully set out to wreck the credibility of the world's most important benchmark and cause hundreds of millions of dollars in collateral losses throughout the financial markets.  But a person acts with a high level of culpability when he knows this would be the natural and probable consequence of a scheme to gain an edge over his counterparties and just didn't care.  The premise that loss amount can be used to measure severity does not hold true where, as here, a defendant's decision to commit a scheme with such wide ranging impact to achieve relatively modest returns reveals a character of callous indifference.  Indeed, what makes section 2B1.1(b) particularly unhelpful in this matter is that it attempts to measure severity in dollars and cents when in fact the gravest harm in this case – the damage done to the integrity of LIBOR and to the public's confidence in the financial markets – is unquantifiable.

Notwithstanding these points, the government submits the Declaration of Kyle Dornbos, which summarizes his best efforts to estimate loss and concludes that Messrs. Allen and Conti's scheme intended to cause a loss of $1,139,952 to Rabobank's counterparties on interest rate swap contracts.  *See United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (district courts need not calculate loss with precision but need only

make a reasonable estimate).[3]  Because the swaps market is a zero sum system in which

one party's gain is another party's loss, the defendants' loss amount should be measured

by the amount of money that Rabobank traders hoped to gain from their efforts to

manipulate the USD and JPY LIBOR rates.[4]  Here, the defendants' *intended* loss is the

relevant consideration because it is unlikely that they were successful in moving the

overall LIBOR "fix" on each attempt.  *See* U.S.S.G. § 2B1.1 Application Note 3(a) ("loss

is the greater of actual or intended loss").  Because Application Note 3 specifies that

"intended loss" includes "intended pecuniary harm that would have been impossible or

unlikely to occur," the defendants should be held to account for instances in which the

manipulated rate that they submitted to the BBA could not, as a matter of mathematics,

have changed the overall average.  This would have happened where, for example, the

defendants' attempt to move the overall fix was thwarted by unforeseen submissions of

other panel banks.

Messrs. Allen's and Conti's intended loss should include losses resulting from

manipulation attempts undertaken by their co-conspirators because the jury convicted

them of participating in a scheme to defraud.  The Guidelines now ask the Court to

---

[3] Mr. Dornbos's declaration does not purport to explain every step of his analysis.  The government provided in discovery the work papers underlying Mr. Dornbos's calculations as well as the data upon which he relied.  In lieu of a direct examination, the government proposes to establish loss through Mr. Dornbos's declaration.  Mr. Dornbos will be available for cross-examination at the sentencing hearing if defense counsel conclude that it is necessary.  With the goal of obviating the need for cross-examination, the parties have worked to narrow the issues in dispute and the United States has agreed to execute a written stipulation.

[4] The government does not raise the issue of the defendants' gain as an alternative to calculating loss.  *See* U.S.S.G. § 2B1.1 Application Note 3(B) (allowing for the use of a defendant's gain when loss cannot be determined).  Rather, in the context of interest rate swaps, gain and loss are one and the same.

determine the "pecuniary harm that the defendant purposely sought to inflict."  U.S.S.G.

§ 2B1.1 Application Note 3(A)(ii).  But because section 2B1.1 focuses on the

characteristics of the "offense," which, in this case, was a scheme to defraud (and not the

loss resulting from each step taken individually by the defendant) the question is how

much loss Messrs. Allen and Conti intended for the *scheme* to inflict.  Where the

defendant was convicted of a "jointly undertaken criminal activity," such as a scheme to

defraud, specific offense characteristics should be determined on the basis of "all acts and

omissions of others that were (i) within the scope of the jointly undertaken criminal

activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in

connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).

