**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,      :

     :

    v.      :

     :   Case No. S4 14-CR-272 (JSR)

ANTHONY ALLEN,      :

PAUL THOMPSON,      :

TETSUYA MOTOMURA, and      :

ANTHONY CONTI,      :

     :

     Defendants.     

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**SENTENCING SUBMISSION**</u>
<u>**ON BEHALF OF ANTHONY ALLEN**</u>

**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant Anthony Allen*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................4

I. CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A LENIENT SENTENCE. .................................................................................5

    A. Mr. Allen's History and Character.................................................................5

    B. The Nature and Circumstances of the Offense. ..............................................14

    C. A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases. ...........................................................19

    D. A Non-Custodial Sentence is Sufficient to Deter Others.................................23

II. THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE. ......................24

    A. Mr. Allen Was Not the Leader of the Criminal Scheme..................................24

        1. The Criminal Scheme Began When Mr. Allen was a Junior Trader Without Any Management Responsibility................................................25

        2. Mr. Allen Did Not Exercise Any Decision-Making Control Over the Criminal Scheme...................................................................27

        3. The Nature of Mr. Allen's Participation Does Not Support a Leadership Enhancement. ...................................................................31

        4. Mr. Allen Did Not Recruit Any Accomplices. ..........................................32

        5. Mr. Allen Did Not Claim a Right to a Larger Share of the Fruits of the Crime...................................................................................32

        6. Mr. Allen Did Not Engage In Any "Planning" or "Organization" of the Offense. ...............................................................................32

        7. Mr. Allen Did Not "Control" Any Other Participant in the Scheme.........33

    B. No Loss, Actual or Intended, Resulted From the Offense..................................35

        1. The Sentencing Commission Significantly Revised the Definition of "Intended Loss" Effective November 1, 2015.......................................36

        2. The Government's Estimate of Intended Loss, as described in the PSR, is Incorrect. .......................................................................40

i

C.      There is No Evidence that Mr. Allen Intended a Loss to the World
        Financial Markets of $300,000,000 or More. ........................................................47

D.      There Are No Victims of the Offense.....................................................................51

E.      An Abuse of Trust Enhancement is Inapplicable. .................................................52

CONCLUSION.............................................................................................................................57

# TABLE OF AUTHORITIES

Cases                                                                      Page(s)

*Gall v. United States*,
    552 U.S. 38 (2007)........................................................................................4, 24

*United States v. Broderson*,
    67 F.3d 452 (2d Cir. 1995)..........................................................................36, 53

*United States v. Brunson*,
    54 F.3d 673 (10th Cir. 1995) ...........................................................................54

*United States v. Chavez*,
    549 F.3d 119 (2d Cir. 2008)..............................................................................33

*United States v. DeGovanni*,
    104 F.3d 43 (3d Cir. 1997)................................................................................33

*United States v. Ebbers*,
    458 F.3d 110 (2d Cir. 2006)........................................................................45, 47

*United States v. Eisner*,
    59 F. App'x 379 (2d Cir. 2003) ........................................................................32

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)..............................................................4, 5

*United States v. Hirsh*,
    239 F.3d 221 (2d Cir. 2001)..............................................................................53

*United States v. Jean*,
    29 F. App'x 652 (2d Cir. 2002) ........................................................................32

*United States v. Jolly*,
    102 F.3d 46 (2d Cir. 1996)....................................................................53, 54, 56

*United States v. Leonard*,
    37 F.3d 32 (2d Cir. 1994) .................................................................................33

*United States v. Manatau*,
    647 F.3d 1048 (10th Cir. 2011) ..................................................................38, 39

*United States v. Rutkoske*,
    506 F.3d 170 (2d Cir. 2007)........................................................................45, 46

*United States v. Skys*,
    637 F.3d 146 (2d Cir. 2011)..............................................................................52

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)..................................................................................................23


Other Authorities

U.S. Sentencing Guidelines Manual §3B1.1 cmt. n.4 (U.S. Sentencing Comm'n 2015)..............25

U.S. Sentencing Guidelines Manual §2B1.1(b)(1) cmt. n.3 (A)(i)-(ii)
    (U.S. Sentencing Comm'n 2015).......................................................................................36

U.S. Sentencing Guidelines Manual §2B1.1(b)(1), cmt. (n.1)
    (U.S. Sentencing Comm'n 2015).......................................................................................51

U.S. Sentencing Guidelines Manual §2B1.1(b)(1), cmt. (n.3(i), (iii))
    (U.S. Sentencing Comm'n 2015).......................................................................................52

U.S. Sentencing Guidelines Manual §3B1.3 (U.S. Sentencing Comm'n 2015)...........................53

Defendant Anthony Allen respectfully submits this memorandum to aid the Court in his sentencing, currently scheduled for March 10, 2016.

**INTRODUCTION**

Anthony Allen is deserving of the Court's mercy and leniency.  One hundred and sixty-five people have written letters to the Court on Mr. Allen's behalf, attesting to and describing his character and integrity.  Each one describes the man they know, and have known, for upwards of four decades.  Each letter pleads with the Court to exercise compassion for a father and a family that have already suffered mightily.

As the letters attest, Mr. Allen is, above all else, a loving and caring father to two little girls, Neve and Faye.  Mr. Allen has been a stay-at-home dad for the entirety of his daughters' lives: he cooks dinner every night for his family, volunteers at the girls' school, and spends his afternoons at ballet and gymnastics classes in the rural English town in which he and his family reside.  Mr. Allen's five-year old daughter, Faye, was born with a birth defect and Mr. Allen has spent years caring for her through multiple surgeries and health-related challenges, which will persist into the foreseeable future.  Neve, age eight, is famous in town for her morning bicycle rides to school with her dad.  Mr. Allen and his partner, Tracy, have been together since they were both college students, a twenty-five year partnership.  By all accounts, they are a close and loving young family.  Losing Mr. Allen to a custodial prison sentence, three thousand miles from home, would be a tragedy almost beyond contemplation.

Mr. Allen has never demonstrated a proclivity towards the excesses and immorality often associated with white-collar criminals.  Rather, he has led an exemplary life of integrity and is well-known in his community as a gentle and kind man.  He has never before been arrested or convicted of a crime.  His respect for the law was demonstrated by his voluntary appearance here to answer these charges.  Unlike several of his co-defendants, Mr. Allen

immediately waived extradition from the United Kingdom, even though he could have engaged the United States in a lengthy extradition battle, a fact which we submit warrants meaningful consideration by the Court.

Just as Mr. Allen is different from most convicted of fraud offenses, Mr. Allen's conduct is far outside the heartland of fraud cases. This case bears almost no relation to typical fraud cases where one preys on the powerless or uneducated, in a scheme motivated by greed. The alleged offense here was not intended to line Mr. Allen's pockets; the crime was Mr. Allen's alleged consideration of his employer's interests when making LIBOR submissions. Mr. Allen gained not one nickel from the offense. The parties alleged to have been deceived were almost entirely large financial institutions which were themselves engaged in identical conduct. In addition, the Government has not, and cannot, show any pecuniary loss suffered by any of Rabobank's sophisticated counterparties.

In addition to the lack of evidence of personal gain or pecuniary loss, the conduct in this case differs from most fraud cases in that it was so enormously widespread as to have become virtually an accepted industry practice. The practice of making and receiving requests to submit a higher or lower LIBOR rate to benefit swap trades was engaged in by at least seventeen different employees at Rabobank alone. The Government's own cooperating witness, Lee Stewart, testified that it wasn't considered "inappropriate" at Rabobank for swap traders to ask LIBOR setters to make certain LIBOR submissions, and the requests were made out in the open, with the knowledge of senior employees and even internal audit. Even so, Mr. Allen's involvement in the conduct at issue was limited. Mr. Allen submitted LIBOR only approximately twice a year, and over a four-year period, he received only sixteen LIBOR requests. He responded to just four.

The conduct at issue in this case extended far beyond Rabobank.  As shown in a chart attached as Exhibit 11, which summarizes the Government's allegations in its various LIBOR-related prosecutions, identical conduct was engaged in by *more than 125 employees* of at least *10 different financial institutions*.  Even high ranking public officials engaged in similar conduct.  The Deputy Governor of the Bank of England, Paul Tucker, instructed Barclays to submit "low" LIBOR rates, in an effort to disguise Barclays's difficulties during the financial crisis.  Regulators at the Swiss National Bank were nervous that the national bank would not able to meet its targets and therefore instructed LIBOR setters at both UBS and Credit Suisse to change their LIBOR submissions to ensure the SNB would meet its projections.  Mr. Allen himself reported the conduct to investigators from the Federal Reserve, and the British Bankers Association was well aware of it.  The pervasiveness of the offense conduct is brought to the Court's attention not to suggest that it excuses improper behavior, but rather so the Court, in fashioning a sentence, can avoid unwarranted sentencing disparities.  The fact is that many individuals who engaged in identical conduct will go unpunished.  Mr. Allen's sentence should reflect this disparity, as well as the fact that Mr. Allen has always been a law-abiding, responsible citizen, known for his kindness and decency.

The allegations, trial, and jury verdict against Mr. Allen have already wreaked irrevocable harm on his life, and that of his family.  His reputation has been destroyed.  His picture has been published in every major newspaper in the world as the face of white-collar greed and his name will forever be linked to this trial and the jury's verdict.  Mr. Allen's life savings have been spent to pay for his defense.  Most devastating of all is the suffering endured by his family over the last two years.  Despite his best efforts to protect them, Mr. Allen's young daughters have been deeply affected by the stress of the trial.  They are terrified of losing their

father, and have begun sleeping badly at night and crying during school.  His partner Tracy is distraught, both by the verdict and the prospect of raising Neve and Faye alone, while Mr. Allen is imprisoned three thousand miles away.  In short, this is a man who has already been punished severely.

As this Court has stated on many occasions, it is a man's whole life that matters at sentencing.  Accepting the jury's verdict for purposes of sentencing, we respectfully submit that when Mr. Allen's entire life, and the punishment he has already suffered, are weighed, the Court can determine that a custodial sentence would be greater than is necessary to achieve the sentencing purposes of section 3553(a).  This is especially true considering that two little girls will be irrevocably damaged if their father is sentenced to prison in a foreign country far from home.  In this instance, a non-custodial sentence would fully satisfy both the objectives of sentencing and the call of justice.

## ARGUMENT

As this Court has noted, "imposing a sentence on a fellow human being is a formidable responsibility."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The responsibility carries with it the obligation to "consider every convicted person as an individual and every case as a unique study," and, for that reason, judges are given both flexibility and deference, so that they may freely exercise compassion in the face of the "the human failings" that can, and do, lead good people temporarily astray.  *Gall v. United States*, 552 U.S. 38, 52 (2007) (internal citations omitted).

Sentencing a man requires "great care and sensitivity" because the "facts and factors" that must be weighed are numerous and important.  *Gupta*, 904 F. Supp. 2d at 350. While a sentencing court is required to "correctly calculat[e] the applicable Guidelines range," *see Gall*, 552 U.S. at 49-50, that calculation falls "second" to "the bedrock" of federal

sentencing, 18 U.S.C. § 3553(a), which "requires a court to take account of a defendant's character in imposing sentence." *Gupta*, 904 F. Supp. 2d at 353-54.  Under § 3553(a), the Court must look at (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the need to protect the public from further crimes of the defendant; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentence disparities. *Id*. at 49-50.  As these factors reflect, sentencing bestows a "moral responsibility" to "judge the man as a whole." *Gupta*, 904 F. Supp. 2d at 350, 354.

Here, the Guidelines range, when calculated correctly, and consideration of the statutory factors under § 3553(a) leads to the same result:  a non-custodial sentence.

## I.  CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A LENIENT SENTENCE.

### A.  <u>Mr. Allen's History and Character.</u>

One hundred and sixty-five people have written to the Court to explain that the Anthony Allen who was depicted at trial and vilified in the press bears no resemblance to the gentle man they know, and live with, and love.   (*See* Ex. A (Letters to Judge Rakoff).)  The writers range from ages nine to eighty-three, and they've known Tony in every stage of his life: his childhood, university, his time at Rabobank, as well as the last seven years when Tony has been a full-time stay-at-home dad.

Mr. Allen has not worked in banking in many years.  Since being laid off from Rabobank in late 2008, Tony has been a full-time caretaker for his children.  Tony and his partner, Tracy, have tried to raise Neve and Faye with the same values that they were brought up with.  The two met at college and have been together ever since.  Tony is the epitome of a modern dad:  he's the cook of the family and is often "the only man in a sea of pink" during his daughters' ballet classes. (Ex. A-28.)   Neve and Faye are involved in lots of activities—

gymnastics, ballet, swimming—and Tony is there for all of those, in addition to the birthday

parties, play dates, and school activities that keep the family busy.

