## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                         :
                                                  :
     v.                  :
                                                  :  Case No. S4 14-CR-272 (JSR)
ANTHONY ALLEN,                                    :
PAUL THOMPSON,                                    :
TETSUYA MOTOMURA, and                             :
ANTHONY CONTI,                                    :
                                                  :
Defendants.                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### SENTENCING MEMORANDUM
### ON BEHALF OF ANTHONY CONTI

**TOR EKELAND, P.C.**
Tor Ekeland
Aaron Williamson
195 Plymouth St, Floor 5
Brooklyn, NY 11201
(718) 737-7264 tel.
(718) 504-5417 fax
tor@torekeland.com
aaron@torekeland.com
*Attorneys for Defendant Anthony Conti*

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................2

I.     THE SECTION 3553(A) FACTORS WARRANT A LENIENT SENTENCE. .................2

    A.    Mr. Conti's History and Character ..........................................................2

    B.    The Nature and Circumstances of the Offense. ....................................13

    C.    A Non-Custodial Sentence is Adequate for Deterrence ........................18

    D.    A Non-Custodial Sentence is Appropriate Given the Available Sentences and Corresponding Correctional Treatment ...........................................21

        1.    Mr. Conti Will Be Ineligible For A Standard Minimum Security Designation Due To His Immigration Status ..............................21

        2.    Mr. Conti Will Be Designated to a Privately Contracted BOP Facility for Sentenced Criminal Aliens .....................................23

        3.    Mr. Conti Will Not Be Eligible for Pre-Release Transition Through a BOP Residential Re-Entry Center .........................................24

        4.    ICE Detainer Will Delay Mr. Conti's Release Beyond His BOP Release Date ..............................................................................25

II.    THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE. ......................27

    A.    No Loss Enhancement is Warranted. ....................................................27

    B.    No Abuse of Private Trust Enhancement is Warranted. .......................29

    C.    Because the Government Cannot Prove Actual Loss, the 10-Victim Enhancement is Unwarranted.. ..........................................................30

    D.    The Loss Estimate Overstates the Severity of the Offense ...................30

Case 1:14-cr-00272-JSR   Document 229   Filed 03/04/16   Page 3 of 34

# TABLE OF AUTHORITIES

**CASES**

*United States v. Adelson*, 441 F. Supp. 2d 506, 508 (S.D.N.Y. 2006)……………………………2

*United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) ......................... 17, 18, 20, 27

*United States v. Manatau*, 647 F.3d 1048, 1052 (10th Cir. 2011)................................................. 28

*United States v. Stewart*. 590 F.3d 93, 141 (2d. Cir. 2009) .................................................... 16, 18

**STATUTES**

18 U.S.C. § 3553 .................................................................................................. 2, 15, 18, 21, 26

**OTHER AUTHORITIES**

United States Sentencing Guidelines, U.S.S.G. §2B1.1 ............................................................. 27

Defendant Anthony Conti respectfully submits this memorandum to aid the Court in his sentencing, currently scheduled for March 10, 2016.

## INTRODUCTION

As the Court will learn from the many letters submitted by his family, friends, and colleagues, Anthony Alan Conti is a man of humble origins, known for his kindness, integrity, and above all, his ceaseless devotion to his family. (*See* Ex. A.) He is a loving and supportive partner to his wife Lisa of 12 years, beloved and admired by her family. He is patient and attentive father, present in his children's lives at every opportunity. Every night after family dinner, he helps his school-aged girls, Lilly (10) and Mia (6) with their homework, then plays on the floor with his little son Samuel (20 months). When his brother Stephen lost his wife suddenly, half a world away, Mr. Conti dropped everything and arranged to travel with Stephen's son to grieve with him. When his father began slipping into dementia, Mr. Conti moved him close to his own family and saw to his care. When his father died, Mr. Conti took responsibility for his mother's care.

Mr. Conti's former colleagues describe him, without exception, as a hard worker, "completely honest and trustworthy." That he could be involved in a crime of dishonesty has come as a shock to the many people who know, to this day, "would never doubt Mr. Conti's integrity in any way." Their letters show how truly aberrant the instant offense is to Mr. Conti's character and history. They also underscore that Mr. Conti's conduct was not the greedy behavior of a callous fraudster. He did not stand to derive any personal financial gain from his conduct. Rather, he engaged in conduct that, regrettably, was condoned within the bank he worked for and all but normalized within the financial industry. While these facts do not excuse

1

dishonest conduct, they serve to illustrate that Mr. Conti poses no risk of recidivism, and militate

for a sentence reflecting that identical conduct has gone unpunished elsewhere.

Before being prosecuted for this offense, Mr. Conti had never been accused of

any crime. His trial—for offenses he never profited or sought to profit from—has devastated him

and his family, both financially and psychologically. His wife and children now face the

harrowing prospect of potentially losing him for years to incarceration in a foreign country. This

would leave Lisa to raise their children without their father and sole financial provider during

their crucial formative years.

Mr. Conti appeals now to the mercy and humanity of this Court. He asks that, in

imposing a sentence, the Court take account of his law-abiding history, his unselfish

commitment to the wellbeing of his family and friends, and his young family's future.

## ARGUMENT

In determining an appropriate sentence, "[t]he Court's first job [is] to calculate

what the sentence would be under the Sentencing Guidelines." *United States v. Adelson*, 441 F.

Supp. 2d 506, 508 (S.D.N.Y. 2006). However, for the reasons set out in Section II, below, "[t]his

is one of those cases in which calculations under the Sentencing Guidelines lead to a result so

patently unreasonable as to require the Court to place greater emphasis on other sentencing

factors." *Id*. at 506. The Court should instead "focus[] more on the statutory factors set forth in

18 U.S.C. § 3553(a)." *Id at* 512. Those factors counsel a sentence well below the Guidelines

range calculated by the Probation Office.

I.      **THE SECTION 3553(A) FACTORS WARRANT A LENIENT SENTENCE.**

A.      **Mr. Conti's History and Character.**

2

Tony Conti (46) was born March 11, 1969 in the Islington section of London, England, the son of Raymond Conti (now deceased) and Eileen Conti (nee Nash, now 74). After World War I, his father's parents had emigrated from Italy to England, where they opened up a sandwich shop. He describes his grandmother on that side as a "fiery Italian" woman, very much the head of their Catholic family.

Tony has fond memories of visiting his grandparents (on both sides) in Islington on Sundays. His father Ray was one of four brothers and Tony remains close to all of his uncles and their families. He now co-owns and operates a catering company with his dad's brother John. Just as Tony remains close with the family he came from, and he has fostered this value in his children. His daughter Lilly loves her extended family and is in regular contact with her cousins in Jersey and New Zealand.