Messrs. Allen and Conti are responsible for the losses caused by their co-

conspirators' attempts to manipulate the USD and JPY LIBOR – including manipulation

attempts of which they were not directly aware, but which were foreseeable to them –

because Messrs. Allen and Conti were active and fully informed participants in the

scheme.  Every attempt by Rabobank traders to manipulate USD and JPY LIBOR is

within the scope of the scheme, the purpose and object of which was to rig these rates to

Rabobank's advantage.  As the jury found, Messrs. Allen and Conti participated actively

in the scheme and were well aware that others (including Lee Stewart, Paul Robson,

Takayuki Yagami, Tetsuya Motomura, Christian Schleup, and Justin Sliney) were doing

the same.[5]  Messrs. Allen and Conti were not simply *aware* that their colleagues were

---

[5] Stewart testimony: Tr. 186:17-19; 188:15-18; 191:9-11 189:14 – 190:9; 191:5-11;
192:1-15; 234:17 – 235:8; 283:9-11.  Robson testimony: Tr. 323:11-16; 324:2-24.
Yagami testimony: Tr. 688:17 – 689:5; 689:6 – 690:3; 702:9-12; 785:21-23; GX 101AA
(Schleup to Allen & Conti); GX 101AD (Schleup to Conti); GX 101AF (Yagami to
Allen, Conti & Paul Butler); GX 101AJ (Schleup to Allen); GX 101AM (Sliney to

manipulating the rate, they *intended* for their conspirators to do so because one of the objects of the conspiracy was to increase Rabobank's bonus pool, which was determined by the overall performance of the bank and not just trades executed by Messrs. Allen and Conti individually.[6]

As set forth in the government's declaration, Mr. Dornbos's loss analysis was based on 201 documented manipulation requests, many of which did not include Messrs. Allen and Conti as direct participants.  *See* GX 227 and GX 228 (identifying communications).  The inclusion of these manipulation events is appropriate because the defendants intended for other traders to attempt to enlarge the bonus pool by manipulating the LIBOR rate to favor their derivative positions.  Notably, and again, the government's analysis of loss does not attempt to assign losses to manipulation that was

Allen); GX 101C (Schluep to Allen); GX 101E (Schluep to Allen); GX 101G (Schluep to Allen); GX 101I (Schluep to Conti); GX 101J (Schluep to Conti); GX 101L (Schluep to Conti); GX 101Q (Yagami to Allen & Conti); GX 101X (Schluep to Conti); GX 101Y (Schluep to Allen); GX 106B (Schluep to Conti); GX 115A (Yagami to Conti); GX 126 (Thompson to Allen); GX 128 (Yagami to Conti & Jeroen Beaard); GX 134 (Yagami to Conti, Robson, Butler & Damon Robbins); GX 152 (Schluep to Conti); GX 201A (Thompson to Robson); GX 701 (Stewart to Conti); GX 1001 (Schluep to Conti); GX 1601 (Stewart to Conti).

[6] *See* Tr. 1206:7-8 (Mr. Allen: "I believed [the traders] were doing it to better themselves, to benefit the bank and make more money"); Tr. 1293:4-14 (Mr. Allen's supervisor telling him that "squeezing [the] maximum out of the various books is vital" and "bonuses . . . are key to the future"); GX 104C (Mr. Conti arguing for a larger bonus based on his book performance); Tr. 256:4-11 (Mr. Stewart confirming that the size of the bonus pool "influence[s] . . . the size of the bonus that a trader gets"); Tr. 408:8-12 (Mr. Robson explaining that "as long as the bank performed well, [it] would then set aside a sum of money to pay additional bonuses from, and that decision was left to Mr. Allen to decide how that some of money was divided up between the team"); Tr. 705:15-17 (Mr. Yagami's understanding that "traders' performance affect[s] the bonus pool of trading desk as a whole, and this performance, overall performance makes the bonus performance of senior management").

done in person, even though the testimony established that only a fraction of the scheme was accomplished through written or recorded communications.

Having identified 201 instances in which the schemers conspired in writing or on tape to manipulate the USD and JPY LIBORs, Mr. Dornbos used trading data provided by Rabobank to determine the size of Rabobank's derivative positions on the days in question.[7]   Assuming that Rabobank skewed its submission by one basis point to accommodate a trader's request – which is conservative considering that traders often made written requests for swings of as much as five basis points – Mr. Dornbos calculated the amount by which Rabobank's net swaps position would have improved if the overall LIBOR fix moved by 1/8 of a basis point in a direction favorable to the bank. Because the LIBOR fix was taken by averaging the middle eight panel bank submissions, one bank's decision to skew its submission by a single basis point would, under most circumstances, move the fix by 1/8 of a basis point.  Applying this methodology, Mr. Dornbos concluded that, for the selected written manipulation events at issue, Rabobank profited by $1,139,952, which caused a corresponding loss to Rabobank's counterparties and other market participants upon whom these counterparties shifted exposure through hedging transactions.