Tony's oldest daughter, Neve, is eight.  She is a serious, quiet little girl:  her most

recent accomplishment was an award for being the "most courteous" girl in her elementary

school class.  (Ex. A-14.)  Tony and his daughter Neve are well-known around town because

Tony doesn't drive Neve to school, like all the other parents.  Instead, Neve and her dad bicycle

to school every morning, rain or shine.  Tony has acquired a nickname in town as the "dad on the

bike."  (Ex. A-36.)  Tony is also known for coming to school during the day to watch Neve's

"football" (soccer) matches, and he's a constant presence on the sidelines during both practices

and on game days.  (Ex. A-46.)  Now that Neve is old enough for homework, she turns to her dad

for help, especially with "maths."  (Ex. A-1.)  Since the trial, however, Neve has been distracted

in school and crying during class, behavior that she never before exhibited.  (*Id*.)  She no longer

sleeps well and is anxious and scared about what is going to happen to her father.  (*Id*.)

Tony's younger daughter, Faye, is five, and is almost invariably described by

everyone who knows her as "funny," with an "infectious" smile.  Faye is lighthearted, but she

hasn't had it so easy in her short life.  Faye was born with a cleft lip and palette, which means

she had a large hole in her face—between her nose and mouth—that made eating nearly

impossible for the first year of her life.  (Ex. A-1; Ex. A-47.)  Even though Faye is only five,

she's already had multiple surgeries to try to repair the birth defect.  (*Id*.)  She still has additional

surgeries ahead, including a bone graft from her hip and cosmetic surgeries to help reduce the

scarring on her face.  (*Id*.)  The idea that Faye would undergo serious surgery while her father is

imprisoned 3,000 miles away in a foreign country is terrifying to the family, especially since

Faye is, and always has been, a real "daddy's girl," preferring Tony above everyone else.  (Ex. A23.)

Tony and Tracy are both very close with their extended families, and the family spends most of its vacations visiting relatives in other parts of England.  Neither Tony nor Tracy is the "jet-setting" type and the family lives in a rural town approximately forty miles outside of London.  They don't have a large house or live in a wealthy neighborhood—their next-door neighbor is a window cleaner by profession, and Tony is best known on the street for his care with the family garden.  (Ex. A-26.)  Neve and Faye share a room; the family has one, ten-year-old car.  (Ex. A-1.)  The Government has made much of Tony's salary and bonuses from Rabobank, but Tracy and Tony have always been responsible with money, using the income to pay down the family's mortgage and to start a savings account for the girls' education.  (Ex. A-1; Ex. A-152.)  Of course, at this point, the family's savings have been wiped out by the cost of the trial and it seems likely that the girls will need to be pulled out of their school at the end of the term.

Tony is an active participant in his small community.  He and Tracy are devoted members of a local running club, in which the other members have young children around the same age as Neve and Faye.  Saturday mornings are spent in the public park in town, organizing races and various activities with the children, followed by a community breakfast.  (Ex. A-82.)  Tony doesn't spend his time with wealthy financiers or glamorous types:  his friends are ordinary people—teachers, police officers, men in the building trade, other parents—and his relationships often go back twenty or thirty years.

Paul Priestly, a police officer with the Dorset Police and former officer in the Royal Navy, has known Tony for over twenty years.  He writes, "I can absolutely refute the

picture painted of Tony's character; he has been portrayed almost as a pantomime villain, who is manipulative and sinister." Tony is in fact the "polar opposite," Officer Priestly says. "Tony is quite frankly a good human being. He is a lovely, affable person who would go out of his way to make people feel happy. He is not manipulative or self-centered, what you see is what you get, a good person who likes to be kind and make people happy." (Ex. A-7.)

Antony Vann Norman has also known Tony for twenty years and wants the Court to know the "real Anthony Allen." (Ex. A-8.) In his words, "Tony is the guy who volunteers for good causes and raises money to support charities. He's the bloke that takes the time to kick a ball around the park or play dollies with the kids. He's the person you would ask for advice or share problems with, knowing he will give a sympathetic ear and an honest and balanced opinion. He is the parent who you see at the school gates, who cooks the girls' dinner and helps them with their homework." (*Id*.) In sum, Tony is a "straightforward, ordinary family man who has always been considerate and caring." (*Id*.)

Paul Scourfield has been a friend since "the age of 5," meaning that he has known Mr. Allen for almost forty years. (Ex. A-30.) In his letter to the Court, Mr. Scourfield confesses that he can only "hope I have been there for [Tony] over the last two years" in the same way that Tony has always been there for him—"in times of hardship, pain and anguish, as well as the happy times of marriage and family growth." (*Id*.) In letters that could not have been easy to write, Mr. Scourfield and his wife Sacha describe the deep grief they endured through the loss of three pregnancies. Mr. Scourfield states simply that Tony was "there" for him during those difficult times. (*Id*.) His wife Sacha is able to say more about Tony's involvement, describing Tony as the person her husband particularly turned to for help grieving. (Ex. A-12.) When the couple was eventually able to conceive, they asked Tony to be godfather to their son. Both

parents agree that Tony has been an active and important part of their son's life, attending his rugby and cricket matches, and "teaching him about life, respect and manners."  (Ex. A-12; Ex. A-30.)

Each of the letters are similar in this way.  When a family friend became very sick, Tony jumped in to help, driving the friend to all of his doctor's appointments in effort to ease the burden.  (Ex. A-16.)  Another friend, with an autistic daughter, describes Tony taking care of the child and putting the girl at ease, something her mother said she couldn't picture anyone but Tony being willing to do.  (Ex. A-21.)  Tony is the one who "dressed as Santa to ride on [the local charity's] Christmas sleigh to distribute gifts donated by the [charity] to children's centres and Senior Citizens homes."  (Ex. A-41.)  Tony helped his friend build his own house, *see* Ex. A-109, he runs marathons to raise money for CLAPA, the Cleft Lip and Palate Association, and he's actively involved with the local Parent-Teachers Association at his daughters' school.  (Ex. A-55; Ex. A-53.)  Over and over again, the people who know Tony best insist to the Court that he does not have a "criminal bone in his body;" he is just not a person who is motivated by money or prestige or a cutthroat desire to get ahead.

Nor is it the case that Mr. Allen acted as one person to his friends and family and a different sort of person when he went to work.  Dozens of his colleagues and supervisors have written to the Court to confirm that, in their experience, Mr. Allen was always honest, a person of integrity.  Jason Van Praagh, Tony's supervisor at both Deutsche Bank and Rabobank, recounts that he first met Mr. Allen when Mr. Allen was twenty-two years old and a junior trader.  Mr. Van Praagh characterized the trading floor at Deutsche Bank as "challenging" and even, "at times," a "dog eat dog" environment.  (Ex. A-10.)  Yet, Mr. Van Praagh informs the Court, "what struck me most working with Tony was not only his fierce intellect and affable

demeanor but his 'team first' ethos, in good times and bad." (*Id*.)  Mr. Van Praagh assures the

Court: "Throughout my entire working life I cannot think of anyone more dedicated, hard-

working, trustworthy and generous of heart than Tony Allen.  He is a man of integrity." (*Id*.)

       Bill Cuthbert was a Deutsche Bank executive, responsible for Deutsche Bank's

worldwide money market operations and a member of the bank's executive committee.  (Ex. A-

9.)  Mr. Cuthbert had global responsibilities and acknowledges that it was unusual for him to

have a direct relationship with a trader.  (*Id*.)  Yet, "he knew Tony quite well," and he therefore

informs the Court—and with his experience, he would have reason to know—that "although

many traders do have their heads turned by the exceptional rewards that banking has to offer,"

Tony was not among them.  (*Id*.)  Tony, he says, "is made of better metal." (*Id*.)

       Mr. Cuthbert was shocked by the jury's verdict because, in his view, Mr. Allen is

"one of the most moral and level-headed individuals with whom I have worked," someone

whose "good judgment" could be "trusted," and who is, "in short…honorable." (*Id*.)  Mr.

Cuthbert has invited the Court to contact him if there is any way in which he can usefully

"demonstrate [his] confidence in Tony's integrity." (*Id*.)

       Jonathan Boyd was another of Tony's managers and his hand-written letter

assures the Court that "Tony is a man of the highest moral standing and integrity," a "loyal

friend," and above all else, a "strong family man." (Ex. A-65.)  Paul Spensley, another of

Tony's supervisors, contends that with age—he is now 65—comes the ability to judge a person's

character.  Mr. Spensely has known Mr. Allen for nineteen years.  He says that Mr. Allen

"is…and always has been, a person of the utmost integrity," and a "true gentleman in every sense

of the word." (Ex. A-19.)  As evidence, he points to the fact that Mr. Allen "was never one to be

involved in the sometimes excessive activities that young men get involved in." (*Id*.)  To the

contrary, he remembers that Mr. Allen was "always the first to want to get home to his family." (*Id*.)

Many of Mr. Allen's former colleagues have written to the Court to contradict what they have read in the newspapers and to give an honest account of the man they worked with.  Still, the number of letters should be higher.  Many of the people that Mr. Allen worked with at Rabobank are still employed there.  They have reached out to him to explain that Rabobank's lawyers have forbidden its employees from writing to this Court about Mr. Allen. (Ex. A-1.)  While these individuals have privately expressed their devastation over the jury's verdict, they understandably fear for their jobs.  For that reason, their stories are not included here.

The words of those who have moved on from Rabobank, and are therefore able to write to the Court on Tony's behalf, are therefore, quite meaningful.  For example, Andrew Docker, like Tony, joined Rabobank in 1998 and the two became fast friends.  (Ex. A-66.)  Mr. Docker tells the Court that he never saw Mr. Allen "being dishonest or lacking integrity"—not during their employment at Rabobank, or at any time thereafter.  (*Id*.)  Instead, he says, Tony has always had an "abundance" of "honesty and integrity."  (*Id*.)  Mr. Docker personally attests to Mr. Allen's commitment to his partner, Tracy, and their daughters, Neve and Faye.  He says that despite everything that has happened, he would nonetheless still "hold Tony [out] as a role model that anyone should be encouraged to aspire to."  (*Id*.)  Mark Curtis, who worked for Mr. Allen, has also written.  (Ex. A-156.)  He tells the Court that Mr. Allen "was instrumental in eradicating some of the more aggressive practices" on Rabobank's trading floor, by making procedures and pricing within the bank "more transparent."  (*Id*.)  Mr. Allen's changes resulted in a "personal loss" for the cash desk, but had an "overall benefit" to the bank and made it a better place to

work.  (*Id.*)  Mr. Curtis assures the Court that he never saw Mr. Allen "let greed guide him," but instead only witnessed Mr. Allen following his "strong sense of what is right and lawful."  (*Id.*)

Dina Noelle, formerly of Rabobank's Treasury Department, and a woman with over twenty years of experience in the cash markets, worked with Mr. Allen "consistently" for a decade.  (Ex. A-56.)  In her letter, she writes, "I can honestly say, with hand on heart, that Tony is one of the most conscientious and upstanding people I have had the pleasure to meet and work with."  (*Id.*)  The jury's verdict has left her "deeply saddened."  (*Id.*)

Similarly, Pablo Vergara, Rabobank's Head of Treasury in the Netherlands, admits that he was "astonished and incredulous" of the jury's verdict because "Tony was always considered by his colleagues and I, from London and abroad, as an example of professional conduct and work discipline."  (Ex. A-33.)  Mr. Vergara says he "would go as far as qualifying Tony's behavior as exemplary to many of us in senior management, and to his colleagues."  (*Id.*)  Mr. Vergara's letter is corroborated by David Vander, who was the head of the Rabobank division that Tony worked in from 1998 to 2003:  "In an environment where people were often superficial and selfish, Tony had a sense of perspective and responsibility that was lacking in others."  (Ex. A-27.)  Mr. Vander found Mr. Allen to be "unfailingly honest, transparent and fair."  (*Id.*)  He tells the Court that his "belief" and "trust" in Mr. Allen's "integrity" is so strong, even now, that he would "have no hesitation in working with him again should the opportunity arise."  (*Id.*)

Perhaps the most meaningful letter written by one of Mr. Allen's former colleagues at Rabobank is the one from Mogens Hansen.  (Ex. A-15.)  Mr. Hansen worked under Mr. Allen on the cash desk and he was Rabobank's LIBOR submitter for Scandinavian currencies.  His letter is hand-written and heartfelt.  He begins by explaining that he spent "10

years" of his life, sitting close to Mr. Allen, for "10 hours a day, 5 days a week." (*Id*.)  He writes

because he wishes for the Court to know that Mr. Allen was "only…kind, helpful and

understanding" to the traders working for him; Mr. Hansen was present for all of the years that

were described at trial, and yet, as he tells the Court, he cannot "recognize the person portrayed

during th[e] trial." (*Id*.)  For this reason, Mr. Hansen asks for "justice" on Mr. Allen's behalf.

(*Id*.)