Tony was raised in a two-bedroom apartment in Islington, on the third floor of a city-owned high-rise. He shared a bedroom with his older brother Stephen (now 51), whom he idolized and with whom he remains extremely close. They ran around and played soccer with friends, and followed the same teams. (Tony would later follow Stephen into banking.) The neighborhood was safe, if not exactly fancy.

His father, Raymond "Ray" Conti was a hardworking, hard-drinking construction foreman who had served in the UK military in Hong Kong. He worked long hours, so Tony's mother Eileen did most of the childrearing: driving the kids to school, keeping them clothed and fed. She worked part-time at department stores to support her husband and children. Tony describes his father as strict (though fair) and a bit scary when he was mad. Ray liked to gamble and, in his later years, Tony and his brother Stephen had to bail him out on occasion. Ray's

3

drinking was sometimes a problem, but he never abused his family. Tony's parents, like Tony himself, were kind, caring, and committed to their family.

While Tony's family was not especially religious, Tony was an altar boy and sang in the choir. From 1980 to 1985 (ages 11 to 16), he attended a renowned Catholic school in London, the Cardinal Vaughan Memorial School. The school was strict—teachers wore gowns and students wore uniforms—but Tony didn't mind: "It made me work hard." He was a well-behaved student who excelled in math, history, and English, among other subjects, and played for the school football and cricket teams. Though he enjoyed school, he was eager to get to work.

In 1985, when Tony was 16, his working-class roots took hold and he left school to begin his professional career in London, where his older brother Stephen worked in banking. By 1987 he'd followed in Stephen's footsteps and secured a job at the Bank of Nova Scotia, where he worked for two years in the back room processing trader's deals.

Eager for a chance to work as a trader, Tony moved in 1989 to the Bank of New York, where he again was relegated to the back room. After two years there, a former manager who had moved from Bank of Nova Scotia to Bank of Ireland offered him a job as a trainee trader. Tony was overjoyed, and accepted.

He worked at Bank of Ireland from 1991 to 1997, when the bank relocated 100 miles away from London. His superior at Bank of Ireland, Barry Littlefield, attests that Tony has always privileged his family and friends over money: "I did all in my power to persuade him to move with us, but he was a London boy and he just didn't want to move away from his family and friends. We offered him a decent amount of money to move, but the salary wasn't overly important to him, he wasn't really motivated by that." (Ex. A (Littlefield) at 21.) Of Tony's time there, a manager at the Bank of Ireland who worked with him writes: "I always found Tony to be

open and honest in all my dealings. I should note that I had occasions to call out other traders who were attempting to infringe our controls. To reiterate, I found Tony to be of upright and honest character with a strong sense of good family ethics." (*Id.* (Cosgrave) at 11.)

In 1998, Tony took a job as an interest rate trader at Rabobank London. In 2000, he began seeing the love of his life, Lisa Thirkettle (now Conti, aged 35), then a coworker at Rabobank. Of Tony's reputation at the bank, Lisa writes, "He would treat the back staff with the same attitude that he did the front office staff, which wasn't always the case with the other traders. He was known as 'The soft guy' on the desk and my colleagues and I only had kind words to say about him." (*Id.* (L. Conti) at 5.)

He and Lisa loved to travel, so when Tony was transferred to Singapore for work in 2002, Lisa quit her job to move there with him. Just one month into their life in Singapore, Tony was diagnosed with rectal cancer. This trauma tested both his body's resilience and his relationship's. But Lisa remained devoted throughout this difficult time. Thanks to her support, an early diagnosis, and a top surgeon, the mass was removed before it could spread. A few months after his recovery, Tony asked Lisa to marry him, and she said yes. They wed just six months later, in Essex, England on July 31, 2004. "We were both so happy and love each other today as much if not more than we did on our blessed wedding day," Lisa writes. (*Id.* (L. Conti) at 6.)

The following year Lisa and Tony returned to London, where Tony continued working for Rabobank, and began raising a family. They had a daughter, Lilly (now 10), who would later be followed by two siblings: Mia (now 6) and Samuel (now 20 months). The family all lives together in Essex, just outside of London, and Lisa remains fully supportive of Tony. Of the children, only Lilly is aware of Mr. Conti's legal trouble.

Tony worked at Rabobank until his position was outsourced to the Netherlands in 2009, at which point he took a job at a London brokerage house called RP Martins, followed by a then more senior role at Landesbank Baden-Wurttemberg (LBBW), a small German regional bank and commercial lender. He worked at LBBW for four years, only resigning in October 2014 when this prosecution became public, effectively ending his career in banking. Of his time there, one co-worker says: "He was accurate and diligent in his daily work and adhered to work related limits set by London and the Head Office in Stuttgart/Germany at all times. His professional attitude and co-operation made him a most respected and well-liked colleague in the London Office." (*Id.* (Klomps) at 19.) In July 2015, with no future in banking, he bought into a catering business started by his uncle John in 1969.

Tony's family weathered a series of heavy personal blows before this prosecution. In 2011, Tony's father's mental state began rapidly deteriorating. He was later diagnosed with dementia, and it advanced so relentlessly that Tony's mother Eileen would lock Ray in his room to protect him. Often Tony had to go into London to find and rescue his father, who would wander off and get lost in the city, sometimes as late as three in the morning.

After several months with nothing close to improvement, Tony and his mother decided that fulltime care for Ray was necessary, and they found him an assisted living home, which they would visit several times a week. They later moved him to a home in Islington, closer to Tony, where he lived out his remaining days until passing away from pneumonia in early 2013.

Around the same time their father's mind was being ravaged by dementia, tragedy struck Tony's brother Stephen. In December 2012, Stephen's wife died suddenly from a brain hemorrhage. Stephen was living in Abu Dhabi at the time, working and saving money to move to

New Zealand, his wife's home country, where she was still living. When she passed away, Stephen flew to New Zealand. Recalling Tony's support for him during this time, Stephen writes:

> Tony insisted on dropping everything in the U.K. and flew to my side, arriving in NZ two days later on the Friday of the same week… Tony also arranged that my eldest daughter whom was living in England (she was 14 at the time), was on the same flight and was also able to be by my side at this terrible time. Tony arranged all of this and had to pay all costs, as bank accounts in NZ were in probate and money was frozen etc and he did this without the slightest second thought, or hesitation. Tony took an enormous amount of the burden of funeral arrangements and organising "things" but, most importantly was there for me at a time when I truly needed my family around me. (*Id.* (S. Conti).)

This concern for the wellbeing of others is recalled time and again in the letters submitted by Tony's friends and family.