_____

[7] Mr. Dornbos calculated the size of Rabobank's trading positions in the manner most favorable to the defendants.  Specifically, he did so by excluding from his analysis Rabobank's futures positions which, like interest rate swaps, are sensitive to movements in LIBOR but which, unlike swaps, may be existed before maturity (generally through sale on the Chicago Mercantile Exchange).  The evidence at trial established that Rabobank traders executed futures contracts tied to LIBOR.  *See* Tr. 166:13-14; 177:21-25 (testimony of Lee Stewart).  Because Rabobank's trading data did not record if or when Rabobank exited a particular futures position, we were unable to identify the amount of exposure that Rabobank's counterparties had to futures contracts on the days in question.

Mr. Dornbos's analysis does not attempt to exclude losses that were mitigated by any hedged positions taken by Rabobank's counterparties which would have reduced losses on the days in question.  Whether or not Rabobank's counterparties were hedged is irrelevant because the evidence established that the defendants intended for them to pay out more money under their swaps.  Moreover, the extent to which Rabobank's counterparties were hedged is a completely fortuitous coincidence for which the defendants cannot claim credit.  Courts have interpreted U.S.S.G. § 2B1.1 Comment 3(E) (credits against lost) as applying only to recoveries brought about by the defendant's intentional action.  *United States v. Wolfe*, 71 F.3d 611, 618 (6th Cir. 1995) (defendant not entitled to offset funds returned to victims of his Ponzi scheme by a bankruptcy trustee because "the agency of another cannot be used to reduce the amount of loss"); *United States v. Harris*, 38 F.3d 95, 99 (2d Cir. 1994) (defendant not entitled to offset tax write-offs taken by victims of his fraud scheme); *United States v. McAlpine*, 32 F.3d 484, 489 (10th Cir. 1994) (defendant not entitled to take credit for "the victim's receipt of something of value").

As a practical matter, whether or not Rabobank's counterparties took positions that offset the damage caused by the defendants' conduct has no bearing on the defendants' culpability.  In limiting intended loss to the damage that the defendants "purposefully sought to inflict," the Sentencing Commission underscored the notion that a district court's analysis of loss "should focus more specifically on the defendant's culpability."  April 30, 2015 Amendments to the Sentencing Guidelines at page 25. Because there is no evidence that the defendants reconstructed the net LIBOR sensitivity of other market participants and decided to defraud only those counterparties that they

14

perceived as hedged, whether or not Rabobank's counterparties had offsetting positions has no bearing on their culpability.  Indeed, given that swaps trading is a zero-sum venture, the defendants understood that any profits realized on a swap contract with a perfectly hedged counterparty came from the pocket of another market participant.

### C. The Court should apply a two-level enhancement under section 2B1.1(b)(2)(A) because the defendants' scheme involved ten or more victims.

The defendants' scheme involved ten or more victims, which the guidelines define as any individual or company that "sustained any part of the actual loss determined under subsection (b)(1)."  Comment 3 further defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."  Because victims, for the purposes of this enhancement, must sustain an "actual loss," the United States may make this showing by identifying instances in which the conspirators successfully changed the LIBOR rate to the detriment of at least ten counterparties.  While most written manipulation attempts involve a directional request but do not specify what Rabobank's "true" number would have been, the record contains three examples of cases in which the submitter expressed what Rabobank's submission would have been absent the trader's accommodation request.[8]  To determine the resulting victims, FBI analysts calculated what the LIBOR fix would have been had Rabobank submitted the number first identified by the submitter and then searched Rabobank's trading data to identify counterparties

---

[8] In GX 101N, for example, Mr. Yagami asked Mr. Robson where he intended to set LIBOR, to which Robson responded "bookies reckon 1m sets at .85."  Mr. Yagami explained that his derivative position would benefit from a higher LIBOR fix and asked Mr. Robson to submit 0.90, which Mr. Robson did.  In GX 601A, Mr. Robson indicated to Mr. Yagami that brokers were predicting six-month LIBOR to set at 1.03 and added "but will set your level cheers any orders?"  Mr. Yagami responded by asking for LIBOR to be set a couple of basis points higher and Robson responded that he would do so.

who held positions that were adversely affected by the movement in the fix.  GX 226.