 It is important to explain that Mr. Allen's job at Rabobank had very little to do

with LIBOR.  Rather, it was primarily concerned with managing Rabobank's financial risk.  (Tr.

1170:21-1171:15[1].)  Mr. Allen was very good at his job, during a period in which many in the

financial industry were impervious to excessive risk and put the savings of ordinary investors in

peril.  Unlike other large banks, Rabobank did not have substantial debt, did not invest in unduly

risky financial products, and did not need, or receive, any public financing to survive the

worldwide financial crisis.  (Ex. 1.)  It was the only bank in the world that managed to maintain a

triple-A credit rating throughout the market's turmoil.  (*Id*.)  Rabobank's management repeatedly

attributed this stability to Mr. Allen, who was praised on multiple occasions for prioritizing the

bank's long-term health over short-term profit.

 For example, Mr. Allen's boss, Gerry Hughes, wrote on December 11, 2007,

"throughout this crisis, we Position Management and especially Tony's group have behaved in

the most appropriate way for the Bank, often at the expense of P&L; all of which is absolutely

correct."  (Ex. 2.)  Mr. Hughes informed Rabobank's senior management that "the troops in

Position Management have done an outstanding job…the liquidity management and prudential

---

[1] References to "Tr." refer to the trial transcript, and the excerpted portions are attached as
Exhibit B.

role has been discharged faultlessly and many of the businesses have cut back positions (with huge opportunity costs) to help manage the Group's liquidity position." (Ex. 3.)

In considering Mr. Allen's time at Rabobank, the Court should take into account the fact that Mr. Allen's primary contribution to the financial markets was a positive one, and that ordinary investors were likely safer because of his level-headed and cautious approach.

## B.   The Nature and Circumstances of the Offense.

In November 2014, this Court, as part of an ABA Criminal Justice Task Force on the Reform of Federal Sentencing for Economic Crimes, submitted a proposal to the Sentencing Commission seeking substantial revisions to the Sentencing Guidelines for economic crimes. (Ex. 4 ("A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes," American Bar Association, Nov. 10, 2014).)  The Task Force recommended that when a defendant has "zero criminal history points" and his "offense was not otherwise serious" as set forth in 28 USC §994(j), a "sentence other than imprisonment is generally appropriate" to satisfy the objectives of sentencing.  (*Id*. at 2.)

More specifically, the Task Force recommended the following proposal:

> Where the motive for the offense was not entirely predatory, where the loss was largely intended rather than actual, where the defendant's gain from the offense was significantly less than the loss, where the offense was of limited sophistication or duration, where significant and unusual extenuating circumstances contributed to the commission of the offense, or where the defendant took significant steps to mitigate the harm caused by the offense, the guideline may produce an offense level that substantially overstates the seriousness of the offense.  If so, a downward departure may be warranted.  Where the totality of the circumstances demonstrate that the offense is not otherwise serious and the defendant is a first offender, a departure to a sentence other than imprisonment is generally appropriate.

(*Id*. at 6-7; *see also* Ex. 5 (Testimony from the American Bar Association before the United States Sentencing Commission, March 12, 2015) at 12-16.)

In the present case, the conduct for which Mr. Allen was convicted falls far outside the heartland of fraud cases that typify the offense and, while unquestionably harmful to public confidence in the markets, does not fall within the definition of "serious" set forth by the Task Force.  Mr. Allen did not profit from the conduct for which he was convicted.  The Court has held that the LIBOR rates Mr. Allen submitted were fraudulent because Mr. Allen's submissions "reflected, in material part, an intent to benefit Rabobank's trading positions." (Order, Feb. 16, 2015 (Dkt. No. 221) at 5.)  But Mr. Allen did not supervise Rabobank's swap traders—they were in an entirely different department of the bank—and their performance had no impact on his compensation.  (Tr. 173: 15-174: 22 (Mr. Stewart did not report to Mr. Allen), 704: 9-18, 713:12-17 (Mr. Yagami did not work for Mr. Allen and his contact with him was "very limited"), 1193:2-1195:8 (Mr. Allen was not compensated based on swap traders' performance).)

The Government has speculated that Mr. Allen may have been motivated to commit this offense because Rabobank had a collective "bonus pool," but this theory makes little practical sense.  Rabobank's "bonus pool" accommodated thousands of Rabobank employees, located around the world.  Even if the LIBOR rates submitted by Mr. Allen were meant to help a swap fixing, any resulting contribution to the Rabobank "bonus pool" from the success of that fixing would have been infinitesimal.  For example, the alleged manipulation of LIBOR by Paul Robson on May 10, 2006, adduced at trial, would have resulted in a theoretical benefit to Rabobank of precisely $2,250.  The acts of manipulation had no meaningful impact on Rabobank's bottom line, and any profits from them that might have made their way into the "bonus pool" would have been divided amongst Rabobank's thousands of employees.  There is

no basis to conclude that the Mr. Allen's conduct was motivated in any way by personal gain. (Tr. 851:1-852:2.)

Mr. Allen's conduct is also outside the heartland of fraud offenses because it was committed out in the open, not behind closed doors, or as part of a clandestine operation. Mr. Stewart told the jury that he offered LIBOR preferences "out loud," "in front of everyone," without "car[ing] who saw." (Tr. 259:12-262:8.) He never used "code" or "tr[ied] to hide what [he] was talking about." (*Id*.) As Mr. Stewart explained to the jury, it wasn't considered "inappropriate" at Rabobank for swap traders to ask LIBOR setters to make certain LIBOR submissions. (Tr. 262:1-8.) Mr. Robson described a regular "practice" in which a "shout would go up on the desk," after which "all of the interested parties would gather and discuss their positions, what they needed, and what was going to be set in the various tenors to suit the positions." (Tr. 324:2-325:4.) Mr. Robson also informed the jury that he would "holler" out what LIBOR submissions Mr. Yagami needed when a "number of people would have been about." (Tr. 335:6-336:15.)

Senior Rabobank executives were well aware of the offense conduct. Rabobank's Head of Treasury in London, Eddie Okhuijsen, sat directly across from Mr. Allen and right next to Mr. Stewart, for eight years, from 2000 throughout 2008. (GX113 (Mr. Robson's diagram of the trading desk); Tr. 313:22-314:12.) Similarly, Count 19, one of the counts of which Mr. Allen was found guilty, describes conduct that occurred on a July 10, 2008 bank-wide, international conference call, regularly joined by at least a dozen other employees, including those from the credit department and Rabobank Treasury. (Tr. 1233:10-1237:22.) After Mr. Stewart berated LIBOR-setter Damon Robbins for making a submission that was contrary to Mr. Stewart's request, Mr. Allen reported the incident to Mr. Stewart's boss, Henk Rozendaal, who supervised

16

all of Rabobank's swap traders.  (Tr. 1298: 2-21; *see also* Ex. 6 (FBI Memorandum of July 30,

2013 Interview with Damon Robbins) at 7 ("Allen told Robbins he was going to speak with

Stewart's boss [Henk] Rozendaal about it" to ensure that this kind of behavior would not happen

again).)  Additionally, Rabobank's top executive in Asia, Martijn Nijziel, was copied on Mr.

Yagami's requests to Mr. Robson for favorable LIBOR rates.  (DX203.)  In December 2008,

Peter Jongmans, Mr. Allen's successor as Global Head of Liquidity and Finance, a mid-level

management position, was told by Paul Butler, the JPY submitter after Mr. Robson left the bank,

that "sometimes Yagami will email from Toyko to ask for any special requests" for JPY LIBOR.

(Ex. 7.)  Rabobank's Internal Audit Department also knew about the offending conduct.  In

March 2009, when Rabobank's Internal Audit staff reviewed the JPY LIBOR submission

process, they noted that the LIBOR-submitter simply "inputted" LIBOR rates that Mr. Yagami

sent from Toyko, but, nonetheless, Internal Audit signed off on the review.  (Ex. 8.)  Even one of

the Government's cooperators admits that he did not know he was engaging in a fraud:  Mr.

Stewart told the jury that when he left the bank in 2009, he had "no inkling that LIBOR

submissions at Rabobank were an issue or a problem."  (*Id*.)

   The conduct that Mr. Allen was found guilty of was not just known at Rabobank.

In 2006, Mr. Robson called the BBA to complain that banks were "manipulat[ing]" LIBOR, *see*

DX31R, but the BBA told him not to "worry about it because inaccurate rates get dropped out of

the LIBOR rates and so they have no impact."  (Tr. 540:19- 543:18; *see also* 721:12-17.)  In fact,

Mr. Robson recalls that the BBA *itself* would ask Panel Banks to change their submissions after

the fact so that the rates would appear more consistent, even if doing so resulted in inaccurate

submissions.  (Tr. 553:11-555:18.)

This case is also different than most, if not all, other fraud cases because government authorities on both sides of the Atlantic were aware that LIBOR submissions were often inaccurate, submitted to protect a Panel Bank's interests, or both, but they allowed the submissions to continue.  (*See* Ex. 9)  The U.K.'s Financial Conduct Authority took the position that LIBOR was a privately-run, unregulated benchmark and issues with its operation should be left to the BBA's discretion.  (*Id.* at 95.)  In May 2008, Mr. Allen told the New York Federal Reserve that additional guidance on LIBOR-setting would be a relief, because "banks were not basing their LIBORs on cash but basing them on what their swap derivative resources were." (Tr. 1249:15-1253:18; *see* DX001CT.)  The American regulators took Mr. Allen's disclosure in stride and said nothing about such conduct being illegal, either to Mr. Allen or in the report prepared after the conversation.  (DX16 at 2 (report from the Federal Reserve explaining that "panel banks may have incentives to misreport in order to manipulate the level of the LIBOR fixing and thereby influence their funding or derivative positions" but saying nothing about the illegality of such a practice).)

And this case is different in that the allegedly deceived parties were nearly all sophisticated financial institutions that were themselves engaged in identical conduct.  Given the unique nature and circumstances of this alleged offense—conduct that was intended to benefit Mr. Allen's employer as opposed to himself, resulted in no personal gain  and caused no pecuniary loss, and which occurred out in the open with the awareness of the BBA and regulators, and about which Mr. Allen himself volunteered information to regulators in the United States—a "sentence other than imprisonment is generally appropriate."

### C.   A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases.

One of the factors to be considered under Section 3553(a) is the need to avoid unwarranted sentence disparities.  In Mr. Allen's case, this factor supports a non-custodial sentence.

There is evidence that the LIBOR submitters at almost every institution on the LIBOR Panel engaged in the same conduct as Mr. Allen, including the LIBOR submitters at Bank of America, Citibank, JP Morgan, Deutsche Bank, HSBC Bank, UBS, Barclays, Societe Generale, Bank of Nova Scotia, BNP Paribas, West LB, Lloyds Bank, Royal Bank of Scotland, Merrill Lynch, Bank of Toyko Mitsubishi, and Credit Suisse.  (Ex. 10; *see also* Ex. 11 (chart of comparable conduct); Exs. 33-39 (DOJ settlements regarding LIBOR); *see also* Ex. 12 (Hayes Tr. at June 5, 2015, Day 8, at 143:22 – 144:15; June 8, 2015, Day 9, at 18:21 – 20:19, at 21:7 – 21:9, at 23:24 - 25:19, at 49:16 – 49:19, at 53:15 – 53:22, at 111:15 – 112:11 (excerpts of sworn testimony of John Ewan regarding reports to BBA about Panel Banks setting LIBOR to suit their own interests)).)  None of the LIBOR-submitters at these banks have even been criminally *charged*, much less convicted and sentenced to prison.

Conduct similar to Mr. Allen's was also committed by high-ranking government officials.  Paul Tucker, the Deputy Governor of the Bank of England, instructed Barclays to submit lower LIBOR rates to contain the reaction of the British public regarding Barclays's difficulty funding itself during the financial crisis.  (Ex. 13.)  In 2007, the Swiss National Bank ("SNB") instructed the submitters at the two Swiss banks on the LIBOR Panel, Credit Suisse and UBS, to make LIBOR submissions that would fall into the middle range of submissions.  (Ex. 14.)  These instructions were motivated by the SNB's own interests, since it had based certain of its financial projections on 3M LIBOR and wanted to meet its targets.  (*Id.*)  Mr. Tucker and the

officials at the SNB held important, *public* positions and were responsible for the integrity and functioning of the financial markets; of all people, these individuals should have known better. Yet, they will never face prison time for their actions.

In late January 2016, six brokers in the United Kingdom escaped criminal punishment despite LIBOR-related misconduct that is undisputedly more culpable than that committed by Mr. Allen.   (Ex. 15 ("Libor Trial," the Independent, Feb. 9, 2016).)  The U.K. brokers admitted receiving more than £450,000 from Citibank swap trader Thomas Hayes, in exchange for passing on estimated rates to LIBOR setters at different Panel Banks that would benefit Mr. Hayes's trading positions.  (*Id*.)  The press reported that the brokers were acquitted because the jury understood that the "Libor system was broken well before this indictment period," and believed that the brokers' indictments were just "a political show trial."  (Ex. 16 ("Jury acquits five of six brokers in LIBOR trial," Financial Times, Jan. 27, 2016); Ex. 17 ("Six Ex-Brokers Acquitted of LIBOR Rigging In London," Wall Street Journal, Jan. 27, 2016).)