Of Tony's conviction last November, his wife Lisa writes: "[t]he day of the verdict is one I shall never forget, I believe my body went into shock and I could not really hear much more after the verdict apart from ringing in my ears and my body shook in disbelief. . . . From the day Tony was charged by the DOJ we agree to tell the truth and take on trial in the US to fight for his innocence." (*Id.* (L. Conti) at 6.) The Contis had to sell their house—the home for which Tony had worked 30 years—in order to pay legal fees, costs, and travel expenses.

For the past three years, Mr. Conti has lived in a constant state of anxiety and stress. "It's the last thing you think of before sleep and the first thing you think of when you wake up," he writes. "It never leaves you." As a result of this prosecution, Tony has experienced severe anxiety, depression, and insomnia for the last several years. His doctor prescribed him citalopram and diazepam, which he takes today. Because his previous bout with cancer arose during a period of high stress, Tony is understandably afraid that it could recur.

7

More than anything, however, Tony fears for the wellbeing of his children, stating, "My children will now not be able to go to university as we will not be able to pay for it. I am devastated about all of this. My children's lives will be ruined." His eldest, Lilly, is sensitive and bright. She knows something is wrong and has been meeting with a counselor at school to cope. Mr. Conti fears this will devastate her, and perhaps permanently disrupt her academic performance and social skills. Lisa writes:

> I could never have imagined the impact that it has already had on her [Lilly] since November. We have had to seek help from her school in order for her to cope with the upset and anxiety of not knowing if her Daddy will be home when he leaves for New York in March. (*Id.* (L. Conti) at 7.)

The other kids, feisty Mia (6) and happy Samuel (20 months), are too young to grasp the conversation that is looming. "It will be like a bereavement to them," Tony states. "They won't understand any of it." Lisa says. For financial reasons, they likely won't be able to fly to the U.S. to see him, to say nothing of the impact of a child seeing their father in a federal prison.

Thankfully, Tony's entire family remains incredibly supportive. His wife is still his best friend, a beacon in dark times; he says their marriage has never been stronger. He also talks to his brother (who still lives in New Zealand, where he has remarried) on the phone regularly, and visits his mother at the nursing home where she has retired. Eileen is in poor health, obese and battling high blood pressure, but she spends time with Tony, Lisa, and the children every weekend. Lisa says that her husband is Eileen's "main caretaker and only relative close by," adding, "I cannot think what effect him not being here would have on her." (*Id.* (L. Conti) at 7.)

8

Lisa continues, "The thought of my children being without their father here is one I cannot comprehend." (*Id.* (L. Conti) at 7.) Like the dozens of other family and friends who have written in support of Tony, she begs for compassion at sentencing, in consideration not only of their family circumstances but of Tony's long history of admirable, law-abiding behavior. The instant offense is his first; he did not benefit from it financially or otherwise, and he never grasped the possible implications of his actions until meeting with the FBI. As a first-time offender at age 46, he is not a threat to commit future wrongdoings, he has no future in banking, and would-be offenders have already been discouraged by the media-heavy trial and widely announced guilty verdict.

Tony's three young children will not be able to fly across the Atlantic to visit him often, if ever. His prosecution and conviction have already cost him his home, his job, most of his savings, his self-worth, and his sterling reputation. To then take Tony Conti away from his wife, his children, his elderly mother (who relies on him for care and support), and his network of friends and family will only devastate him, his family, and friends further.

The numerous letters submitted on Anthony Conti's behalf attest to his character. (See *id.*) They describe him as a loving husband, father, son, and friend, as well as a kind, unselfish, and honest man:

> "I would be remiss if I did not tell you that our children utterly adore Tony… A loving, honest husband and father and I am so proud to be his wife… I could write pages of events to show you what kind of person Tony is but the only words that describe him as a person are honest, kind, generous and above all the most loving, dedicated husband and father to our children and I." – Lisa Conti, wife

> "To witness Tony and Lisa raise their children to have good manners, good behaviour, honesty and respect for others fills us with great pride and joy… Tony is a dedicated and loving husband and father to Lisa and their children. When Tony arrives home from work he always addresses Lisa and the children and asks what kind

of day they have had at school and home. After family dinner, Tony always helps the girls with their homework… he then spends an hour playing on the floor with Samuel, being aware of spending valuable time with each child… In this letter we have hopefully illustrated that Tony is a good and caring husband, father, son, brother and person who is loved by his entire family and respected by others." – Margaret and Colin Thirkettle, parents-in-law

"I could not have wished for my sister to have met a more caring, supportive, loving person as Tony and he continues to be a wonderful husband and father to their 3 children… Tony is a dedicated family man and we are all very close and I am proud to say I am his brother-in-law. I have the utmost respect for him and admire the way he conducts himself in his day to day life." – Mark Thirkettle, brother-in-law

"My partner… was diagnosed with a rare form of Sarcoma stage 3 cancer in 2013, ten years after Tony's diagnosis… Throughout this period Tony's empathy, selflessness and moral support was demonstrated when he would either be over in Jersey looking after my children with his family or alternatively looking after his children in Essex, so my sister Lisa was flying over to Jersey to support and assist my family with hospital visits etc… Tony is one of the kindest, most selfless and honest men that I have ever met." – Gary Thirkettle, brother-in-law

"Tony… was there for me at a time when I truly needed my family around me. This says more to me about the character of the man than any other experience that I could share with you and it is a window into his soul. Tony is a family man, family comes first, he has two beautiful daughters and his youngest child a son is not even two years old, the thought of being separated from them for any length of time I know will be tearing him apart." – Stephen Conti, older brother

"When thinking of a God Parent for my son Will, my wife and I wanted to choose a close friend, who showed integrity, was of outstanding character and ultimately someone who could trust to assist in bringing a child into an ever-changing world. We didn't hesitate to choose Tony and was thrilled when he accepted this very important role. Unsurprisingly, Tony has played an important role in Will's development, being there for important stages of my son's life in person and from afar whilst away working. Now in his early adult years, my son Will continues to be influenced by his God Father in all the positive characteristics that Tony holds and values." – Tom Smith, friend of over 40 years

"…he is honest, straightforward, incredibly hard-working and committed to his wife and three young children. He is kind, considerate, polite, well mannered and loyal. He is naturally quiet but also sociable… He is a son any parent would be proud to have. I would trust him with my life and that of my family, and my family is everything to me sir, as it is to Tony." – Stephen Douglas, friend of over 35 years

"Tony is an incredibly responsible and loving father and husband. These are not template words I write – I truly look up to him in all respects and try emulating his character and behaviour with my own wife and family. His gentle, understanding temperament has contributed to development of three wonderful children who are a pleasure to be around, surrounded by love and stability." – Tony Lawlor, friend of 30 years