This methodology revealed ten counterparties who sustained an actual loss.

| Exhibit | Fixing Date | Tenor | Rabo's "true" rate | Actual submission | Victim | Change in the fix |
|---------|-------------|-------|--------------------|-------------------|--------|-------------------|
| 901B1 | 5/10/06 | 6m JPY | 0.3 | 0.26 | Standard Chartered Bank | 0.25 bp |
| 101N | 9/21/07 | 1m JPY | .085 | 0.9 | BNP Paribas<br><br>JPMC<br><br>Südwestdeutsche Landesbank Girozentrale | (0.375) bp |
| 601A | 3/19/08 | 6m JPY | 1.03 | 1.1 | Bank of America<br><br>Barclays Bank PLC<br><br>Deutsche Bank<br><br>Societe Generale<br><br>Merrill Lynch<br><br>Citigroup Global Markets | (0.125) bp |

Because the evidence summarized above demonstrates that the conspirators

successfully moved the LIBOR rate to the detriment of positions held by ten different

institutions, their actions caused "actual loss."  For the reasons stated above, because the

conspirators moved LIBOR in a way that benefitted Rabobank's swaps with these ten

counterparties, it does not matter whether these counterparties executed offsetting hedge

trades or whether they had a net sensitivity to LIBOR.  What matters for this analysis is

that they paid more money on their swaps with Rabobank than they would have absent the LIBOR manipulation.

### D. The Court should apply a four-level aggravating role enhancement under section 3B1.1(a).

A four-level enhancement under § 3B1.1(a) for Mr. Allen's aggravating role as an organizer or leader of a criminal activity that involved five or more participants is appropriate in this case. Among the factors set forth by the Sentencing Commission, Mr. Allen's exercise of decision making authority, the nature of his participation in the commission of the offense, and the degree of control and authority he exercised over others are the most relevant. *See* U.S.S.G. § 3B1.1 cmt. n.4.

Starting with those factors, which overlap to a significant extent, evidence adduced at trial and developed during the investigation demonstrates that Mr. Allen was an organizer or leader. Mr. Allen was the head of Rabobank's London desk and the Global Head of Liquidity and Finance, and the LIBOR submitters answered to him. Paul Robson testified that Mr. Allen authorized accommodating manipulation requests and resolved conflicts regarding LIBOR submissions.[9] Mr. Yagami testified that when he was unsure to whom he should send his manipulation requests, he would send them to Mr. Allen as a means of "making very, very sure . . . this request [was] taken care of."

---

[9] Specifically, Mr. Robson said that he went to Mr. Allen for approval to accommodate manipulation requests from Asian traders, and Mr. Allen gave his approval. Tr. 323:12-16; Tr. 327:13 – 328:9. Mr. Robson also testified that, on an occasion when he was acting as the back-up United States Dollar LIBOR submitter, he once mistakenly failed to account for the trading positions of Rabobank employee Lee Stewart, who became very upset with Mr. Robson. After the situation calmed down, Mr. Allen instructed Mr. Robson, "[j]ust make sure you check with [Mr. Stewart] next time." Tr. 402:19-22. Mr. Robson went on to explain more generally that when there was a conflict about which trader positions should be accommodated by the day's LIBOR submission, "Mr. Allen would calm things down and would make a decision." Tr. 403:1-3.

Trial Tr. at 690:2-3.  And Christian Schluep, a derivatives trader who did not testify at trial, explained to the FBI and DOJ attorneys: "If anyone at the bank would have been the person to tell SCHLUEP this type of behavior was wrong, it would have been ALLEN, and ALLEN never did so.  In fact, he received neutral to encouraging responses from both ALLEN and CONTI related to requests he made for LIBOR rate accommodation.  He learned the behavior in part from ALLEN . . . ."  *See* GX 184 (memorializing Mr. Schleup's statement).