The only person who has been sent to jail for LIBOR-related conduct is Thomas Hayes.  Mr. Allen, however, is not Thomas Hayes—not by a wide margin.  Mr. Hayes bribed at least five different brokers with commissions generated by wash trades to induce them to disseminate false market information to clients, so that cash traders at those clients would set LIBOR in accordance with that false information, thereby helping Mr. Hayes's trading positions. (Ex. 18 (Compl., *United States v. Hayes*, 12 Mag. 3229 (Dec. 12, 2012) at ¶¶ 19, 23-25.)  He also asked traders employed by at least four different Panel Banks to intercede with their respective LIBOR rate-setters to move their LIBOR submissions in a direction that would help Mr. Hayes's book.  (*Id*. at ¶ 26.)  Finally, when the Department of Justice made known its intent to

interview a junior trader aware of Mr. Hayes's conduct, Mr. Hayes tried to obstruct the investigation by recommending that the trader leave the country.  (*Id*. at ¶ 35.)

For this behavior, Mr. Hayes was sentenced to eleven years.  However, defendants in the United Kingdom only serve half their sentence, *see* https://www.gov.uk/types-of-prison-sentence/determinate-prison-sentences-fixed-length-of-time, so he will be released in five and half years.  Mr. Hayes's sentence was one of the harshest penalties ever inflicted on a white-collar defendant in the United Kingdom, and yet, it is less than the sentence that the PSR recommends for Mr. Allen.  In addition, Mr. Hayes is incarcerated in his own country, at Lowdham Grange prison, a facility that is less than ten years old and considered one of the best prisons in the United Kingdom.  (*See* Official Website, Lowdham Grange, located at www.hmp-lowdham-grange.org.uk.)  Inmates have their own private rooms, with en-suite shower facilities. (*Id*.)  There are playgrounds for visiting children.  (*Id*.)  The prison offers many workshops and educational programs, including bricklaying, plumbing, electronics, and painting.  (*Id*.)

Mr. Allen is far less culpable than Mr. Hayes.  Mr. Allen received 16 requests related to LIBOR over a 4-year period—more than 1,000 working days.  Mr. Allen responded to just 4.  It is undisputed that Mr. Allen did not bribe anyone, nor did he ever accept any bribes. Mr. Allen did not make a nickel from the offending conduct.  The Government does not even argue that Mr. Allen's LIBOR submissions contained inaccurate information, but rather, only that Mr. Allen submitted rates influenced by a desire to help his employer.  (Tr. (Gov. Closing) 1590:4-10 ("We are not here asking you to determine if the actual submission, the actual number after the fact was right or wrong."); Tr. (Gov. Closing) 1609:13-17 ("Defendants have been charged with basing their LIBOR submissions, at least in part, on trading positions in order to make money.  That's what the government is charging.  That's the crime alleged."); Gov. Mot.

In Limine, Dkt. No. 122, at 1, 6 ("it makes no difference whether or not [Defendants'

submissions]…[were] otherwise within the 'range' of what the defendant thought Rabobank's

borrowing costs might have been.").)

      The difference between Mr. Allen's and Mr. Hayes's conduct is significant.  Yet,

a custodial sentence for Mr. Allen would almost certainly be far worse than anything Mr. Hayes

will ever experience.  Mr. Allen is not a U.S. citizen, thus, unlike most white-collar defendants,

he is not eligible for a minimum-security prison, which generally have adequate living

conditions, including access to healthcare, and some educational or vocational programs.  By

virtue of nothing more than his U.K. citizenship, Mr. Allen stands a good chance of being

incarcerated in one of the eleven private prisons that exist in this country for non-citizens

convicted of federal crimes.

      The American Civil Liberties Union completed an investigation into these non-

citizen prisons in 2014 and found that "the men held in these private prisons are subjected to

shocking abuse and mistreatment."  (*See* Ex. 19 ("Warehoused and Forgotten," American Civil

Liberties Union, June 2014, at 1-3, 16, 25-52); *see also* Ex. 20 ("This Man Will Almost

Certainly Die," The Nation, January 28, 2016, at 3).)  The ACLU reports that the prisoner

dormitories are nothing more than "Kevlar tents that each house about 200 men in bunk beds,"

are "crawling with insects" and are equipped with communal toilets that "overflow and always

smell awful."  (*Id*.)  The medical care at these facilities is dismal, without doctors or registered

nurses on site.  (*Id*.)  It can take weeks to get a prescription and prisoners die on a regular basis

from easily-treatable causes.  (*Id*.)  There are no workshops, or educational programs.  (*Id*.)

These living conditions would be made worse by the fact that Mr. Allen's two daughters, Neve

and Faye, his partner, Tracy, as well as his parents, who steadfastly attended the entirety of the

trial, live thousands of miles away in another country, without any ability to visit Mr. Allen, or even communicate with him, on a regular basis.

No matter what the Court's view of Mr. Allen's conduct might be, he does not deserve incarceration under these circumstances, for no other reason than the Government's decision to prosecute him in the United States, rather than allowing him to stand trial in his own country. For this reason too, a non-custodial sentence for Mr. Allen is appropriate.

### D.    A Non-Custodial Sentence is Sufficient to Deter Others.

Although 18 U.S.C. 3553(a) requires this Court to consider the need for deterrence before sentencing a defendant, that objective can be achieved in this case through a non-custodial sentence. As the Second Circuit has observed, "the need for further deterrence and protection of the public is lessened" when conviction impacts a defendant's livelihood, because "the conviction itself already visits substantial punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009). The permanent loss of one's reputation and career, especially in cases where a defendant has spent a lifetime working hard to achieve success in his field, is a tremendous blow. The cost of litigating a white-collar case is astronomical, even for wealthy individuals. The public humiliation associated with being indicted, much less convicted, of a white-collar crime is acute, especially in the current atmosphere, where the public's hunger to see "Wall Street" punished for its role in the financial crisis is often exploited by a media eager to sell newspapers. The experience of seeing one's face splashed across the pages of the Financial Times or the Wall Street Journal, underneath a headline proclaiming one a nefarious crook, is deeply difficult, made worse by the knowledge that one's family and children must also bear the brunt of the public's derision. Mr. Allen's humiliation has been eagerly reported by newspapers around the world. Anyone paying attention has received the message, loud and clear, that financial crime does not pay; Mr. Allen does not need to be incarcerated to get that

message across.  Moreover, to the extent that a would-be offender is not deterred by the devastation that accompanies a criminal indictment and conviction, but instead is determined to engage in a crime similar to Mr. Allen's unless he knows that jail is a real possibility, Mr. Hayes's prison sentence in the United Kingdom achieves that goal.

Finally, there is no need for specific deterrence in this case.  Mr. Allen is not a threat to the public.  This is his first offense and an aberration in a life otherwise characterized by law-abiding behavior, as the many individuals who have wrote letters to the Court on Mr. Allen's behalf can readily attest.  Mr. Allen's voluntary appearance in this case and his compliance with every condition that the Court has imposed upon him is indicative of his respect for the law.  There is no risk of recidivism:  Mr. Allen's entire life has been reduced to shambles as a result of this case, and he will never work in the financial markets again.  The public does not need to be protected from Mr. Allen.

## II.        THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE.

Although a sentencing court does not need to follow the Sentencing Guidelines, it is required to "correctly calculat[e] the applicable Guidelines range" before imposing a sentence. *Gall*, 552 U.S. at 49-50.  In the present instance, the Presentence Investigation Report, dated January 27, 2016 (the "PSR"), recommends a sentence of 87 months, based on an offense level of 29.  (PSR, at p. 27.)  Mr. Allen respectfully disagrees with the calculation of the applicable Guidelines range found in the PSR.  When the Sentencing Guidelines are calculated correctly, they result in an offense level of 7 and a Guidelines range between 0-6 months.  As a first offender, the imposition of a non-custodial sentence is appropriate for Mr. Allen.

### A.        <u>Mr. Allen Was Not the Leader of the Criminal Scheme.</u>

The PSR erroneously states that a four-level increase in Mr. Allen's sentence is warranted because Mr. Allen "was the leader of the offense."  (PSR, at 27.)  According to the

PSR, Mr. Allen "used his managerial position, combined with the knowledge and connections that he obtained through his experience in the financial industry, to attempt to inflict a level of fraud that would have earned him large commissions." (*Id.*) The PSR also contends that Mr. Allen "orchestrated the scheme that included five or more participants" and "also directed all of the codefendants and coconspirators on how to manipulate derivative products and go undetected by law enforcement." (PSR, ¶¶ 43, 54.) The PSR's findings are completely unsupported by the record.

Section §3B1.1 ("Aggravating Role") provides that if:

a) "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels"; or

b) "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels."

The Guidelines provide that "in distinguishing a leadership and organizational role from one of mere management or supervision" a court should consider factors such as "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S. Sentencing Guidelines Manual §3B1.1 cmt. n.4 (Nov. 2015). There is no evidence that Mr. Allen engaged in any of the conduct identified as meriting a four-level enhancement.

1. *The Criminal Scheme Began When Mr. Allen was a Junior Trader Without Any Management Responsibility.*

Nothing in the record demonstrates that Mr. Allen "used his managerial position, combined with the knowledge and connections that he obtained through his experience in the

financial industry" to "orchestrate" the scheme, or that he "directed all of the codefendants and coconspirators on how to manipulate derivative products and go undetected by law enforcement."  (PSR, ¶¶ 43, 54, p. 27.)  The jury found that Mr. Allen participated in the scheme, but nothing in the evidence demonstrates that Mr. Allen was its "orchestrator."  Indeed, because there is no evidence that Mr. Allen held a leadership role, the Government did not make such an argument to the jury.  (*See* Tr. (Gov. Closing) at 1464: 5-10 ("[the cooperating witnesses] testified that Mr. Allen and Mr. Conti *were helping out* with the scheme, were participating in the scheme.") (emphasis added); 1613 (Gov. Closing) (arguing to the jury that Mr. Yagami is credible because his testimony was only that Mr. Allen and Mr. Conti "were there" when Mr. Robson was "coordinating with traders" and if Mr. Yagami was lying, wouldn't he "come up with something better to tell you?").)

A fair review of the evidence demonstrates that the criminal scheme began in 1999, when Mr. Allen was 27 years old and a junior trader without any management responsibility whatsoever.  In February 1998, when Mr. Allen was 26, Rabobank hired him to trade U.S. dollars on its London trading floor.  (GX104D.)  From February 1998 until June 2005, Mr. Allen and the other cash traders, including Mr. Robson and Mr. Conti, were supervised by Jason Van Praagh and later Peter Norrie.  (Tr. 1162:88-1163:10.)

In 1999, approximately one year after 26-year-old Mr. Allen joined the bank, his boss, Mr. Van Praagh, successfully petitioned the BBA to add Rabobank to the LIBOR Panel.  (Tr. 62:7-9.)  Mr. Van Praagh "introduced" Rabobank's cash traders, including Mr. Allen and Mr. Robson, to the LIBOR-setting role "at the same time."  (Tr. 1162:23-1163:10, 1168:11-17, 1174:13-22.)  At trial, Mr. Stewart admitted that Rabobank's swap traders began asking for certain LIBOR submissions as soon as Rabobank joined the LIBOR Panel in 1999.  (Tr. 192:25-

193:17.)  Mr. Stewart said that he asked for favorable LIBOR rates, with no sense that it was

improper to do so, for ten straight years, until he finally left the bank, of his own accord, in 2009.

(Tr. 262:1-8.)

        The evidence demonstrated that Mr. Robson also began submitting LIBOR rates

favorable to the bank at the outset of Rabobank's participation on the LIBOR Panel.  During

trial, Mr. Robson estimated that he might have personally "start[ed] manipulating" LIBOR

around 2002, *see* Tr. 629:10-11, but Mr. Yagami was able to give a more specific date, since he

observed Mr. Robson accommodating trader requests in August 2000.  Mr. Yagami testified that

in August 2000, he traveled to London and spent "three weeks" watching Mr. Robson

"chang[ing]" the "submission levels for yen LIBOR" in response to traders' requests.   (Tr.

644:2-24, 652:19-654:6.)  Thus, the Government's evidence demonstrates that the scheme began

prior to August 2000.

        In 1999-2000, when the scheme began, Mr. Allen was only 27 and had been at

Rabobank for roughly a year.  Mr. Allen was younger than both Mr. Robson and Mr. Stewart,

and both men had been employed Rabobank for considerably longer—Mr. Robson had been

there for a full decade.  (Tr. 261:3-4, 299:14-16.)  It is impossible for Mr. Allen to have used his

"managerial position," or the "knowledge and connections that he obtained through his

experience in the financial industry, *see* PSR ¶ 54, to "orchestrate" the criminal scheme because

Mr. Allen did not have a managerial position, or significant experience in the financial industry

when the scheme began.