"Tony is a loving, loyal, faithful, kind and protective husband to Lisa of circa 12 years and a father of three gorgeous children… Undoubtedly someone I would class as a 'family man.'" – Daniel Wellington, friend of 15 years

"Tony is a dedicated husband and father, for whom his family come first and I can only imagine the heartache, worry and sadness that this episode is causing to all his family." – William Foley, friend and cricket teammate

"He is a father to three children who are his world. He is a doting husband to his wife Lisa and takes wonderful care of his now widowed, elderly mother Eileen. He's very much involved in any after school tutoring of his children, instilling his virtues of the benefit of a good education in this life." – Daniel Etherington, friend

"It has been my pleasure to know Tony over the last year and it is rare in business that you meet such a genuine, honest, unselfish and good all round person. He loves his family and friends dearly and is making the best of everything in very difficult circumstances." – Lesley Allen, friend and coworker at Conti Catering

"Tony is in my mind not only a good friend, but also a family man who loves his wife, children, and mother to bits." – Neil Young, friend

"Although my dealings with Tony were purely on a business/work level, it became apparent through various private conversations about his life and family, that Tony is a decent man as well as a

11

compassionate, loving husband and father." – Mark Klomps, former coworker at LBBW

"…he is honest, straightforward, incredibly hard-working and committed to his wife and three young children. He is kind, considerate, polite, well mannered and loyal. He is naturally quiet but also sociable… He is a son any parent would be proud to have. I would trust him with my life and that of my family, and my family is everything to me sir, as it is to Tony." – Stephen Douglas, friend of over 35 years

"Tony is in my humble opinion your honour, an honest and trustworthy character that has never ever since I have known him displayed any unethical behaviour or such a characteristic whatsoever. I can think of no other friend or colleague that I would trust more than Tony in any circumstance – he would be there for anyone and is an extremely unselfish and popular individual" – Daniel Wellington, friend of 15 years

"When I found myself on hard times and in-between jobs he was the first one to help myself and my (now) wife Stephanie Helen Traynor, (Bed Hons). We lived with him and Lisa Conti during a six month period. He refused to take rent and treated us as a member of his family. His compassion and generosity was much appreciated at this point in my life. It was also a fundamental part of myself and my wife to staying together in a foreign country and eventually led to our marriage. Being instrumental to other people's happiness is an integral part of Anthony's character." – Brett Traynor, friend and former coworker

"Tony is very loyal and has a strong moral compass… Of all the people I have met in over 30 years of working in the city, I cannot think of anyone less likely to find himself in the position of being sentenced for a crime than Tony. My experience of working with Tony showed him to be diligent, keen and reliable… I consider him to be honest and trustworthy and I would have no problem in entrusting my family or my finances to his care. I would be happy to offer Tony employment in the future should circumstances allow." – Alan Thornton, friend and former coworker

"Tony is quite a humble person and doesn't appreciate the qualities he has to offer. I wanted him to move with us, because he was an extremely hard worker, very diligent, completely honest and trustworthy and just a lovely person to work with… He is very fondly regarded and people are genuinely distressed to see him in this position." – Barry Littlefield, friend and former superior at Bank

12

of Ireland

"I can be honest and wholeheartedly genuine when I state that at my age of 44, I have never, ever met someone as altruistic as Tony is. He has nothing but interest in everyone else around him and cares for all of his friends and family above himself… Patience, empathy and honour are all qualities that sum Tony up. I have nothing but admiration for him and I continue to observe and learn from him." – Daniel Etherington, friend

"I have been involved in [the] difficult breakdown of my marriage over the last few years and Tony has been there as a friendly ear and has always willingly given me both good advice and words of comfort. Not once has he turned the conversation back to his own troubles or made light of my problems. I can honestly say that in Tony I have made a friend for life. He always has a smile on his face, a cheeky laugh, and is definitely one of the nicest guys that anyone could have the fortune of spending time in the company of." – Darren Pateman, friend and cricket teammate

"It has been my pleasure to know Tony over the last year and it is rare in business that you meet such a genuine, honest, unselfish and good all round person. He loves his family and friends dearly and is making the best of everything in very difficult circumstances." – Lesley Allen, friend and coworker at Conti Catering

"I have known Mr Tony Conti since 1991 and in all my dealings with him, have found him to be a straightforward and honest man… With all my experience, I consider myself to be a very good judge of character and I would never doubt Mr Conti's integrity in any way." – William Robert Gibson, friend and colleague

## B.     The Nature and Circumstances of the Offense.

As the excerpts above show, Mr. Conti is described universally by those who know him as "upright and honest," "unselfish," and "trustworthy." His participation in the offenses of which he was convicted can only be understood within the context of the "circumstances of the offense"—the widespread, systemic failure of the LIBOR. The LIBOR benchmark is a "made-up number," Tr. 274:23-25, not in the sense that it is meaningless or cannot reflect reality, but in the sense that it is the product of the subjective evaluations of human

beings. And LIBOR was "made up" in 1986 specifically so that the financial derivatives products at issue in this case—interest rate swaps, forward rate agreements, and the like—could be settled by reference to an independent benchmark. (*See* Ex. B (Position Paper on the Evolution of ICE LIBOR, Oct. 20, 2014) at 2.)

But LIBOR was never truly independent. It was created by the British Bankers' Association, a consortium of the very banks who would both calculate and use the benchmark. (Ex. C (BBA Historical Perspective).) When LIBOR was established, these banks determined that it would be governed by a minimal set of rules primarily concerned with the mechanics of submissions. (*See Id.); (See also* Ex. D (GX116A).) A contributor would not be required to base submissions on any objective information, but instead would be given wide latitude in determining "the rate at which an individual contributor could borrow funds" based on "that bank's perception of its cost of unsecured funds in the London interbank market." (*See* Ex. D (GX116A); (Ex. E (Libor BBA – Definitions).) As the market for derivatives products based on LIBOR grew, LIBOR itself grew to encompass currencies rarely traded in the London market. (Ex. F (Wheatley Report) at 36.) The BBA, which licensed the LIBOR "fixing" data to the financial services industry and therefore profited from LIBOR's expansion, knew that LIBOR panel banks, such as Rabobank, almost never engaged in transactions that met the LIBOR definition.

Despite LIBOR's subjective nature, participants in the financial industry soon came to treat it as immutable, an objective reflection of the interbank market. This misapprehension was apparent at trial, where Tracey Twomey, the Chief Financial Officer of Super Store Industries, testified that, "I always had the understanding that LIBOR was . . . a representative interest rate out in the market and couldn't—couldn't be adjusted—couldn't be

manipulated." (Tr. 828:5-8.) Regulators, too, disregarded LIBOR's subjectivity and capture by self-interested banks. Even when LIBOR's failing became apparent in the throes of the 2008 financial crisis, the Bank of England, the FSA, and the New York Federal Reserve took a laissez-faire approach, refusing even to have their names associated with the BBA's review of LIBOR's governance structure. (Ex. G (Michael Cross Email).)