Other factors such as the recruitment of accomplices and the claimed right to a larger share of the fruits of the crime also weigh in favor of the application of an aggravating role enhancement.  First, Mr. Allen recruited Mr. Robson, who testified that when he started receiving requests from Asian traders, he sought guidance from Mr. Allen, who instructed Mr. Robson to accommodate their requests.  Tr. 323:12-16.  Mr. Allen also recruited Paul Butler, a back-up JPY LIBOR submitter.  During an FBI interview, Mr. Butler said that Mr. Allen instructed him "to speak with the Far East guys, named YAGAMI and THOMPSON, who were traders handling all JPY-related products, to find out what rates he should submit."

Second, Mr. Allen claimed a larger share of the fruits of the crime.  Mr. Robson testified that, when there were LIBOR submission disputes due to conflicting trader positions, Mr. Allen "[i]nvariably" resolved the disputes in favor of his own "dollar book."  Tr. 403:8-10.  But more generally, witness testimony established that the better their books performed, the bigger the bonus pool and the bigger their bonuses, and that Mr. Allen determined bonuses for those he supervised.  Tr. 255:21 – 256:11 (Mr. Stewart); Tr. at 407:3-12 (Mr. Robson); Tr. 696:14 – 697:9 (Mr. Yagami).  Although

Mr. Allen did not determine his own bonus, it is a fair inference that he would not have doled out bonuses to his underlings larger than his own.  Indeed, a comparison of his bonuses with Mr. Conti's bonuses reveals exactly that.  *Compare* RABO_DOJ_0003330 (Mr. Allen's 2006 bonus of £575,000), RABO_DOJ_0003333 (Mr. Allen's 2007 bonus of £575,000) *with* RABO_DOJ_0003388 (Mr. Conti's 2006 bonus of £140,000), RABO_DOJ_0003390 (Mr. Conti's 2007 bonus of £130,000).

### E.  The Court should impose a two-level enhancement for abuse of trust under § 3B1.3.

According to the Sentencing Guidelines, a 3B1.3 enhancement applies where a defendant's position of trust "significantly facilitated the commission or concealment of the offense," U.S.S.G. § 3B1.3, and, in that position, the defendant was afforded "substantial discretionary judgment that is ordinarily given considerable deference." U.S.S.G. § 3B1.3 cmt. n.1.  Although the position of trust "must be entrusted to the defendant by the victim," *United States v. Broderson*, 67 F.3d 452, 455-56 (2d Cir. 1995), abuse of trust enhancements are not limited to fiduciary relationships.  *United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999).  Indeed, "a § 3B1.3 enhancement may apply whether the person whose trust a defendant abused was the 'primary' or a 'secondary' victim of the crime." *United States v. Roberts*, 660 F.3d 149, 164 (2d Cir. 2011).

Misplaced trust was the fuel that propelled this scheme.  Because Rabobank rarely borrowed money on the days that the conspirators manipulated the rate – much time at trial was dedicated to describing the "lack of liquidity" during the financial crisis – its LIBOR submitters were not constrained by hard data and instead exercised

discretion in making Rabobank's submissions.[10]  The evidence at trial showed that both

the BBA and Rabobank's counterparties entrusted the defendants to undertake a good

faith estimate of Rabobank's borrowing costs.  The trust that the BBA placed in the

defendants as the agents of a panel bank was illustrated during a recorded conversation in

which the BBA's John Ewan responded to Mr. Allen's defense of a Rabobank LIBOR

submission by saying: "[t]hat's absolutely fine.  I mean, it's not my job and I really don't

want to try and ever be accused of telling you where to put your LIBORs, so it's basically

if you're happy and you reckon you can stand by that, that's cool."  GX 109B.  Although

the abuse of trust enhancement is applicable to secondary victims, *see United States v.*

*Friedberg*, 558 F.3d 131, 134 (2d Cir. 2009) (I.R.S. considered secondary victim), by

entering into swap agreements linked to LIBOR, Rabobank's counterparties entrusted the

defendants to set the benchmark according to the rules.[11]  This is because Rabobank's

counterparties entered into swaps that were pegged to a number over which Messrs. Allen

---

[10] Tr. 83:4-11 (Mr. Schachter: "because there was no interbank lending and the hypothetical question that they are supposed to be answering when they log onto the website is: what rate can I borrow from another bank?  That became a much rougher estimate"); Tr. 160:3-4 (Dr. Harris testifying that the definition of LIBOR allowed for some discretion); Tr. 679:19-23 (Mr. Yagami: "because there was no prices in the market, it would make easier for traders to manipulate or to request the LIBOR's than before"); Tr. 1038:19-25 (Dr. Subrahmanyan: "there was a lot of room for estimation error because there's a whole range of numbers and one could never be sure what the right number was because there was so much uncertainty in the market"); Tr. 1073:1-5 (Dr. Subrahmanyan: "the submission by a bank ought to be an honest and truthful estimate of the borrowing cost for that maturity, tenor, and currency on that particular day at around 11 a.m. London time.  That is the question by the British Bankers Association").