        2.    *Mr. Allen Did Not Exercise Any Decision-Making Control Over*
                *the Criminal Scheme.*

        In support of the four-level "leader" enhancement, the PSR states that Mr. Allen

"exercised decision-making authority" in the criminal scheme.  (PSR, at 24.)  As evidence for

this contention, the PSR states that Mr. Allen "authorized accommodating manipulation requests and resolved conflicts regarding LIBOR submissions." (*Id.*)  More specifically, the PSR references Mr. Robson's testimony that when LIBOR requests from swap traders first "started coming through," to him, he'd turned to Mr. Allen and said, "you're happy for me to do this?" and Mr. Allen was "fine with that." (Tr. 323:11-324:24.)

However, because Rabobank did not join the LIBOR Panel until 1999 and because Mr. Yagami saw Mr. Robson accommodate LIBOR requests in August 2000, *see* Tr. 644:2-24, 652:19-654:6, this conversation between Mr. Robson and Mr. Allen had to have happened at some point between 1999 and July 2000.  Accepting for purposes of sentencing Mr. Robson's testimony that Mr. Allen said he was "fine" with Mr. Robson's accommodation of traders' requests, that acquiescence does not prove Mr. Allen was the "leader" of the criminal offense.  In 1999-2000, Mr. Robson was supervised by Mr. Van Praagh, who had initiated Rabobank's LIBOR-submission process and "introduced" Mr. Robson to the role:  if Mr. Robson was looking for an authority figure to bless his conduct, the person to ask was Mr. Van Praagh, not 26 or 27-year-old Mr. Allen.  (Tr. 1162:23-1163:10, 1168:11-17, 1174:13-22.)  Mr. Allen had been at the bank for less than two years, while Mr. Robson had been there for approximately a decade, since 1990.  (Tr. 299:14-16.)  Mr. Allen could not have "authorized" Mr. Robson's conduct, *see* PSR, at 24, because Mr. Allen had no authority to authorize *anything*.

Likewise, Mr. Robson's testimony about a conversation he had with Mr. Allen after a "compliance training" regarding "conflicts-of-interest," once put its chronological context, also does not support a finding that Mr. Allen "authorized accommodation requests." (PSR, ¶ 54.)  Mr. Robson told the jury that he recalled attending a compliance training with Mr. Allen on "conflicts-of-interest," after which he said to Mr. Allen, "If I understood what I just

heard in that meeting, that means what we are doing with Lee [Stewart] must be along these lines as well, yeah?" (Tr. 340:25-341:19.) According to Mr. Robson, Mr. Allen responded, "No, no, no. It's different. Lee's part of the team. It's fine.," and Mr. Robson "was like, okay, fair enough." (*Id*.) At trial, Mr. Robson said he "was not totally sure" when that conversation happened," *see* Tr. 385: 13-15, but Special Agent Weeks's memorandum of his August 25, 2015 interview with Mr. Robson confirms that Mr. Robson told him that the conflicts-of-interest training had occurred "between 2003 and 2005." (DX608K, at 1.) At this time, Mr. Allen had not been promoted to Global Head of Liquidity and Finance, and did not have management authority at Rabobank. Furthermore, Mr. Robson's testimony doesn't demonstrate that Mr. Allen was the "leader" of the conspiracy. At most, his testimony demonstrates Mr. Allen's awareness that Mr. Robson was accommodating trader preferences and Mr. Allen's belief that the accommodation of trader requests was not prohibited by Rabobank's compliance rules. There is no authority which holds that a four-level sentencing enhancement is appropriate under these circumstances.

The PSR states that Mr. Yagami "testified along the same lines" as Mr. Robson, meaning that Mr. Yagami's testimony was that Mr. Allen "authorized accommodating manipulation requests." (PSR, at 24.) This characterization of Mr. Yagami's testimony is directly contradicted by Mr. Yagami's actual testimony to the jury:

> **Q**: You have never spoken to Tony Allen about the LIBOR submission process, have you?
>
> **A**: No.
>
> **Q:** Tony Allen never instructed you to tell Paul Robson about your trading positions, correct?
>
> **A**: That is correct.

> **Q**: Tony Allen never told you that it was acceptable for you to tell Paul Robson about your trading positions so that you could set LIBOR, correct?
>
> **A**: That is correct.
>
> **Q**: Mr. Allen was not your direct supervisor, correct?
>
> **A**: It is correct.

(Tr. 703:18-704:15.)  Mr. Yagami also told the jury that he had never seen Mr. Allen submit, or direct anyone else to submit, a fraudulent LIBOR rate:

> **Q**: To be clear, you have no recollection from your visit to London in 2000 of hearing Tony Allen talk to anyone else on the desk about LIBOR preferences, correct?
>
> **A**: That is correct.
>
> **Q**: You do not recall Tony Allen asking anyone on the desk if they would prefer a higher or lower LIBOR rate, correct?
>
> **A**: Yes, I do not recall.
>
> **Q**: You don't recall anyone telling Tony Allen that they had a preference for a certain LIBOR rate, do you?
>
> **A**: I don't recall.

(Tr. 717:17-718:1.)

Despite this clear testimony, the PSR nevertheless contends that Mr. Allen was a "leader" of the offense because Mr. Yagami testified that he sent Mr. Allen a November 4, 2008 email, GX101AF, to make "very, very sure" that the rate contained in the email "[was] taken care of."  (PSR, at 24; *referring to* Tr. 689:6-690:3.)  However, the email that Mr. Yagami was discussing during that testimony does not contain an improper "manipulation" request, as the PSR erroneously states, but rather contains legitimate market information about the Japanese Yen cash market.

The evidence at trial was very clear on this point.  Mr. Yagami explained that after Mr. Robson was laid off from the bank in October 2008, Mr. Yagami was Rabobank's only JPY cash trader.  (Tr. 753:2-18, 756:22-759:13.)  Accordingly, Mr. Yagami saw it as his responsibility to send the London "transition" team JPY LIBOR rates, since the few remaining "transitional" employees, including Mr. Allen, did not trade Yen.  (*Id.*; DX288 (stipulation regarding dates in which Mr. Yagami did not have trading positions).)  Mr. Yagami's suggestion of a 6M JPY LIBOR rate on November 4, 2008 was provably legitimate—the parties have stipulated that Mr. Yagami did not have any trades benefitting from the 6M JPY LIBOR on that date.  (*See* DX288.)  Mr. Yagami's decision to include Mr. Allen on an email containing a legitimate suggestion for the 6M JPY LIBOR does not prove that Mr. Allen was the "leader" of the criminal offense.

This fact is further supported by Mr. Yagami's testimony at his own plea.  During that proceeding, Mr. Yagami's sworn testimony was that he participated in a conspiracy with Mr. Robson, Mr. Thompson and Mr. Motomura.  Mr. Yagami did not mention that Mr. Allen was even involved, much less that Mr. Allen was the leader of the scheme or that Mr. Allen had "authorized" Mr. Yagami's criminal conduct.  (Tr. 710:21-711:10; DX217 at 21 (Tr. of Yagami Plea).)

3.    *The Nature of Mr. Allen's Participation Does Not Support a Leadership Enhancement.*

Nor does the nature of Mr. Allen's participation in the offense support a leadership enhancement.  Over a four year period—more than 1,000 working days—Mr. Allen received only 16 emails or instant messages in which a trader expressed a preference for a higher or lower LIBOR rate.  Mr. Allen responded to only 4—and of those, the Government contends that only 3 were followed.  (Ex. C (March 3, 2016 Stipulation), at ¶¶ 5,6.)  Paul Robson, on the

other hand, participated in at least 70 improper communications in the period between May 2006 and October 2008 alone.  Nothing about the "nature" of Mr. Allen's participation merits a four-level enhancement for being a leader of the scheme.

### 4.    *Mr. Allen Did Not Recruit Any Accomplices.*

Mr. Allen did not "recruit any accomplices" to the criminal scheme and none of the witnesses at trial testified that he did.

### 5.    *Mr. Allen Did Not Claim a Right to a Larger Share of the Fruits of the Crime.*

There is no evidence that Mr. Allen claimed a "right" to a "larger share" of the "fruits of the crime" and any enhancement on that basis is inappropriate.  *Compare with United States v. Jean*, 29 F. App'x 652, 654 (2d Cir. 2002) (holding that 3-level enhancement properly applied where defendant "received a percentage of every [stolen and altered] check the group cashed."); *United States v. Eisner*, 59 F. App'x 379, 383 (2d Cir. 2003) (4-level "leader" enhancement was appropriate where evidence showed defendant received a 10% share of all "donations" as his personal "commission" in the scheme).  In fact, the Government has not proved that that there were "fruits of the crime," much less that they were made available to Mr. Allen, or that he somehow managed to claim a specific, "larger" share of them.

### 6.    *Mr. Allen Did Not Engage In Any "Planning" or "Organization" of the Offense.*

There is no evidence that Mr. Allen ever engaged in any "planning" or "organization" of the offense.  The criminal conduct alleged here involved the receipt of instant messages or emails, containing a few words from a swap trader about his LIBOR preference, followed by the submission of an interest rate to the BBA via a website.  Submitting LIBOR took about "five or ten minute[s]" and was a "straightforward process."  (Tr. 1169:10-16.)  As such, the crime was not one that required "planning" or "organizing."  *Compare with United States v.*

*Chavez*, 549 F.3d 119, 136 (2d Cir. 2008) (enhancement appropriate where defendant led a massive drug ring and evidence demonstrated that the defendant gave directions to those junior in the "organization" about how to "dilute" cocaine in order to increase profits, was responsible for making hiring/firing decisions in the drug ring and kept the ring from being discovered by directing certain dealers to "hide in Mexico").

> 7.    *Mr. Allen Did Not "Control" Any Other Participant in the Scheme.*

There is no evidence that Mr. Allen "controlled" any other participant in the scheme.  Without such evidence, Mr. Allen does not qualify for the "manager or supervisor" enhancement, much less a four-level enhancement for being the "leader" of the scheme.

To the extent that the PSR applies the enhancement because of Mr. Allen's position as Rabobank's Global Head of Liquidity and Finance, that is inappropriate.  Any "aggravated role" enhancement must be based on the defendant's "leadership" or "supervisory" role *in the criminal scheme* and not the fact that he held a leadership or managerial job in his legitimate employment.  *United States v. Leonard*, 37 F.3d 32, 38 (2d Cir. 1994) (noting that the enhancement may have been error if it was based only on finding that defendant, a supervisor at Stew Leonard, "exercised supervisory control over various store workers who performed activities that advanced the cash-skimming scheme."); *see also United States v. DeGovanni*, 104 F.3d 43, 45 (3d Cir. 1997) (enhancement inappropriate where defendant, a police sergeant, had supervisory control over some of his co-conspirators by virtue of his *de jure* position, but was just a "rank and file" participant in the criminal scheme).

In the present case, there is no evidence that Mr. Allen was anything more than a "rank and file" participant in the scheme.  Rabobank, which employed all of the conspirators, preserved and produced every relevant email, instant message, and phone call dating from at least 2005 until 2011.  In these hundreds of thousands of communications, there is not a *single*

33

email, instant message, or phone call in which Mr. Allen directed anyone to submit a LIBOR rate based on a swap trader's request.  There is also not a single email, instant message or phone call in which one of the conspirators stated, or even suggested, that he is submitting LIBOR rates based on trading positions because Mr. Allen directed him to do so.

Furthermore, the testimony of the Government's cooperators confirmed that Mr. Allen did not "control" their behavior.  For example, Mr. Stewart testified as follows to the jury:

> **Q**: Did Mr. Allen ever give you a directive to try to influence the LIBOR rate to your favor?
>
> **A**: Not for my book, no.
>
> **Q**: Did he ever tell you "Lee, you need to influence the LIBOR rate to help yourself out?"
>
> **A**: No.

(Tr. 192:16-21).  Mr. Yagami's testimony, described above, was consistent with Mr. Stewart's testimony.  He confirmed to the jury that Mr. Allen never gave him any instruction to make LIBOR requests to Paul Robson.  (Tr. 703:18-704:15.)  Even Mr. Robson agreed that Mr. Allen did not supervise the submissions he made to the BBA:

> **Q**: Now, Mr. Allen did not supervise your LIBOR submissions, did he?
>
> **A**: No, he didn't.
>
> **Q**: You didn't get his approval for your yen LIBOR submissions?
>
> **A**: No, I didn't.

(Tr. 512:25-513:4.)