Meanwhile, the banks responsible for LIBOR's governance failed to govern. When LIBOR contributors raised concerns of manipulation with the BBA, those concerns were downplayed or ignored completely. For example, when Paul Robson complained to the BBA of manipulation in 2006, he was told "not to worry about it because inaccurate rates get dropped out of the LIBOR rates and so they have no impact."  (Tr. 540:19- 543:18; *see also* 721:12-17.)

For the first two decades of LIBOR's existence, those responsible for its integrity—the BBA, the central banks, and financial regulators the world over—exhibited a near-total lack of concern when faced with evidence of self-interested submissions by contributor banks. And those banks got the message—accommodation of trader requests became routine practice at nearly every bank on the U.S. dollar LIBOR panel. (*See* Sentencing Submission of Anthony ("Allen Memo") ECF #227 at 19.) According to the Government's witnesses, Rabobank was no exception. By the time Mr. Conti began making the bank's U.S. dollar LIBOR submissions in 2005, they testified, it was common and accepted practice for LIBOR submitters to hear trader requests. (Tr. 718:2-5.) Rabobank's management was aware of these practices and did nothing to discourage them. (Allen Memo at 16-17.)

These circumstances do not excuse the offense. But in determining a just sentence, the court is required to consider not only "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), but also "the need for the sentence imposed to reflect the seriousness of

the offense." 18 U.S.C. § 3553(a)(2)(A). In doing so, the Court should take into consideration

that, before the stress of the financial crisis exposed the inherent weaknesses in LIBOR's

governance and oversight, those with authority over LIBOR and over banks failed to

communicate the seriousness of self-interested submissions. The opprobrium that is now directed

toward benchmark manipulation has largely grown out of the LIBOR scandal—it would be

unfair to sentence Mr. Conti as though it was regarded with the same seriousness at the time of

the offense. The fact that similar conduct was widespread, while regulatory authorities stood by,

demonstrates that it was not.

      Mr. Conti joins Mr. Allen's argument that "a departure to a sentence other than

imprisonment is… appropriate," according to the recommendations of the ABA Criminal Justice

Task Force on the Reform of Federal Sentencing for Economic Crimes ("Task Force"). (Allen

Memo at 14-15, 37) The Task Force recommended that, in determining the seriousness of an

economic offense, a court should consider "the amount of loss" suffered by victims. (Ex. H

(Task Force) at 6.) But as the Probation Office found, on the basis of information provided by

the Government, "no financial losses were suffered by any of the intended victims" of the

offense. (PSR ¶ 47.)

      The Task Force also recommended that an offense be considered less serious if

"the defendant's gain from the offense is less than the loss." (Ex. H (Task Force) at 6.) The

record here demonstrates that Mr. Conti did not benefit at all from the offense. (Tr. 851:1-852:2.)

The Government's cooperating witness, Lee Stewart, testified that he never paid Mr. Conti for a

favorable LIBOR submission. (Tr. 268:2-7.) And as the Court noted at trial, Mr. Conti's bonuses

cannot be evidence of personal benefit because the Government cannot show that "[b]ut for the

alleged misconduct [he] would have made" less. (Tr. 851:1.)

This is not a case in which, "when one looks at the nature and circumstances of the offense, the picture [of the Defendant's character] darkens considerably." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) aff'd, 747 F.3d 111 (2d Cir. 2014). Mr. Conti did not breach his employer's trust in pursuit of "an avenue to future benefits, opportunities, and even excitement." *Gupta*, 904 F. Supp. 2d at 254. Nor can it be said that Mr. Conti's actions "represented the very antithesis of the values he had previously embodied." *Gupta*, 904 F. Supp. 2d at 254. On the contrary, Mr. Conti's case demonstrates that a man's best instincts can also be his most serious weakness.

Many of the letters submitted by those who know Mr. Conti describe his unwavering loyalty. When his friend and former colleague Alan Thornton "moved into broking [and] was searching for clients," for example, Tony declined because "he had been speaking to a few brokers for many years and… did not want to let [them] down by talking to [Thornton]." (Ex. A, (Thornton) at 34-35.) And Rabobank, according to the Government's witnesses, was an environment where being "a good team player" was paramount. (Tr. 336:1-10, 323:20-324:1.) According to Paul Robson, the "very friendly sort of team atmosphere" on the trading desk was compromised only when a LIBOR submitter failed to take a trader's request into consideration. (Tr. 397:20-402:14.) This testimony, taken together with the lack of financial incentive, shows that it was Mr. Conti's loyalty to Rabobank and to his colleagues, rather than self-interest, that motivated Tony's actions.

These circumstances do not, of course, excuse dishonest conduct. Though loyalty is among the qualities for which he Tony so well-regarded by those close to him, it is not an unalloyed virtue. Tony would have done well to rely more on the other qualities he is known for—his honesty, integrity, and sense of fair play—and to ignore traders' requests entirely. But it

is appropriate for the Court to consider that Tony was not motivated by greed or self-interest.

Accordingly, and because Tony has no criminal history, PSR ¶ 74, "a sentence other than

imprisonment is… appropriate" to satisfy the requirements of 18 U.S.C. § 3553(a). (Ex. H (Task

Force) at 7.)

### C.      A Non-Custodial Sentence is Adequate for Deterrence

No punishment is necessary to deter Tony from further offenses. *See* 18 U.S.C. §

3553(a)(2)(C). As a result of the offense, Tony has lost his career in banking, his family's home,

and most of his savings. (PSR ¶¶ 81, 97; Ex. A (L. Conti) at 6.) He and his wife fear that they

will now never be able to afford to send their children to university. Tony has been diagnosed

with anxiety and depression "caused by the ongoing court case" and is taking medication to

cope. (*Id.* (Dr. T. Syed) at 27.) His eldest daughter Lilly, who "utterly adore[s] Tony," is

receiving counseling "to cope with the upset and anxiety of not knowing if her Daddy will be

home" after sentencing. (*Id.* (L. Conti) at 7.) Between these heart-wrenching losses and "having

suffered such a blow to his reputation," Tony—who has no prior criminal record and is

renowned for his integrity—"is unlikely to repeat his transgressions, and no further punishment

is needed to achieve [specific deterrence]." *Gupta*, 904 F. Supp. 2d at 355; *see also United States

v. Stewart*, 590 F.3d 93, 141 (2d. Cir. 2009).