[11] Tr. 500:13-14 (Mr. Smith testifying that he perceived LIBOR as the rate at which banks could borrow money); Tr. 828:5-8 (Ms. Twomey: "I always had the understanding LIBOR was something that couldn't be manipulated; that it was set by a group of banks. It was a representative interest rate out in the market and couldn't . . . be manipulated");

and Conti had influence.  As Mr. Robson explained, the conspirators abused this trust: "[w]e had a privileged access to a number, a reference number, and we were using it to our own benefit."  Tr. at 322:15-17.

The defendants also abused the trust of their employer, Rabobank.  In *Roberts*, the defendant's employer was found to be a secondary victim because his criminal conduct exposed the employer to harm in the form of "public criticism . . . with possible adverse consequences to . . . business operations," and "to criminal scrutiny and the possibility of fines or forfeiture."  660 F.3d at 164-65.  *See also United States v. Ojemen*, 465 Fed. App'x 69, 71 (2d. Cir. 2012) (holding that the defendant's criminal conduct "cast [the employer] in an unfavorable light with possible adverse consequences for its operations").  The application of a section 3B1.3 enhancement is appropriate because the defendants used their employment in furtherance of a scheme that required Rabobank to pay hundreds of millions of dollars in fines and caused considerable damage to the bank's reputation.

## VI.   THE NEED TO AVOID SENTENCING DISPARITIES AMONG DEFENDANTS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

The only person to date who has been sentenced for manipulating LIBOR is Tom Hayes, a former derivative trader at UBS and Citigroup, who ultimately received an eleven-year sentence in the United Kingdom.  *See R. v. Hayes*, [2015] ECWA Crim. 1944, Court of Criminal Appeal (Dec. 21, 2015) (re-sentencing the defendant to eleven years).  Unlike Mr. Hayes, who was a "line level" trader who rigged LIBOR to suit his own positions, Mr. Allen was a supervisor who helped implement a policy of manipulation.  On the other hand, these two cases are distinguishable on the grounds that

Mr. Hayes engaged in manipulation more frequently than anybody at Rabobank, generally took larger positions than Rabobank's traders, and enlisted the help of cash brokers to move the rate.  While the government concedes that the unique circumstances of Mr. Allen's conduct coupled with his personal characteristics would render an eleven year sentence greater than necessary to achieve the objectives of 18 U.S.C. § 3553, the fact that Mr. Hayes received a sentence of over a decade in prison demonstrates that both the trial and appellate courts in England considered LIBOR manipulation to be an extremely serious offense.

## VII.    A FINE IS WARRANTED BECAUSE THE NATURE AND BREADTH OF MR. ALLEN'S CRIME RENDERS CALCULATION OF RESTITUTION IMPRACTICABLE

Restitution for wire fraud and conspiracy is mandatory under the Mandatory Victim Restitution Act ("MVRA") where an "identifiable victim" has suffered a "pecuniary loss."  *See* 18 U.S.C. § 3663A(c)(B).  The MVRA does not apply, however, to cases in which "the court finds, from facts on the record, that (A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3).  "Unlike loss under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative metrics, such as gain."  *United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008).  For the reasons set forth below, the United States submits that the MVRA is inapplicable under both prongs of section 3663A(c)(3).