In addition to the cooperating witnesses, many individuals interviewed by the Government squarely refuted the notion that Mr. Allen orchestrated or directed a criminal scheme.  For example, Damon Robbins, a Rabobank LIBOR-submitter, told the Government that

he was "never directed by management to accommodate requests from traders" and that he never heard Mr. Allen instruct Rabobank's LIBOR setters to accommodate requests from derivatives traders. (*See* Ex. 6 at 10.) Paul Butler, a Rabobank JPY LIBOR-submitter—who is still employed at Rabobank today—told the Government that he had no recollection of Mr. Allen ever "telling him to accommodate the preferences of the Far East traders" when making JPY LIBOR submissions. (Ex. 21 (FBI Memorandum of December 10, 2012 Interview with Paul Butler) at 11).)

On September 10 and 21, 2015, counsel for Mr. Allen spoke with Nicholas Hodge, another Rabobank LIBOR submitter during the relevant period, who sat several feet away from both Defendants, and who was supervised by Mr. Allen. (*See* Ex. 22 at ¶¶ 1, 3, 8.) Mr. Hodge stated that he was "100 percent" certain that Mr. Allen had never directed him or Rabobank's other LIBOR submitters to accommodate or solicit requests from swaps traders for favorable LIBOR submissions. (*Id.* at ¶¶ 4-6, 11.) Mr. Hodge characterized the idea that Mr. Allen was a "criminal mastermind" as "outrageous." (*Id.*)

Any fair reading of the evidence leads to the conclusion that Mr. Allen was not the "leader" or "orchestrator" of the offense. For this reason, there is no basis for a sentencing enhancement under Section 3B1.1.

### B.   No Loss, Actual or Intended, Resulted From the Offense.

The PSR states that a 14-level increase in Mr. Allen's sentence is warranted because he "intended loss" of $1,149,671.76. (PSR, at 22-23, 27, ¶47, ¶57.) The PSR states that "from September 2005 through May 2009, numerous emails between Allen, Thompson, Motomura, Conti, Robson, Yagami, Trader-R1, Trader-R2, Trader-R3, Submitter-R1, and Submitter-A, included conversations regarding the manipulation of benchmark interest rates in their favor." (PSR, ¶ 47.) According to the PSR, the "Government estimates that if the LIBOR

was successfully moved at each request, one-eighth of a basis point, in whichever direction
benefitted Rabobank, their counterparties would have suffered losses totaling $1,149,671.76."
*Id*.

Mr. Allen objects to this enhancement because the PSR provides no basis on
which the Court could find, by a preponderance of the evidence, that Mr. Allen personally and
purposefully sought to inflict—meaning that it was Mr. Allen's "'conscious object' to cause"—a
loss of approximately $1.1 million to Rabobank's counterparties. The PSR's estimate of
intended loss is contrary to both controlling law and the factual record.

1. *The Sentencing Commission Significantly Revised the Definition of
   "Intended Loss" Effective November 1, 2015.*

The definition of "intended loss" was amended in the recent revisions to the
Sentencing Guidelines and went into effect on November 1, 2015.[2] Intended loss now means the
"pecuniary harm that the defendant purposefully sought to inflict." U.S. Sentencing Guidelines
Manual §2B1.1(b)(1) cmt. n.3 (A)(i)-(ii) (Nov. 2015). Intended loss is a subjective standard.
(*See* Ex. 23 (U.S. Sentencing Comm'n, Amendments to Sentencing Guidelines, dated April 30,
2015) at 24-25.) It does *not* include losses purposefully sought by a defendant's co-conspirators,
but not purposefully sought by the defendant himself. (*Id*.)

The new definition of "intended loss" marks a substantial departure from the
previous rule. From November 1, 2001 until November 1, 2015, the Guidelines defined
"intended loss" to mean "the pecuniary harm that was intended to result from the offense"
including "intended pecuniary harm that would have been impossible or unlikely to occur." (*Id*.)
But, on January 16, 2015, the Commission issued a set of "Proposed Amendments to the

---

[2]    "A sentencing court generally is required to apply the Guidelines Manual in effect at the
time of sentencing." *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995).

Sentencing Guidelines" and sought public comments.  (Ex. 24 (U.S. Sentencing Comm'n,

Proposed Amendments to the Sentencing Guidelines, 80 Fed. Reg. 2570 (January 16, 2015).)

One of the Proposed Amendments was a revision to the definition of "intended loss."  (*Id*. at 72-

74.)  The Commission explained that its revision was a reaction to comments received by the

Commission "expressing concern regarding the operation of intended loss" and suggesting that

the Commission revise the definition to "better reflect a defendant's culpability."  (*Id*. at 73.)

        Although the Commission did not state so specifically, it was almost certainly

referring to the November 10, 2014 report authored by the ABA Task Force and this Court.  In

its proposed changes to the Guidelines for economic crimes, the Task Force recommended that

the Commission eliminate "intended loss" altogether and only impose sentencing enhancements

for actual loss.  (Ex. 4, at 1.)  In the Task Force's view, the "minimum" change that the

Commission should make to the definition of intended loss would be to "clarify that intended

loss is limited to that which the defendant purposefully sought to inflict."  (Ex. 5, at 14-15.)  The

Task Force explained its reasoning: "the use of aggregate loss to drive culpability is sustainable

where those losses are actual, but this justification loses much of its force where the losses exist

only in the minds of others."  (*Id*.)

        In light of this recommendation, the Sentencing Commission's Proposed

Amendments included two different "options" for a revised "intended loss" definition.   (Ex. 24.)

The Commission specifically sought public feedback to help it determine the better course.

"Option 1" in the January 16, 2015 Proposed Amendments was that "intended loss" would mean

"the pecuniary harm that the defendant purposefully sought to inflict."  (*Id*.)  Option 1 was meant

to "reflect certain principles discussed in the Tenth Circuit's decision, *United States v. Manatau*,

647 F.3d 1048 (10th Cir. 2011)."  (*Id*.)  Under Option 1, the appropriate standard would be the

defendant's "subjective intent to cause the loss." (*Id*. at 74 (*citing Matatau*, 647 F.3d at 1056).)

"Option 2" in the January 16, 2015 Proposed Amendments was "similar to Option 1, but would

also encompass the pecuniary harm that any other participant purposefully sought to inflict, if the

defendant was accountable under §1B1.3(a)(1)(A) for the other participant." (*Id*.)  In fact, the

Commission specifically sought comment on the following question:  "Should intended loss be

limited to the amount the defendant personally intended, or should it also include amounts

intended by other participants, such as participants (i) that the defendant aided and abetted,

and/or (ii) that were in a jointly undertaken criminal activity with the defendant?"  (*Id*. at 75.)

On March 9, 2015, the Justice Department submitted a response to the Sentencing

Commission regarding the proposed revisions to the definition of "intended loss." (*See* Ex. 25

(DOJ Comments on Proposed Amendments, dated March 9, 2015).)  The Government informed

the Commission that it "opposed redefining 'intended loss' using the *Manatau* framework."  (*Id*.)

In response to the Commission's specific question about loss intended by others engaged in a

jointly-undertaken criminal activity, the Government informed the Commission that it

"prefer[ed] Option 2" because under Option 2, defendants would be held "responsible for

conduct of other participants in jointly undertaken criminal activity, (*i.e.*, conduct the defendant

agreed to participate in)." (*Id*. at 29.)

On April 30, 2015, the Commission issued revised "Amendments to the

Sentencing Guidelines," effective November 1, 2015, *rejecting* the Government's position.  (*See*

Ex. 23, at 28.)  The Commission explained that a subjective inquiry into the defendant's purpose

was required and specifically stated that it was "adopt[ing] the approach taken by the Tenth

Circuit" in *United States v. Manatau*.  (*Id*. at 24-25.)  In *Manatau*, the Tenth Circuit confirmed

that "intended loss does not mean a loss the defendant merely *knew* would result from his

38

scheme or a loss he might have *possibly and potentially* contemplated." *Manatau*, 647 F.3d at 1050 (emphasis in original.)  Instead, only financial losses that a defendant "had a 'conscious object' to cause" may be included.  (*Id*.)  Even losses that a defendant is "aware" are "practically certain" to result from his conduct may not be included.  (*Id*.)

The PSR's $1.1 million intended loss estimate ignores the Sentencing Commission's revised definition of intended loss and is therefore inappropriate.  Nothing in the record establishes that Mr. Allen "had a 'conscious object' to cause" any particular monetary harm.  *Manatau*, 647 F.3d at 1050.

First, it is undisputed that when Mr. Allen received requests from swap traders, he had no knowledge of the terms of their swap or what loss, if any, would result from any change to his LIBOR submission.  The trading folders of Rabobank's derivative traders were locked and LIBOR submitters did not have access to derivative positions, so it was *impossible* for Mr. Allen to know what transactions, if any, might be affected by LIBOR on a given day.  (Ex. C (Stipulation), at ¶22; Tr. 269:9-16.)

Second, the Government has not, and cannot, show that Mr. Allen in fact changed his LIBOR submission when he received any of the 16 requests sent to him, particularly since he responded on only 4 occasions and the Government's analysis found that the submission was inconsistent with the request on at least one of those occasions.  There is therefore no basis to conclude that Mr. Allen ever purposefully sought to inflict financial harm following any particular one of the few requests he received.[3]

---

[3] Indeed, the offense conduct here did not necessarily encompass conduct which contemplated any financial loss at all.  Because the jury was instructed that it could find that Mr. Allen possessed specific intent if he intended to "deprive one or more of the counterparties of material information," the offense did not require a finding that Mr. Allen intended financial loss.  (Tr. 1632:7-9, 1634:6-12.)

Considering these facts, there is no basis to find that Mr. Allen purposefully sought to inflict any particular monetary loss, and any sentencing enhancement is therefore unwarranted.

2.     *The Government's Estimate of Intended Loss, as described in the PSR, is Incorrect.*

Even on its own terms, the PSR's intended loss estimate is overstated.  First, the estimate is based on 201 written or recorded communications in which a Rabobank trader sought a higher or lower LIBOR.  (Declaration of Kyle Dornbos ("Dornbos Decl."), March 2016, at ¶ 2.)  The intended loss estimate is not based on LIBOR requests that Mr. Allen received or responded to, but rather hundreds of communications that Mr. Allen was not party to.  (PSR ¶ 47 (estimate based on "numerous emails between Allen, Thompson, Motomura, Conti, Robson, Yagami, Trader-R1, Trader-R2, Trader-R3, Submitter-R1, and Submitter-A" in the years 2005-2009).)  Of the 201 communications included, Mr. Allen received only 16 and responded to just 4.  (Ex. C (Stipulation), at ¶¶ 5,6.)  Of the 4 that Mr. Allen responded to, even the Government agrees that only 3 were "accommodated."  (*Id*. at ¶8.)

Any estimate of "intended loss" must be based solely on pecuniary losses that Mr. Allen personally and purposefully sought to inflict.   For this reason, and as described above, there is no "intended loss."  But, if the Government wanted to put forward an argument that even attempted to reflect the law, its analysis should have gone no further than the three LIBOR requests to which Mr. Allen actually responded and which the Government contends were accommodated.

The Government's intended loss estimate also assumes that every communication about LIBOR was fraudulent.  This assumption is contradicted by the record.  As discussed above, Mr. Yagami testified at trial that he sometimes sent LIBOR requests that were unrelated

to his own trading interests, but were instead his honest estimate of the Yen cash market.  (Ex. C
(Stipulation), at ¶13; Tr. 753:2-18, 756:22-759:13; DX288 (stipulation regarding request dates in
which Mr. Yagami and Mr. Motomura did not have any trading positions with external
counterparties).)  Despite this fact, the Government's intended loss estimate incorrectly assumes,
in 24 different instances, that Mr. Yagami's communications about LIBOR were fraudulent,
even though it is a stipulated fact that Mr. Yagami did not have any trading positions on those
dates that could have motivated his request.  (Ex. C (Stipulation), at ¶¶ 13, 14.)  None of these
communications should have been included.

        The Government even asserts that Mr. Allen intended loss on days in which the
Government's own conclusion was that the LIBOR request was *not* followed.  (*Id*. at ¶¶ 11, 12.)
FBI accountant Kyle Dornbos analyzed the 201 requests that are included in the intended loss
calculation.  He concluded, in 114 cases, that the request was not accommodated or that it was
impossible to say whether the request was accommodated.  (*Id*.)  The Government's "intended
loss" of approximately $1.1 million, however, *includes* the 114 instances in which the
Government's own accountant concluded there was no basis to conclude that manipulation
occurred.  (*Id*.)

        Furthermore, the Government told the jury that it was not alleging that every
trader request was accommodated, and its intended loss estimate should not be contrary to its
own description of the allegations.  (*See* Tr. (Gov. Closing) at 1463:6-16 ("But the biggest
question with this idea of ['] was every request accommodated[?' is]: so what?  Every request
doesn't have to be accommodated.  That's not the allegation."); Tr. (Gov. Closing) 1461:25-
1462:4 ("There was a lot of testimony on ['] was this particular request accommodated, did
somebody make the submission that was asked for on this particular day[?'].  And the answer is

no.  It appears from the evidence that that not every single request was accommodated and that is not surprising.").)  Because the Government did not even *allege* that every request was accommodated but rather has admitted that every request was *not* accommodated, it is inappropriate to sentence Mr. Allen on a theory that every request was accommodated and intended to cause financial loss.