Due to the unique circumstances of this case, a custodial sentence is also

unnecessary to serve the purpose of general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Since the

conspiracy at issue concluded in 2010, every aspect of LIBOR governance and oversight has

been overhauled to prevent rate-manipulation. The British Chancellor of the Exchequer

commissioned a comprehensive review of LIBOR, culminating in a "ten-point plan for the

comprehensive reform of LIBOR." (*See* Ex. F (Wheatley Report) at 8-9.) Many of these reforms

have since been implemented. The BBA was replaced as the administrator of LIBOR, "following a rigorous selection process," by the Intercontinental Exchange Group, Inc. ("ICE"), which instituted new surveillance and auditing measures to discover and prevent manipulation. (*See* Ex. I (Meredith A. Bieber, ICE Benchmark Administration Replaces the British Bankers' Association as Administrator of LIBOR, White and Williams LLP, Feb. 4, 2014).); (See also Ex. B (Position Paper on the Evolution of ICE LIBOR, Oct. 20, 2014) at 3-4.)

The U.K. Financial Conduct Authority established a new "Approved Person" regime requiring banks and other regulated firms to seek prior approval of any individual involved in the submission or administration of financial benchmarks, including LIBOR. (Ex. J (Special Report: Approved Persons, Thomson Reuters) at 25.)  This approval regime requires that banks contributing to benchmarks (including LIBOR): involve senior management in oversight of the submission process; calculate their benchmark submissions according to an "effective methodology, based on objective criteria" that is reviewed quarterly; implement "an effective conflicts policy around benchmark submissions"; notify the FCA of suspected manipulation; keep records on benchmark submissions and supporting information and provide this information to the benchmark administrator; and appoint an independent auditor to report annually to the FCA. *Id*. at 26. The U.K. Financial Services Act was also amended to include a criminal offense for "making false or misleading statements, or the creation of false or misleading impressions in relation to [LIBOR]." *Id.* at 27.

In addition to these new legal and regulatory controls, authorities in the U.S. and the U.K. have taken action against a number of institutions found to have participated in LIBOR manipulation. Six LIBOR contributor banks—Rabobank, Barclays, UBS, RBS, Lloyds, and Deutsche Bank—have entered deferred prosecution agreements with the Department of Justice

to settle charges similar to those in this case. In addition to imposing substantial financial penalties, those agreements require the banks to implement new compliance programs to prevent benchmark manipulation, and to submit to continued auditing by all of the "regulatory or enforcement agencies" participating in the international LIBOR investigation. (*See, e.g.* Ex. K (Rabobank Deferred Prosecution Agreement) at 12-14.)

Financial benchmark manipulation is vastly different from insider trading, which this Court has noted is "an easy crime to commit but a difficult crime to catch." *See Gupta*, 904 F. Supp. 2d at 355. Insiders privy to material non-public information are a vast and diffuse group, as are those capable of capitalizing on that information by buying or selling securities. As such, neither group is susceptible to effective regulation, nor can their activities be readily monitored to detect misconduct. By contrast, financial benchmarks such as LIBOR are produced by a relatively small number of highly regulated institutions. At each institution, only a handful of individuals are typically involved in the benchmark submission process. Consequently, the actions of these individuals and institutions can be comprehensively vetted and audited in a way that "insiders" cannot.

The problem with the previous LIBOR regime was not that manipulation was "a difficult crime to catch"—it was that no one was trying. LIBOR submitters and other benchmark contributors now live in a different world, subject to more rigorous oversight by employers, benchmark administrators, and regulators, and to the threat of criminal penalties for malfeasance. These institutional and regulatory controls provide far more effective general deterrence than existed prior to the offense, or than is possible for other economic crimes such as insider trading. In light of this new environment, a custodial sentence is unnecessary to promote effective general deterrence.

20

### D.    A Non-Custodial Sentence is Appropriate Given the Available Sentences and Corresponding Correctional Treatment

Section 3553 requires the Court to consider "the kinds of sentences available," 18 U.S.C. § 3553(a)(3) and "the need for the sentence imposed… to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Because Mr. Conti's immigration status precludes him from being designated to a facility appropriate to his needs and the severity of his offense, a non-custodial sentence is appropriate.[1]

#### 1.    *Mr. Conti Will Be Ineligible For A Standard Minimum Security Designation Due To His Immigration Status*

Absent any serious medical condition or non-citizen status, an inmate such as Mr. Conti—considering the nonviolent nature of his offense, lack of criminal history, and recommended United States Sentencing Guideline range—would be designated by the Federal Bureau of Prisons (BOP) Designation and Sentence Computation Center to a minimum-security camp.  However, because Mr. Conti is not a U.S. citizen and is subject to an immigration detainer upon the conclusion of the Court's sentence, he will not be ineligible for a Federal Prison Camp (FPC) within the BOP's system and will be assigned instead to a low security facility. The security at a low-security prison far exceeds that of a FPC and the confinement conditions are far harsher.  Moreover, the average offense level of the inmates is higher, as is

---

[1]    In drafting this section, counsel was advised by criminologist Joel Sickler concerning Mr. Conti's likely processing by the Bureau of Prisons and, later, Immigration & Customs Enforcement. Mr. Sickler has worked in the field of sentencing and corrections for more than 30 years and heads the Justice Advocacy Group LLC (JAG), a consortium of criminal justice professionals based in Alexandria, Virginia. JAG produced research for and advises criminal defense lawyers, probation departments, and judges on federal sentencing and confinement issues. Mr. Sickler has visited 51 federal prisons and advised clients with inmates in 86 of the Bureau of Prisons' 119 institutions. He has extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, and institutions.

their propensity for violence. In addition to these characteristics, there are four significant differences between minimum-security camps and low-security institutions:

Perimeter and Internal Security. Whereas FPCs are fenceless, low-security facilities are surrounded by two separate perimeter barriers, each reinforced with multiple coils of long-barb razor wire, gun towers, detection devices, and armed patrols. Their additional security systems include video surveillance, door controls, intrusion detection, and perimeter monitoring.  Inside the facility, inmates are subjected to controlled movements on the hour, with only ten minutes to move between assigned destinations. All inmates endure: a minimum of five inmate "counts" daily, including a count during the middle of the night conducted with flashlights or by turning on the house lights; random pat-downs; and strip-searches, whenever the inmate is removed from the facility for a visit or a community health appointment.  Unscheduled "lockdowns" can continue for a period of days, during which inmates are confined to quarters for extended, even multiple-day periods, even for meals. Recreation, visiting, and telephone calls are suspended during lockdown.