As to the first prong, the vastness of the market of instruments linked to LIBOR, which, by the BBA's estimate, includes "$350 trillion in interest rate swaps and $10 trillion in loans," *see* GX 108D, makes the identification of victims impracticable.  This is because any credit card holder, mortgagor, derivative trader (including swaps, futures, and forwards), debtor, or lender with an interest in movements in LIBOR is a potential victim of the scheme.  Even the universe of victims in the swaps market who sustained losses as a result of the defendants' efforts to defraud Rabobank's counterparties is extraordinarily difficult to ascertain.  Based on Rabobank's trading data, the United States identified 2,742 counterparties who held swaps with Rabobank which fixed on the 254 dates identified in GX 227 and GX 228.  But restitution under the MVRA would require the Court to determine whether any of these counterparties, by virtue of hedging transactions with other entities, passed any portion of their losses on to other downstream swaps traders.  *See* 18 U.S.C. § 3664(j)(1) ("if a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obliged to provide the compensation").  Hence, the MVRA appears to require the government identify any entity to which any of these 2,742 counterparties "unloaded" even a portion of their loss.

Even if the identification of such a large class of victims were feasible, it is impractical to determine the net exposure to LIBOR of each of Rabobank's counterparties as well as the out-of-pocket losses that those counterparties passed on to downstream hedge counterparties.  This is because complex financial institutions frequently have sensitivity to LIBOR that comes from sources other than their swaps with Rabobank (for example, a financial institution that was "short the fixing" on its swap

with Rabobank may nonetheless reap a net profit from rising interest rates because it financed mortgage loans pegged to LIBOR).  Because this crime involves an extremely large number of victims who each sustained various losses (frequently as small as tens or hundreds of dollars per swap), the burden of reconstructing the net sensitivity to LIBOR for thousands of financial institutions far outweighs the societal benefits of restitution, especially considering that each dollar of restitution would be split among thousands of victims.

Moreover, in light of difficulties in determining what percentage of the defendants' bonuses were attributable to the performance of Rabboank's swap trades, the United States is not seeking forfeiture, which "focuses on the disgorgement by a defendant of his 'ill-gotten gains.'"  *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) ("the calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain").  Although the object of the conspiracy was to benefit Rabobank's financial position, which would in turn increase the size of the "bonus pool," the government lacks sufficient data to establish the portion of Mr. Allen's discretionary bonuses – which, in addition to salary, came out to over $1 million per year in 2005 and 2006 – that were attributable to the performance of Rabobank's interest rate swaps. Indeed, it would be fair to conclude that a substantial portion of Mr. Allen's bonus related to his duties managing Rabobank's cash needs, which was his primary responsibility.

Because he committed a fraud scheme in which the identification of restitution and forfeiture is impracticable, the Court should impose upon Mr. Allen a fine of $150,000, the maximum recommended under the guidelines for an offense that yields a guideline level between 29 and 31 levels.  "The court shall impose a fine in all cases,

24

except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). For offenses committed prior to November 1, 2015, the Guidelines instruct the Court to apply the fine range set forth in the 2014 version of the Guidelines. U.S.S.G. § 5E1.2(h)(1). The maximum fine for a felony is $250,000. 18 U.S.C. § 3571(b)(3). The PSR at para. 101 makes clear that Mr. Allen has the financial wherewithal to pay a fine. Although a fine would undoubtedly have negative consequences on his family, the fact that Mr. Allen has been idle since his separation from Rabobank in 2008 demonstrates that he is a man of unusual means. The most compelling reason for the imposition of a fine is that, due to difficulties in calculating restitution and forfeiture, the defendants would otherwise avoid a monetary penalty. *See* U.S.S.G. 5E1.2(d)(4) and (8) (courts should consider the defendant's restitution obligation as well as "pertinent equitable considerations" in determining the amount of a fine). Given that the defendants committed a scam designed to enrich themselves at the expense of others, the equities favor the imposition of a fine.


Dated: Washington, DC
      March 3, 2016

ANDREW WEISSMANN                         JEFFREY D. MARTINO
Chief, Fraud Section                     Chief, New York Office

/s Brian R. Young                        /s Michael T. Koenig
CAROL SIPPERLY                           MICHAEL T. KOENIG
Senior Litigation Counsel                Trial Attorney
BRIAN R. YOUNG                           U.S. Department of Justice
Assistant Chief                          Antitrust Division
U.S. Department of Justice               450 5th Street, N.W.
Criminal Division                        Washington, D.C. 20001
1400 New York Ave., N.W.                 (202) 616-2165
Washington, D.C. 20005
(202) 616-3114