Indeed, even where the Government asserts that a request was "accommodated" in the corresponding LIBOR submission, the Government is unable to determine what percentage of those LIBOR submissions were specifically intended to accommodate trader requests, and which were only coincidentally consistent with those requests.  It is for this reason that Mr. Dornbos told the jury at trial that even when a submission was consistent with a request, it was "not necessarily" the case that Rabobank "manipulated" LIBOR on that day.  (Tr. 917:17-918:11.)  Without the ability to reach this conclusion, however, the intended loss estimate is necessarily overstated.

The Government also lacks any basis for claiming that Mr. Allen purposefully intended for Published LIBOR to move "one-eighth of a basis point" on each day.  (PSR ¶ 47.)  The assumption of a "one-eighth basis point" impact is completely arbitrary, cannot be proven by a preponderance of the evidence, and is therefore inappropriate.  KPMG performed an analysis indicating that, in 11 of the 16 months between September of 2007 and December of 2008, Rabobank's submission was *excluded* from the calculation of the 3M USD LIBOR fix over 50% of the time (because Rabobank's submission was among the four highest or lowest of the banks on the panel).  (Ex. C (Stipulation), at ¶25; Ex. 26, at 20.)  KPMG's results invalidate the Government's operating assumption that Rabobank moved the overall fix by 1/8 of a basis point on each of the 201 dates.  (*Id*.)

The flaws in the Government's intended loss calculation also extend to the Government's decision to include as "intended losses" potential losses arising out of transactions affected by LIBOR that were booked by anyone at Rabobank, not just the trader who made the request. (Ex. C (Stipulation), at ¶ 19.)  For example, if Mr. Yagami emailed a request to Paul Robson for a "high" 6M JPY LIBOR, the Government did not restrict its assessment of "intended loss" to transactions in Mr. Yagami's trading book that would have benefitted from a "high" 6M JPY LIBOR.  Instead, the Government's argument is that, in this instance, Mr. Allen—who, as an initial matter, had no knowledge that Mr. Yagami had even made the request—purposefully sought to inflict pecuniary harm on external financial institutions engaged in trades with Rabobank employees based in Canada, or the Netherlands, or Australia, even though these trades have absolutely no connection to Mr. Yagami or Mr. Robson, much less Mr. Allen.

Furthermore, the Government's intended loss estimate assumes that none of the affected counterparties had hedged their positions, an assumption which is contradicted by the record. (Ex. C (Stipulation), at ¶3.)  Numerous Rabobank counterparties were interviewed by the Government during its investigation and all of them said that their transactions with Rabobank were hedged, either completely or to a significant degree.  (*Id*.)  If the counterparty's transaction with Rabobank was itself a hedge to a larger position with another financial institution, the counterparty would have lost money on its swap with Rabobank but earned profits of an even larger amount on its other swap, resulting in a net benefit to that counterparty.  If the counterparty had hedged its swap with Rabobank by engaging in smaller swap transactions with other financial institutions, the loss on its Rabobank swap would have been offset, likely by a significant amount.

For example, the Government's estimate assumes that Mr. Allen purposefully sought to inflict monetary loss to JP Morgan of $103,796, resulting from 448 different transactions over a four year period.  The Government, however, has interviewed a representative from JP Morgan, who explained JP Morgan's trades with Rabobank were almost entirely hedged because its traders "attempted to maintain a 'flat' book."  (Ex. 27.)  The Government ignores this fact entirely.  Likewise, the Government asserts that Mr. Allen purposefully sought to inflict monetary losses of $781 to Dean Foods, arising out of its swap contract with Rabobank, which fixed on March 29, 2007.  The Government makes this assertion despite the fact that Dean Food's former Treasurer has previously informed the Government that Dean Foods would have profited, rather than been harmed, from the manipulation of LIBOR that the Government asserts took place on March 29, 2007.  (Ex. 28.)

The Government's intended loss estimate is also purposefully punitive.  If the Government determined that a particular counterparty stood to gain money on one of the days in question, that counterparty was excluded from the analysis.  The result of this decision is a wildly-inflated "intended loss" number that attributes potential loss to counterparties who very well may have benefitted from the scheme.  For example, if the Government determined that JP Morgan could have lost $1,000 on Day 1, due to an alleged manipulation of LIBOR, it would have added $1,000 to its intended loss calculation.  If, however, the Government then determined that JP Morgan would have gained $3,000 on Day 2, due to an alleged manipulation of LIBOR, it excluded that fact from its intended loss estimate.  Mr. Allen is therefore treated as having "intended losses" to JP Morgan of $1,000, even though the Government's own methodology leads to the conclusion that JP Morgan achieved a benefit of $2,000 from the scheme.  Defendants know of no authority that justifies the Government's decision in this regard.

Above all else, the Government's work is simply sloppy.  For example, the Government's calculation purports to be an estimate of intended loss to Rabobank's counterparties.  Yet, a review of the Government's work demonstrates that it has included almost $100,000 worth of loss that is not associated with any external counterparty.  To accept the Government's work is to accept that "Asset Desk Rabobank Netherland," "CMSX Desk Rabobank Netherland," and "Obligatiebedrijf Rabo Netherland," and others like these, are independent, financial institutions unaffiliated with Rabobank.  (Ex. C (Stipulation), at ¶¶ 18, 24.)  This is plainly incorrect.  Because the Government's work includes careless errors—which add up to a significant percentage of its total calculation—its analysis is unreliable.  Mr. Allen's sentence should not be enhanced on the basis of unfounded assumptions, calculations that have never been verified, and a methodology of estimating intended loss that even the Government admits lacks any basis in academic or established authority.  (*Id*. at ¶4.)

The Government's estimate of intended loss also cuts substantial corners.  The Second Circuit has repeatedly held that for purposes of sentencing, "loss must be the result of the fraud."  *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (*citing United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006)).  For example, in securities fraud cases, the sentencing court is required to "disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes." *Rutkoske*, 506 F.3d at 179 (internal citations omitted).

Here, the Government's theory was that Defendants' LIBOR submissions were based on a mix of "legitimate" and "illegitimate" factors.  (Tr. (Gov. Closing) 1609:13-17; *see e.g.* Tr. (Charge Conference) 1346:24-1347:6 (Mr. Young: "I think the particular evidence we are concerned about is the jury will think, well, the defendant, when he submitted that rate or

45

caused somebody else to submit the rate, he had two things in mind.  The first was he was relying on some broker report, which he thought supported the rate, but he was also doing it with an intent to defraud a counterparty."); Tr. (Charge Conference) 1378:24-1379:9 (The Court: "It's not as if anyone is claiming that Mr. Allen or Mr. Conti just made up levels out of whole cloth in order to accommodate trading positions."); Tr. (Charge Conference) 1395:15-1396:10 (The Court: "[Defendants] weren't totally ignoring all the other factors.  They were factoring that in.  Then they raised it or lowered it accordingly to reflect their trading level.  But it wasn't like the whole number was made up out of whole cloth….That's what [the Government] is getting at."); Tr. (Charge Conference) 1397:10-22 (Mr. Young:  "[A] huge part of defendants' case was these broker reports.  And the broker reports were meant to suggest that there could have been legitimate reasons for submitting exactly what the defendants thought.").).

The Government's estimate of "intended loss," however, incorrectly attributes changes in Published LIBOR exclusively to fraud.  But, under controlling Second Circuit authority and in light of the Government's own admissions at trial, it is inappropriate, for estimation purposes, to assume that changes in Published LIBOR that resulted from Mr. Allen's submissions are wholly attributable to fraud.  Rather, the Government is obligated to "disentangle" changes in Published LIBOR that resulted from Mr. Allen's consideration of "legitimate factors" from changes in Published LIBOR that resulted from Mr. Allen's consideration of Rabobank's interests.  *Ebbers*, 458 F.3d at 128  ("Losses from causes other than fraud must be excluded from the loss calculation.").

Because the Government has not shown by a preponderance of the evidence that Mr. Allen purposefully sought to inflict $1,149. 671 in monetary losses, there is no basis for the fourteen-level enhancement the Government seeks.

C.    **There is No Evidence that Mr. Allen Intended a Loss to the World Financial Markets of $300,000,000 or More.**

The PSR states that the Government "will be seeking an upward departure" in Mr. Allen's sentencing because the Government believes that an "intended loss figure in excess of $100 million may be appropriate."  (PSR ¶ 120.)  More specifically, the Government estimates that "if the defendants were successful in this scheme, the world financial markets who also had financial stakes with LIBOR would have suffered a loss of $300,000,000."  (PSR ¶ 47.)  Since reporting this estimate to Probation in late January 2016, the Government has decided that Mr. Allen actually intended a loss to the world financial markets that is twice that size, approximately $631,000,000.  (Dornbos Decl. at ¶15.)  Neither figure can be proven by a preponderance of the evidence.

As an initial matter, the Government admits that its calculation of intended market loss is not supported by any academic or established authority.  (Ex. C (Stipulation), at ¶4.)  The Government's accountant, Mr. Dornbos, simply made up his methodology as he went along.  His work has not been reviewed, or even double-checked, by anyone, and certainly not by an established expert with experience in calculating a "harm to the market" analysis.  "Market harm" is a frequently litigated issue in the civil securities context, and in securities fraud cases, and for that reason, there may very well be an established method for calculating harm to the market as a whole.  Mr. Dornbos's method, however, is not it.

Mr. Dornbos's methodology is flawed at every turn.  In summary, Mr. Dornbos looked at a handful of reports issued by third-parties—*e.g.,* Bloomberg LP, the Bank of International Settlements, and SIFMA—regarding market activity in financial products that he thought might be tied to LIBOR.  (Dornbos Decl. at ¶ 8.)  Mr. Dornbos did not restrict his analysis to interest rate swaps, even though they are the only financial product at issue in this

47

case.  Instead, Mr. Dornbos included financial instruments like credit default swaps, mortgages, consumer credit cards and other types of consumer credit, futures traded on the Chicago Mercantile Exchange, and "collateralized debt obligations." (*Id.*)  Mr. Dornbos also looked at data collected by Bloomberg LP regarding "corporate debt," but the Government did not produce those Bloomberg reports to Defendants, so Defendants do not know what products "corporate debt" might refer to.  (*Id.*)

Mr. Dornbos looked, for example, at the Federal Reserve Bank's website, which contains the Fed's estimate of "outstanding consumer credit," organized by month and year. (Ex. 29.)  For example, the Fed's website estimates that there was $2,290,928.13 (in millions) in consumer credit outstanding in January 2006.  (*Id.*)  Mr. Dornbos added together the estimates of outstanding consumer credit found on the Fed's website for each of the months between January 2005 and October 2008.  (Dornbos Decl. at ¶ 8.)  The Fed's website does not state what products are included in its estimate of outstanding consumer credit.  (Ex. 29.)  The Fed's website does not state how much of the estimated consumer credit is tied to LIBOR, or the tenor and currency that it would be tied to, if it was tied to LIBOR at all.  (Ex. 29.)  Mr. Dornbos, however, assumed that *all* outstanding consumer credit in the United States is tied to LIBOR.  In doing so, he disregarded basic common sense, since any person who has ever held a credit card with a fixed APR could have told him that all outstanding consumer credit in the United States is *not* tied to LIBOR.  Mr. Dornbos then decided that 87.12% of the outstanding consumer credit in the United States is tied to 3M USD LIBOR.  (Ex. C (Stipulation), at ¶27.)  His basis for this assumption was his review of trading data from the LIBOR Panel Banks under investigation by the Department of Justice and the percentage of interest rate swaps in that data that was tied to 3M USD LIBOR.  (*Id.*)  In other words, Mr. Dornbos personally reviewed some data regarding

trading in  interest rate swaps by international banks, and he decided that all of the patterns that

he detected in that data would also accurately apply to consumer credit debt in the United States.

Mr. Dornbos followed a similar process—including the same leaps of logic

regarding LIBOR's applicability—with respect to each of the financial products that he was

interested in, namely, interest rate swaps, credit default swaps, mortgages, consumer credit cards

and other types of consumer credit, corporate debt, futures traded on the Chicago Mercantile

Exchange, and collateralized debt obligations.  After adding up the information contained in the

handful of reports and websites that he decided to look at, Mr. Dornbos concluded that he had

accurately calculated the total value of all the financial products in the entire world that were tied

to LIBOR, over a four-year period.  (Dornbos Decl. at ¶¶ 9, 10.)