Crowding. Low-security facilities typically house 1,200 to 1,500 inmates; FPCs between 100 and 400. This overcrowding is stressful for inmates. There are longer lines and wait times to use the telephone, obtain medication, get laundry done, use the library, or see a doctor. Inmates have less contact with staff. Noise is constant and is compounded by the guards' continuous use of two-way radios. The sheer size of the institution guarantees unsanitary conditions; bacterial infection and viruses are widespread within low-security institutions.

Type of Inmate. FPCs typically house youthful offenders incarcerated for low-level drug offenses and inmates confined for white-collar offenses. All camp inmates are serving short sentences (less than 10 years) and have no history of violence. Inmates are generally well-

behaved, for fear of being moved to a higher security institution. Conversely, inmates at low-security institutions include those serving 10- to 20-year sentences, many of whom have prior records involving gun crimes or violent offenses, are affiliated with gangs or other criminal organizations, or are otherwise high security risks. Consequently, low-security institutions control inmate movements more closely and conduct frequent body checks, requiring inmates to disrobe and permit correctional officers to inspect their bodies for bruises, lacerations, and other indications of fighting or violence.

    <u>Visitation</u>. At a camp, an inmate's family can drive up to the compound, park in a lot immediately adjacent to the visiting room, walk into the visiting barracks unescorted, show ID, and meet the inmate promptly for the visit. At a low-security facility, visitors must pass through metal detectors, are subject to random pat-down searches, and their hands are swabbed to detect illicit narcotics. Visitors then have their hands stamped with invisible ink and are escorted through several checkpoints—steel gates slamming loudly behind them—where the stamp is checked under a florescence lamp. Finally, once in the locked visiting room, they wait a significant amount of time for their friend or family member to be brought to the visiting room, which is almost always crowded and noisy.

    2.  *Mr. Conti Will Be Designated to a Privately Contracted BOP Facility for Sentenced Criminal Aliens*

    Mr. Conti will most likely be designated by DSCC to one of the BOP's privately contracted facilities, which comprise 15% of BOP's total infrastructure. These facilities are specifically structured to incarcerate sentenced convicted aliens, such as Mr. Conti, who are subject to an immigration detainer. These privatized facilities are well-known for housing inmates of more serious security classifications than is typical in BOP-managed low-security

compounds. The environment is a frightening one for someone like Mr. Conti, with no criminal history—he will be confined primarily with violent offenders to be deported to some of the most dangerous parts of the world.

Because these private facilities house a wider variety of inmates than even other low-security facilities, they are far higher-security than Mr. Conti's offense warrants. They house younger inmates serving up to 20-year sentences, who often have violent proclivities and are difficult for the facilities to control. Their populations are also larger, affording individual inmates little or no privacy. Cost savings are a priority: the food is poor, the clothes are often second-hand, and medical care is minimal.

Inmates' interactions with staff at private facilities are also typically worse than at BOP-managed facilities. They are patrolled by guards who are younger, less experienced, and underpaid. Administrators often meet inmates' administrative-remedy inquiries and complaints with hostility or even punishment. Consequently, there is little or no effective redress for inmates with concerns of abuse or neglect. This is a serious concern for Mr. Conti, who is in treatment for anxiety and depression, and at risk for recurrence of cancer.

Designation to a privately contracted facility would be tantamount to multiplying the severity and length of Mr. Conti's sentence. We urge the Court to consider as it deliberates on Mr. Conti's sentence and designation.

3.    *Mr. Conti Will Not Be Eligible for Pre-Release Transition Through a BOP Residential Re-Entry Center*

Due to his status as a convicted alien, Mr. Conti will not be considered for pre-release time in the community. Depending on an inmate's transitional needs, BOP will typically transfer an inmate to the supervision of a residential re-entry center (RRC) near his "release

residence" for a period of time at the end of his sentence. During this time, the pre-release inmate is still under BOP custody, but is supervised by RRC staff either as a resident or on home confinement. Inmates are allowed to seek employment and have direct contact with the community. This program gives inmates the opportunity to start rebuilding productive post-incarceration lives between their formal release from BOP custody and the beginning of their supervised release.

Mr. Conti is ineligible for this program due to his immigration status. While other similarly situated inmates are attending to their pre-release requirements prior to leaving the institution for an RRC, Mr. Conti will instead be awaiting agents from Immigration and Customs Enforcement (ICE) to remove him from the facility and hold him in one of their own, without any opportunity to begin acclimating to life in the community in a structured and constructive manner.

4.    *ICE Detainer Will Delay Mr. Conti's Release Beyond His BOP Release Date*

Mr. Conti's post-incarceration return home will be further complicated by the ICE detainer that will be placed on him immediately upon incarceration in the U.S. to ensure deportation to the U.K. upon completion of his sentence. ICE's Criminal Alien Program is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails. Removal is overseen by the ICE Office of Detention and Removal Operations.

When a prisoner's sentence is complete, he is placed in ICE custody and their status is changed from "prisoner" to "detainee." Armed ICE agents transport the detainee—typically by bus, in shackles and leg irons—to an ICE detention center to await deportation from

25

the United States. It can take up to six months to finalize removal arrangements—six months of confinement in ICE custody while U.S. and foreign bureaucracies sort out the paperwork.

This post-"release" time in ICE custody will effectively extend Mr. Conti's sentence beyond what the court delivers. This added detention should be taken under consideration by the Court when it determines the length of Mr. Conti's sentence.

### E.   A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases.

Mr. Conti joins Mr. Allen's argument that a custodial sentence would create an unwarranted disparity between Defendants and the many LIBOR submitters who engaged in identical or far more culpable conduct, many of whom have avoided charges entirely. (Allen Memo at 19); 18 U.S.C. § 3553(a)(6).) Like Mr. Allen, Mr. Conti's conduct pales in comparison to that of Thomas Hayes, the only trader so far convicted anywhere in the world for LIBOR manipulation. He neither paid nor received bribes for LIBOR submissions. (Tr. 268:2-7.) In fact, he did not stand to benefit financially at all from the offense. The Government does not allege that Mr. Conti coordinated his LIBOR submissions with those of other banks, or that he induced brokers to influence other submitters on his behalf. And the Government has not proven that any of Mr. Conti's submissions were inaccurate estimates of Rabobank's borrowing cost.

Owing to the vagaries of international cooperation between enforcement agencies, Mr. Hayes was tried in the U.K., where he will likely serve only half of his custodial sentence, in a comfortable, humane facility. (*See* Allen Memo at 21.) As detailed above, because Mr. Conti had the misfortune of being tried in the U.S. as a foreign national, is likely to be designated to a privately contracted low-security prison, where he will serve his sentence in deplorable conditions with dangerous inmates convicted of far more serious offenses. He will also be separated by the Atlantic Ocean from his wife and three young children, who depend upon him

in every sense, and from his elderly mother, who has no other family in London. (Ex. A (L. Conti); *id.* (E. Conti).) These substantial and arbitrary disparities can be avoided by the imposition of a non-custodial sentence.