The Government claims that Mr. Dornbos is "a lay witness who performed

mathematical computations."  (Ex. 30.)  However, an average person in everyday life could not

complete the analysis Mr. Dornbos describes.  In addition to the above, Mr. Dornbos states that

he divided his total volume amount by "250, the number of trading days per year, to determine

the average daily global volume of transactions referencing U.S. Dollar LIBOR and Japanese

Yen LIBOR."  (Dornbos Decl. at ¶¶ 9.)  He then "converted each of these amounts to dollar

value per basis point (DV01), by multiplying by one basis point, and applying the interest period

to each amount.  The formula for this calculation is therefore DV01 = NV*.0001 * (30 days *

number of months in tenor) / 360 days, where NV is the referenced daily global volume of

transactions by tenor for each currency benchmark."  (*Id*.) According to Mr. Dornbos, "the

resulting value reflects the incremental effect of a single basis point change in the corresponding

LIBOR fix, excluding futures."  (*Id*.)  Mr. Dornbos's description of his methodology with respect

to futures is especially incomprehensible:

Unlike my estimation of "book loss," my estimation of "market loss" attempts to account for losses sustained as a result of futures contracts linked to the U.S. Dollar benchmark.  Because futures contracts, unlike interest rate swaps, are exchange traded instruments that can be bought or sold before maturity, the price of a given futures contract can be influenced by a movement in LIBOR at any time before its expiration date, not just upon expiration.  The impact of a change in the LIBOR fixing on the price of a futures contract therefore increases as its expiration date approaches, eventually reaching 100 percent if the future is held until expiration.  This correlation was found to be highest for the three contracts expiring closest to the fixing date (also referred to as the front three).  To estimate the impact of a one basis point change in LIBOR on futures contracts, I calculated the average minimum possible change in the value of the front three contracts for each year and included that value in our harm calculation for the one and three month Eurodollar futures contracts.

(*Id*. at 11.)

Finally, all of the flawed assumptions that invalidated Mr. Dornbos's estimate of intended loss to Rabobank's counterparties are also present in his intended market loss estimate. The Government cannot point to any evidence demonstrating that Mr. Allen specifically sought to inflict, or even contemplated, harm to the world's markets, including those for mortgages or consumer credit products.  The intended loss estimate is not based on LIBOR requests that Mr. Allen received or responded to, but rather hundreds of communications that Mr. Allen was not party to.  (PSR ¶ 47 (estimate based on "numerous emails between Allen, Thompson, Motomura, Conti, Robson, Yagami, Trader-R1, Trader-R2, Trader-R3, Submitter-R1, and Submitter-A" in the years 2005-2009).)  Of the 201 communications included, Mr. Allen received only 16 and responded to just 4.  Of the 4 that Mr. Allen responded to, even the Government agrees that only 3 were "accommodated."  Despite this, Mr. Dornbos's analysis assumes that Mr. Allen intended market loss for 201 different requests.  Mr. Dornbos's market loss estimate incorrectly assumes, in 24 different instances, that Mr. Yagami's communications about LIBOR were fraudulent, even though it is a stipulated fact that Mr. Yagami did not have any trading positions on those

dates that could have motivated his request.  None of these communications should have been included.  The intended market loss estimate includes 114 instances in which Mr. Dornbos himself concluded that it was impossible to say manipulation had occurred.  His assumption of a "one-eighth basis point" impact is completely arbitrary, cannot be proven by a preponderance of the evidence, and is therefore inappropriate.  Finally, the Government's intended market loss estimate assumes that no party in the world was hedged, at all.  (Dornbos Decl. at ¶¶ 15.)

The Government's assertion that Mr. Allen sought to inflict $631 million in losses on the financial markets is not supportable and no upward departure is appropriate.

### D.       There Are No Victims of the Offense.

The PSR states that a "two-level increase is warranted because the offense involved 10 or more victims, pursuant to §2B1.1(b)(2)(A)(i)." (PSR ¶ 61.)  However, the definition of "victim" is any person or entity which "sustained any part of the *actual loss* determined under subsection b(1)."  U.S. Sentencing Guidelines Manual §2B1.1(b)(1), cmt. (n.1) (Nov. 2015).

The PSR finds that "no financial losses were suffered by any of the intended victims."  (PSR ¶ 47.)  The Government has agreed that it does not possess "the trading data for the myriad institutions that had an interest in LIBOR on the days for which [the Government] identified a manipulation."  (Ex. 31.)  Even if the Government had that data, it advised Defendants, "reconstruction of the net sensitivity to LIBOR of so many large institutions would be practically impossible."  (*Id*.)  For that reason, the Government's "analysis is based on intended loss, not the amount which victims were out of pocket (after controlling for hedges or net exposure to LIBOR)."  (*Id*.)  Put more simply, the Government does not possess the trading data of Rabobank's counterparties and could not determine the amount which the "victims were out of pocket," even if it did have that information.  (Ex. C (Stipulation), at ¶ 33.)

51

Nonetheless, the PSR finds that there were ten "victims" who sustained "actual losses." (PSR, at 23.) These "actual losses" are not quantified in the PSR. Without quantifiable "pecuniary harm"—defined as harm that is "measurable in money"—it is impossible for the Court to find "actual loss." U.S. Sentencing Guidelines Manual §2B1.1(b)(1), cmt. (n.3(i), (iii)) (Nov. 2015). Thus, there are no "victims," as that term is defined in the Guidelines, and the two level enhancement in the PSR is unwarranted. *United States v. Skys*, 637 F.3d 146, 155 (2d Cir. 2011) (remanding because the "court did not determine the amount of actual losses suffered by the four financial institutions—or even whether they suffered actual losses at all" and therefore the court's "findings were insufficient to support the 10-victim enhancement under subsection (b)(2) and insufficient to permit meaningful appellate review").

### E.    An Abuse of Trust Enhancement is Inapplicable.

The PSR states that a two-level increase in Mr. Allen's sentence is warranted because he "abuse[d] a position of private trust." (PSR ¶ 66, at 23-24.) More specifically, the PSR states that Mr. Allen was "entrusted by the British Bankers' Association" with "responsibility for submitting honest LIBOR rate estimates." (*Id*.) The PSR contends Mr. Allen "abused the BBA's trust" by "submitting or causing to be submitted dishonest LIBOR rate estimates reflecting an intent to benefit Rabobank's trading positions to the detriment of Rabobank's counterparties." (*Id*.) The PSR then concludes by stating, "in Allen's supervisory role, he possessed and exercised significant managerial discretion over Rabobank's LIBOR submissions." (*Id*.) Each of these findings are inconsistent with the record. In addition, even if they were accurate summaries of the evidence, which they are not, they fail, as matter of law, to support an enhancement for "abuse of private trust."

Section 3B1.3 provides for a two-level enhancement if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated

52

the commission or concealment of the offense." To avoid double-counting, "this adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S. Sentencing Guidelines Manual §3B1.3 (Nov. 2015). The abuse of trust enhancement therefore may not be imposed on a defendant convicted of fraud solely because he violated an obligation to be truthful, because that would constitute double-counting, as every fraud involves this element. *See United States v. Hirsh*, 239 F.3d 221, 227-228 (2d Cir. 2001); *United States v. Broderson*, 67 F.3d 452, 455-56 (2d Cir. 1995) (where defendant's fraudulent conduct was falsely signing a certificate of compliance, any "abuse of trust" was inherent in the fraud itself and it would therefore be double-counting to apply the sentencing enhancement).

Moreover, just because a convicted defendant is a manager or executive does not mean he has abused a position of trust. The "trust" that the enhancement is concerned with is not a general sense of moral responsibility, but a specific bestowment of "discretion" that is entrusted to the defendant by the victim personally. *Broderson*, 67 F.3d at 455-56; *United States v. Jolly,* 102 F.3d 46, 48 (2d Cir. 1996) (noting that the Guidelines' examples limit the enhancement to "factual situations in which the defendant occupies a position vis-à-vis the victim that is in the nature of a fiduciary relationship"). In *Broderson*, the Second Circuit confirmed that it was inappropriate to apply the abuse of trust enhancement to the defendant—a high-ranking executive who had managerial responsibility at the company—because there was no evidence that the victim, NASA, had placed any specific trust in the defendant. *Id.* Indeed, in *Jolly*, the Second Circuit confirmed that there is no "abuse of trust" where the "fraud occurs in arm's-length transactions not involving fiduciary-like relationships." 102 F.3d at 49-50; *see also*

*United States v. Brunson*, 54 F.3d 673, 677 (10th Cir. 1995) (no abuse of trust in arm's-length commercial transactions).

The PSR's recitation of the factual record is both incorrect and legally insufficient. As an initial matter, the PSR is simply wrong when it states that in Mr. "Allen's supervisory role, he possessed and exercised significant managerial discretion over Rabobank's LIBOR submissions." (PSR ¶ 66, at 23-24.) As described above, the Government's cooperators all testified that Mr. Allen did *not* supervise Rabobank's LIBOR submissions and there is nothing in the documentary record that would otherwise support such a finding.

Second, the contention that Mr. Allen "abused the BBA's trust" by "submitting or causing to be submitted dishonest LIBOR rate estimates reflecting an intent to benefit Rabobank's trading positions to the detriment of Rabobank's counterparties" is pure speculation. (PSR, at 23-24.) The Government did not elicit any testimony at trial about what the BBA expected from Mr. Allen, or what conduct would have constituted a violation of its' "trust."

In fact, the sworn testimony of John Ewan, the BBA's LIBOR Manager, offered in Thomas Hayes's trial and the brokers' trial in the United Kingdom, leads to the opposite conclusion. Mr. Ewan explained that, at the time, it was the BBA's view that a "contributor panelist who can borrow in reasonable market size at any one of a wide range of offered rates commits no falsehood if she bases her response to the daily LIBOR survey upon the lowest of these or the highest (or any arbitrary selection from nothing [sic] them)." (Ex. 12 (Hayes Tr., June 9, 2015, Day 10) at 107:7 – 107:22).) It was the BBA's position that as long as the rate submitted was within the "wide range of offered rates" for that Panel Bank, the submission was "perfectly consistent with the definition." (*Id*.) Mr. Ewan's testimony about the BBA's understanding of "falsehood," *see id*., with respect to LIBOR is consistent with the trade

organization's actions during this time.  The BBA was made aware that Panel Banks were

selecting their LIBOR submissions based on their own financial interests, but it did not stop the

practice.  (Ex. 12 (Hayes Tr. at June 5, 2015, Day 8, at 143:22 – 144:15 (BBA informed that

because a Panel "bank's profit depends partially on the LIBOR[,] it prefers a high or low LIBOR

on a specific date."); June 8, 2015, Day 9, at 18:21 – 20:19 (BBA informed that Credit Suisse

believed Panel Banks were quoting high or low LIBOR rates depending on their derivative

positions), at 21:7 – 21:9 (BBA informed that HSBC "suspect[s] that certain nameless

contributors might be setting their rates with an eye on their derivatives book."), at 23:24 - 25:19

(BBA informed of Panel Banks whose "LIBOR quotes are high because they are set by the

treasury function within the bank" which then "goes on to use the LIBOR rate internally in the

bank," so that "the treasury department can make extra profit by charging other departments in

the bank itself at that artificial rate!"), at 49:16 – 49:19 (BBA informed that "it is in the interests

of most of the contributors to set there [sic] contributed rates at a few points higher. This is

because it makes their loan book a bit more profitable."), at 53:15 – 53:22 (BBA informed that

"[r]ate setters are obviously setting to suit their underlying positions to some extent. If they're

long, they will set below. If they're being aggressive, they will set above."); *see also* Ex. 32

(Testimony of John Ewan, October 14-15, 2015).)

   Mr. Ewan's sworn testimony demonstrates that the BBA accepted LIBOR

submissions that reflected the financial interests of the submitting institution and squarely *refutes*

the Government's contention that a LIBOR submission was dishonest if it reflected a Panel

Bank's financial interests. Defendants filed two separate motions asking the Court for permission

to take a Rule 15 deposition of Mr. Ewan.  Both were denied, on the opposition of the

Government, which vehemently opposed the defense's efforts to introduce evidence from the

BBA at trial.  It is unfair to argue that Mr. Allen should receive an enhanced sentence on the

basis of a supposed violation of BBA trust that the Government made certain Mr. Allen could

not explore at trial.

In any event, Mr. Allen did not have a fiduciary relationship to the BBA.  In the

Second Circuit, there is no "abuse of trust" except where "the defendant occupies a position vis-

à-vis the victim that is in the nature of a fiduciary relationship." *Jolly*, 102 F.3d at 48-50

(emphasis added.)  For this reason, the two-level enhancement for "abuse of trust" is

unwarranted.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a non-custodial sentence, which we submit is sufficient but not greater than necessary to satisfy the objectives of sentencing.


Dated:   New York, New York
         March 3, 2016

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Michael S. Schachter

Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000

*Attorneys for Defendant Anthony Allen*