## II.      THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE.

While § 3553(a) remains "the bedrock of all federal sentencing," *Gupta*, 904 F. Supp. 2d at 353, the Court is "nonetheless mandated to calculate the defendant's Guidelines range." *Id* at 351. The Probation Office calculated Mr. Conti's Guidelines Offense Level to be 25, which corresponds to a Guidelines recommendation of 57-71 months' imprisonment. (PSR at 29.) Mr. Conti is grateful to the Probation office for acknowledging "the negative impact that a sentence of incarceration will have on [Mr.] Conti's children in particular" and recommending that "the minimum of the advisory guideline range is appropriate in this case." (*See* PSR at 30.) Nonetheless, Mr. Conti respectfully disagrees with the Probation Office's calculation of his offense level.

### A.      <u>No Loss Enhancement is Warranted.</u>

The PSR states that a 14-level increase in Mr. Conti's offense level is warranted on the basis of the Government's estimate that "if the LIBOR was successfully moved at each request, one-eighth of a basis point, in whichever direction benefited Rabobank, their counterparties would have suffered losses totaling $1,149,671.76." (PSR ¶ 47.) Mr. Conti objects to this enhancement and joins Mr. Allen's arguments that the assumptions and methodology underlying the Government's intended loss calculation are inconsistent with the law and the Guidelines and therefore cannot support its loss estimate. (*See* Allen Memo at 35-46.)

The Government's calculation does not reflect "the pecuniary harm that [Mr. Conti] purposely sought to inflict" as required by the recently amended Sentencing Guidelines.

27

U.S.S.G. §2B1.1(b)(1), Application Notes at n.3(A)(i)-(ii). The Government does not even contend that Mr. Conti was aware of the majority of requests for LIBOR manipulation upon which the Government's estimate is premised. Of the 201 requests cited by the Government, only 72 were directed to Mr. Conti. (*See* Ex. L (Government Stipulation) ¶ 5.) There is no evidence in the record that Mr. Conti knew anything of the remaining 129 requests, most of which related to Japanese Yen LIBOR, for Mr. Conti was not responsible. (*See* Ex. L (Government Stipulation) ¶ 31.)

Mr. Conti's "intentions [cannot] include things he never contemplated." *See United States v. Manatau*, 647 F.3d 1048, 1052 (10th Cir. 2011). But even if he knew of the requests, and even if he was "willing that [manipulation] should take place" in response to them, that is insufficient to show that he "intended" the resulting loss within the meaning of the *Manatau* standard incorporated by the Guidelines. *See United States v. Manatau*, 647 F.3d 1048, 1049 (10th Cir. 2011). Rather, the Government must show that it was Mr. Conti's "conscious object" to cause loss to Rabobank's counterparties in response to those requests. *Id.* at 1050. It cannot.

Even for the minority of requests that Mr. Conti received, the Government has not shown by a preponderance of the evidence that Mr. Conti "had as a conscious object to cause" them to be accommodated to the detriment of Rabobank's counterpraties. *See id.* In fact, its assumption that he intended to accommodate all of them is contrary to its own evidence: on cross examination, Government witness Kyle Dornbos agreed that he "reviewed many requests that Mr. Conti received where his submission was inconsistent with the request." (Tr. 917:12-16.)

28

Finally, the Government cannot support its speculation that Mr. Conti intended to move LIBOR, "at each request, one-eight of a basis point, in whichever direction benefited Rabobank." (*See* PSR ¶ 47.) Mr. Conti, like Mr. Allen, did not have access to the trading folders in which other Rabobank traders' positions were recorded and so could not know what would benefit Rabobank. (*See* Tr. 269:4-13.) Moreover, this formulation is based on the assumption that, in response to each request, Mr. Conti submitted a rate that was different by one basis from the rate he otherwise would have submitted. This assumption too is inconsistent with the testimony of Kyle Dornbos, who testified about several instances in which Rabobank's submission moved only one-half of a basis point in the direction of the request. (Tr. 921:15-922:19.)

### B.     No Abuse of Private Trust Enhancement is Warranted.

The PSR states that a two-level increase in Mr. Conti's offense level is warranted because he "abused a position of private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  (PSR ¶ 66.)  Specifically, the PSR states that Mr. Conti "abused a position of trust as a senior trader to ensure that his criminal acts would go undetected." (PSR at 30.)  It also cites the Government's argument that Mr. Conti "abused the trust of the BBA by submitting dishonest LIBOR rate estimates which reflect a clear intent to benefit Rabobank's trading positions" and that he "exercised processional discretion in his role as the primary LIBOR submitter" and thereby "significantly facilitated the commission of the offense." (PSR at 26.)

Mr. Conti joins Mr. Allen's arguments that the Defendants did not abuse the BBA's trust in making their LIBOR submissions. (*See* Allen Memo at 52-56.) Moreover, the PSR's contention that Mr. Conti "abused a position of trust as a senior trader to ensure that his

criminal acts would go undetected" is unsupported by the record. Rather, the Government's witnesses testified that trader preferences were expressed "out loud" and "in front of everyone," without any effort to "hide what [they] were talking about." (Tr. 259:12-21.) Because "[n]o one from the bank ever told [traders] to stop doing this," Tr. 259:22-23, there was no reason for anyone to "ensure that his criminal acts would go undetected." (PSR ¶ 55.)

### C.   **Because the Government Cannot Prove Actual Loss, the 10-Victim Enhancement is Unwarranted.**

The PSR recommends a two-level increase "because the offense involved 10 or more victims." (PSR ¶ 64.) Mr. Conti objects to this recommendation and joins Mr. Allen's argument that, because the Government does not possess sufficient information to determine any counterparty's actual loss, it cannot prove that 10 victims suffered actual loss as required by §2B1.1(b)(2)(A)(i). (*See* Allen Memo at 51-52; §2B1.1(b)(1), Cmt. at (n. 1).)

### D.   **The Loss Estimate Overstates the Severity of the Offense.**

The Government seeks an enhancement on the basis that the §2B1.1 loss figure understates the gravity of the harm caused by the offense. Mr. Conti objects to this enhancement. As stated above, the Government's intended loss figure in fact grossly inflates the harm to the alleged victims.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court determine that a

non-custodial sentence is sufficient to satisfying the objectives of sentencing.


Dated:   New York, New York
         March 3, 2016


**TOR EKELAND, P.C.**

By: /s/ Aaron Williamson
Aaron Williamson
Tor Ekeland
195 Plymouth St, Floor 5
Brooklyn, NY 11201
(718) 737-7264

*Attorneys for Defendant Anthony Conti*