UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x
UNITED STATES OF AMERICA,             :
                                      :
    v.                                :
                                      : Case No. S4 14-CR-272 (JSR)
ANTHONY ALLEN,                        :
PAUL THOMPSON,                        :
TETSUYA MOTOMURA, and                 :
ANTHONY CONTI,                        :
                                      :
            Defendants.               :
---------------------------------------- x


**ANTHONY ALLEN'S RESPONSE TO THE
GOVERNMENT'S SENTENCING SUBMISSION**


**WILLKIE FARR & GALLAGHER LLP**
Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant Anthony Allen*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................1

I. MR. ALLEN'S CONDUCT DOES NOT MERIT A SUBSTANTIAL SENTENCE. ...............................................................................................3

    A. The Government's Description of Mr. Allen's Character Is Inaccurate. ............................................................................................3

    B. The Government Cannot Prove Intended Loss of $1.1 Million. ...................6

    C. There Are No Victims of the Offense, as the Guidelines Define That Term. ........................................................................................9

    D. Mr. Allen Was Not the Leader of the Offense. ..........................................10

    E. An Abuse of Trust Enhancement is Inapplicable. ......................................13

    F. The Court Should Credit Probation's Finding that Mr. Allen Cannot Afford a $150,000 Fine. .................................................................14

CONCLUSION................................................................................................................17

## TABLE OF AUTHORITIES

Cases                                                                                                                    Page(s)

*United States v. Barrett*,
    178 F.3d 643 (2d Cir. 1999)..................................................................................................13

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012).......................................................................................2

*United States v. Hirsh*,
    239 F.3d 221 (2d. Cir. 2001)..................................................................................................13

*United States v. Jolly*,
    102 F.3d 46 (2d Cir. 1996).....................................................................................................13

*United States v. Manatau,*
    647 F.3d 1048 (10th Cir. 2011) ...............................................................................................8

Other Authorities

U.S. Sentencing Guidelines Manual §2B1.1(b)(1), cmt. n.1
    (U.S. Sentencing Comm'n 2015)............................................................................................9

Defendant Anthony Allen respectfully submits this response to the Government's sentencing submission, dated March 3, 2016.

## INTRODUCTION

While the parties disagree on what they believe to be a just outcome, we and the Government agree on nearly all of the most salient facts relevant in sentencing. There is no question that Mr. Allen is a devoted father to two little girls, a first offender, and a man who has demonstrated his respect for the law through his voluntary appearance in this Court. The parties agree that the offense conduct resulted in no personal gain to Mr. Allen, and that Mr. Allen's conduct caused no demonstrable pecuniary loss. Had any swap counterparties been impacted, they were all sophisticated market participants and most were financial institutions themselves engaged in identical conduct. It is similarly beyond dispute that conduct identical to, or far more significant than, Mr. Allen's was practiced by more than 125 employees at 10 different financial institutions. Indeed, the Bank of England itself sought to influence LIBOR rates submitted by a Panel Bank. Yet, the many, many individuals who engaged in similar, or worse, conduct will never face prison time.

It is also beyond dispute that the offense conduct was done out in the open, with the knowledge of Rabobank's Internal Audit department and senior management, and had been reported to the BBA, the FCA, and the Federal Reserve, which took no action. There is no evidence that anyone at Rabobank tried to conceal what they were doing. Indeed, the Government's cooperating witness, Lee Stewart, testified that the practice of requesting higher or lower LIBOR rates to suit trading positions was not considered inappropriate at Rabobank. While the practice certainly had implications beyond a bank's individual swap counterparties, the Government admits that there is no evidence that Mr. Allen ever contemplated, much less intended, that harm. The Government agrees that the "evidence does *not* indicate that the

1

defendants purposefully set out to wreck the credibility [of LIBOR] and cause . . . collateral losses throughout the financial markets." (Gov. Br. 9.)

The difficult question before the Court is whether a father need be separated from his young children, loving partner and aging parents for conduct that resulted in no personal gain, no pecuniary loss, and which was so widespread as to be fairly characterized as an industry practice. The facts described in Mr. Conti's Response, which we join, leave no doubt that conduct far more significant than Mr. Allen's occurred everywhere. The Government calls for a substantial sentence because the conduct was "cultur[al]," making it, in the Government's words, "one of the most significant financial fraud cases in recent history." (Gov. Br. 6.) The defense submits that the fact that the same conduct occurred everywhere, out in the open with no effort to conceal it, with the knowledge of the BBA and numerous regulators, suggests that the line between proper and improper conduct in submitting LIBOR may have been left blurrier than it is in most criminal cases.

Not all criminal offenses are equally venal. The defense has of course studied carefully Your Honor's opinion in *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012). When Mr. Gupta walked out of a Goldman Sachs board meeting and "brazenly disclosed material non-public information to Mr. Rajaratnam," there can be no question that he knew that he was committing an "egregious breach of trust." *Id*. at 351, 354. In contrast, Lee Stewart's testimony that the offense conduct here was not considered "inappropriate," taken together with the enormously commonplace practice of selecting, within a range of reasonable borrowing cost estimates, a LIBOR rate that benefited one's employer, suggests that this conduct was less egregious than Mr. Gupta's violation of a clear legal duty. We submit that the more opaque lines present here are one more factor which we hope will permit the Court to conclude that Mr. Allen

2

need not be incarcerated three thousand miles away from his young daughters, during surgical procedures which make his presence all the more vital, and under the harsh conditions the Bureau of Prisons permits for foreign nationals. A non-custodial sentence is appropriate under these unique circumstances.

In addition to disagreeing with the Government's request for a "substantial" period of incarceration, we also disagree with the Government's proposed application of the Sentencing Guidelines, which we address here.

### I. MR. ALLEN'S CONDUCT DOES NOT MERIT A SUBSTANTIAL SENTENCE.

The Government argues that Mr. Allen "should be sentenced to a substantial term of incarceration and the maximum available fine of $150,000." (Gov. Br. 1.) The Government describes Mr. Allen as "self-centered" and "petty," a man who "treated LIBOR like a joke." (*Id.* at 1, 3, 6.) It "submits that Mr. Allen's adjusted offense level is 29," after the inclusion of a 14-level enhancement for "intended loss," a 2-level enhancement for a scheme involving ten or more victims, a 4-level enhancement for acting as the "leader" of the crime, and a 2-level enhancement for an abuse of trust. (*Id.* at 7.) The Government must prove, by a preponderance of the evidence, that each of these enhancements are warranted. It has failed to make that showing.

#### A. The Government's Description of Mr. Allen's Character Is Inaccurate.

The Government states that Mr. Allen "subordinated the integrity of [a] vast and dynamic market to [his] own petty pecuniary interests" because he is "astoundingly self-centered." (*Id.* at 3.) This is not a fair recitation of the facts. Mr. Allen's conduct was not motivated by self-interest. The Government has stipulated that over a four-year period and even

3

when all 201 "manipulation requests"[1] are taken into account, the trading book that Mr. Allen and Mr. Conti shared would have benefited by "less than $1,500." (Ex. C (Stipulation) at ¶ 24.) The so-called "counterparty" that would have been affected was not an external institution, but rather something called "Struc. CR Legal Neg. Base," *see id.*, almost certainly a trading book associated with Rabobank's "structured credit" department, which was responsible for investing the money that the cash desk borrowed.

The Government also admits that Mr. Allen's salary and bonuses were not based on the performance of Rabobank's derivative traders, but rather his "duties managing Rabobank's cash needs." (Gov. Br. 24.) Furthermore, Mr. Allen's supervisors acknowledged on multiple occasions that Mr. Allen was willing to take losses in his department, if it meant that the bank would be a safer institution. (Ex. 2, 3; *see also* A-10, A-156 (letters written by several of Mr. Allen's former colleagues describing specific instances in which Mr. Allen sacrificed the profitability of the cash desk in favor of action that would make Rabobank a better place to work.).)

The evidence also does not support the Government's assertion that Mr. Allen "treated LIBOR like a joke." (Gov. Br. 6.) Contrary to the Government's representation on page 3 of its submission, Mr. Allen was *not* a member of the BBA's governing body for LIBOR, the FX & MM Committee, *see* Ex. 40 (listing members of the FX & MM Committee) *and* Tr. 1177:9-1178:2,[2] but Mr. Allen did contact the BBA on multiple occasions to express his concern

---

[1] As explained in Mr. Allen's sentencing submission, the Government's own analysis concluded that 114 of these "requests" were *not* accommodated, although it nonetheless included them in its intended loss calculation. (*See* Allen Br. 41; Ex. C (Stipulation) at ¶ 12.)

[2] References to "Tr." refer to the trial transcript. The excerpted portions are attached as Exhibit D. Citations to Exhibits A-C and Exhibits 1-39 refer to exhibits attached to Mr. Allen's March 3, 2016 submission.

4

about the accuracy of the rate. For example, on September 20, 2007, Mr. Allen wrote to John Ewan, the BBA's LIBOR Manager, to express his concern that LIBOR was not reflecting "where the actual term markets are trading," and asking for additional guidance about "the LIBOR 'definition.'" (DX168.) Mr. Ewan brushed aside Mr. Allen's concerns, replying, "I think that the points you make are very valid….[but] I have spoken collectively to the FX and Money Market Committee that oversees the rates and the definition of BBA LIBOR…they are of the view that we should not change the definition of the rates." (*Id.*)

Mr. Allen persisted. He spoke at length to the New York Federal Reserve about his concerns—the call was over thirty-five minutes long—expressing his belief that there was a "big problem" with LIBOR, that he "really fel[t] that LIBOR levels should represent" a bank's cash needs, and that he was hopeful that the BBA would issue guidance to "make sure" LIBOR "is more relevant for what is actually going on in the market." (Ex. 41.) Mr. Allen told the Federal Reserve that banks were setting LIBOR based on swap positions. (*Id.* at 10.)

Mr. Allen was invited to, and attended, a December 11, 2007 BBA meeting to discuss the "transparen[cy] and robust[ness]" of the "BBA LIBOR rate-setting process."[3] (Ex. 42.) At that meeting, Mr. Allen told the BBA that LIBOR was "phoney" and "manipulated," but the BBA was nonchalant. (Ex. 45.) Notes taken by others who attended the December 11, 2007 meeting confirm that it was universally agreed that LIBOR "clearly isn't the rate at which banks lend to each other," but that the BBA demonstrated "little appetite to address the shortcomings." (Ex. 46; Ex. 47.) Mr. Ewan admitted after the December 11, 2007 meeting that Panel Banks "quot[i]ng from their derivative desk" instead of their cash desk was a "regular topic of

---

[3] Mr. Allen also cut short a business trip on May 31, 2008, in the hopes that he would be permitted to participate in a meeting of the FX & MM Committee to discuss problems with the rate. When he arrived in London, however, he was told that he was not on the "invite list" and was turned away at the door. (*See* Ex. 43; Ex. 44.)

conversation at the FX & MM Committee that oversees the rates," but explained that the issue was ultimately considered "intractable." (Ex. 48.)

The Government has produced an audio file of a BBA FX & MM Committee conference call in which John Ewan confirmed that the "the Bank of England, the Fed[eral Reserve Bank], and the FSA" had each "turned down invitations to attend" the BBA's meetings because those institutions were "worried it would look like they [were] giving their imprimatur" to LIBOR and the regulators preferred to have nothing to do with the oversight of the rate. (Ex. 49, at 7; *see also* Ex. 9, at 95 (report from U.K.'s Financial Conduct Authority admitting that it took the position that LIBOR was a privately-run, unregulated benchmark and issues with its operation should be left to the BBA's discretion).)

In its sentencing memorandum, the Government states that Mr. Allen exercised a "callous indifference" to the "credibility of the world's most important benchmark," but the evidence belies that assertion. Unlike the government regulators who disclaimed responsibility for LIBOR, Mr. Allen attempted, on multiple occasions, to bring attention to the fact that LIBOR was broken and needed to be reformed.

### B. The Government Cannot Prove Intended Loss of $1.1 Million.

The Government argues that Mr. Allen "intended loss" of $1,139,952 "to Rabobank's counterparties" and that his offense included intended "collateral losses of over $600 million throughout the markets."[4] (Gov. Br. 8.) As discussed in Mr. Allen's sentencing memorandum, the Government's intended loss calculation suffers from fatal flaws in its methodology as well as its scope. (Allen Br. 36-51.) To avoid repetition, Mr. Allen responds

---

[4] On page 6 of the Government's submission, it mistakenly states that "defendants caused market-wide losses of over $600 billion." This is a typographical error—the Government's estimate is $600 million, not billion, in intended "market loss." (*See* Gov. Br. 8.)

6

only to those points made in the Government's sentencing submission that are not otherwise addressed in his March 3, 2016 submission.

The Government concedes that the Sentencing Guidelines restrict intended loss to the "pecuniary harm that the defendant purposefully sought to inflict." (Gov. Br. 8.) In acknowledgment of the law, the Government states that loss in this case should "be measured by the amount that the defendants sought to exact on Rabobank's counterparties, and not on the market *writ large*," *see id.*, because the "evidence does not indicate that the defendants purposefully set out to wreck the credibility of the world's most important benchmark and cause hundreds of millions of dollars in collateral losses throughout the financial markets." (Gov. Br. 9.) Because there is no evidence that Mr. Allen intended this harm, the Government's estimated $600 million in intended market loss should not be a relevant factor a criminal sentencing.

There is also no evidence that Mr. Allen ever set out to cause loss of $1,139,952 to Rabobank's counterparties. The Government's calculation of approximately $1.1 million in intended loss includes the intentions of Mr. Allen's co-conspirators, even though, as the Government admits, Mr. Allen was "not directly aware" of their "manipulation attempts." (Gov. Br. 11.) The Government argues that the intended losses of the co-conspirators should count because they were "foreseeable," since Mr. Allen participated in "jointly undertaken criminal activity" with the co-conspirators. (Gov. Br. 11.) In making this argument, the Government ignores the Sentencing Commission's new definition of intended loss. Just twelve months ago, the Government petitioned the Commission for a definition of "intended loss" that would encompass "conduct of other participants in jointly undertaken criminal activity," arguing that such conduct should count because it was "conduct the defendant agreed to participate in." (Ex. 25 at 29.)

7

In April of 2015, the Sentencing Commission rejected the Government's arguments in favor of an "intended loss" definition that was meant to "adopt the approach taken by the Tenth Circuit" in *United States v. Manatau*. (Ex. 23 at 24-25.) *Manatau* involved a defendant in a bank fraud "scheme" who had a stolen a number of credit cards. The Government argued that the defendant's "intended loss" should be the total of the credit limits on each of the cards, since presumably the defendant would have maxed out each of the credit cards, had he been given an opportunity before being arrested. *See United States v. Manatau,* 647 F.3d 1048, 1049 (10th Cir. 2011). The defendant disagreed with the Government's intended loss calculation, arguing that "he could not possibly have intended a loss up to the full credit limit of $10,000" because "he never saw a statement indicating that the credit limit was so high" and he "had no other way to know the limit would be so high." *Id*. at 1050. The Tenth Circuit agreed with the defendant, holding that an "intended loss" is only that which the defendant seeks to inflict "on purpose"—*not* a loss that is "merely known [or] foreseen" to him, and not a loss that is "just possible and or potentially contemplated." *Id*.

Mr. Allen's circumstance is similar to that of the defendant in *Manatau*. Just as the *Manatau* defendant had never seen a credit card "statement indicating that the credit limit" of the stolen cards was $10,000 and therefore could not have intended losses of that amount, Mr. Allen could not view the contents of trading folders that were not assigned to him, and could not intend losses commensurate with the value of those unknown transactions. (Ex. C (Stipuation) at ¶ 22.) It was impossible for Mr. Allen to have known what Rabobank's exposure was to LIBOR on a given day, and for that reason he could not have purposefully intended to inflict pecuniary harm on Rabobank's counterparties equal to that (unknown) exposure. The Government is willing to admit that there is no evidence that Mr. Allen contemplated harm to the "market *writ*

*large*," *see* Gov. Br. 9, but the fact is, the counterparties included in the Government's intended loss analysis were just as removed from, and unknown to Mr. Allen, as the indefinable "market." For this same reason, Mr. Allen cannot be held responsible for the intended loss of his co-conspirators, as he was not even aware of the requests that were being made, much less the specifics of the transactions that were intended to benefit. Because the Government cannot prove that Mr. Allen "intended loss" of approximately $1.1 million to Rabobank's counterparties, no enhancement to Mr. Allen's sentence beyond the base offense level is warranted.

### C. There Are No Victims of the Offense, as the Guidelines Define That Term.

Mr. Allen's sentencing submission explained that a 2-level victim enhancement is unwarranted because there are no "victims" of the offense, as that term is defined in the Sentencing Guidelines. (Allen Br. 51-52; *see also* U.S. Sentencing Guidelines Manual §2B1.1(b)(1), cmt. n.1 (Nov. 2015) (defining "victim" as any person or entity which "sustained any part of the *actual loss* determined under subsection b(1).") Mr. Allen does not repeat those arguments here, except to reiterate that the Government has failed to demonstrate any "pecuniary loss" to its ten alleged victims.[5] The Government does not cite, and there is no precedent for imposing, a 2-level enhancement on the basis of speculative losses that the Government otherwise admits it cannot prove. (PSR ¶ 47 ("[N]o financial losses were suffered by any of the intended victims.")

---

[5] The three "requests" that the Government contends support the victim enhancement are instant messages exclusively between Mr. Robson and Mr. Yagami regarding Japanese Yen LIBOR. There is no evidence that Mr. Allen was even aware of these communications, a fact which we submit is relevant in considering the merit of the Government's arguments in favor of an enhancement.

9

### D.    Mr. Allen Was Not the Leader of the Offense.

The Government argues that Mr. Allen was the leader of the criminal scheme and seeks a 4-level enhancement to his sentence on that basis.  Mr. Allen's sentencing submission contains a detailed recitation of the record, to demonstrate that such an enhancement is not warranted.  (Allen Br. 25-35.)  Below, Mr. Allen addresses only those arguments made by the Government that are not addressed in his March 3, 2016 submission.

First, the Government argues that Mr. Allen "authorized accommodating manipulation requests and resolved conflicts regarding LIBOR submissions." (Gov. Br. 18.) The one piece of testimony cited by the Government and not discussed in Mr. Allen's March 3, 2016 submission is Mr. Robson's testimony that when a "conflict arose" over LIBOR submissions, "Mr. Allen would calm things down and would make a decision," and that Mr. Allen "invariably" resolved the disputes in "favor of his own 'dollar book.'" (Gov. Br. 17-18, *citing* Tr. 402:6-403:10.)  As an example of Mr. Allen "resolv[ing] conflicts," Mr. Robson described a dispute with Mr. Stewart over Mr. Robson's submission of USD LIBOR.  (*Id.*) According to Mr. Robson, Mr. Allen resolved the dispute by telling Mr. Robson to check with Mr. Stewart before making any USD LIBOR submissions in the future.  (*Id.*)

This testimony is insufficient to support a 4-level leadership enhancement, for several reasons.  First, it is contradicted by the testimony of Mr. Stewart, who testified that only Mr. Conti, Mr. Robbins, and Mr. Allen inputted USD LIBOR rates.  (Tr. 185: 20-25.)  Mr. Robson did not submit USD LIBOR and so he would not have had any dispute with Mr. Stewart which needed resolution.  Second, Mr. Robson's testimony that Mr. Allen "invariably" resolved disputes in "favor of his own 'dollar book'" is contradicted by the Government's stipulation that over a four-year period, Mr. Allen's trading book would have benefitted by "less than $1,500," from the 201 "manipulation" requests that the Government analyzed.  (Ex. C (Stipulation) at ¶

10

24.) That comes out to $375 per year, and it wasn't even "profit" for the bank—it was just a loss to Rabobank's "Struc. CR Legal Neg. Base" trading book, meaning that the bank ultimately came out even. (*Id.*) Third, Mr. Robson's testimony doesn't make a whole lot of sense. Mr. Stewart was the only USD swap trader in London, so there was no one for Mr. Allen to "calm down" during "conflicts" about USD submissions. (Tr. 402:6-403:10.) There wouldn't have been any "conflicts" for Mr. Allen to "calm down" regarding Yen LIBOR submissions either, because there weren't any Yen swap traders in London.

In support of a 4-level enhancement to Mr. Allen's sentence, the Government also cites an FBI memorandum of a January 18, 2013 interview with Christian Schluep, for the proposition that Mr. Schluep "received neutral to encouraging responses from both Allen and Conti related to requests he made for LIBOR rate accommodation" and "learned the behavior in part from Allen…." (Gov. Br. 18.) The Government's excerpt of its interview with Mr. Schluep is incomplete. Mr. Schluep did not tell the Government that Mr. Allen had directed him to make LIBOR requests, but rather he explained that he had observed Mr. Stewart making requests to Mr. Allen in the years between 2002 and 2004—a fact that Mr. Allen himself admitted at trial. (GX184, at 1, 6, 7; *see* Tr. 1198:1-16, 1203:5-16.) Mr. Schluep told the Government that he could not "recall Allen's reaction to such requests when received," although he did not have a memory of Mr. Allen "responding in a negative manner to the requests." (*Id.*) Mr. Schluep's testimony does not demonstrate that Mr. Allen was the "leader of the scheme." His description of "neutral to encouraging responses" to swap trader requests, and a failure to respond "in a negative manner" to LIBOR requests is nothing more than a description of the basic offense conduct; it does not evidence leadership.

11

The Government also interviewed Mr. Schluep on September 17, 2014. (Ex. 51.) During that interview, Mr. Schluep confirmed that he "did not remember whether Allen would accommodate [Mr. Stewart's] requests or not." (*Id.*) He told the Government that "it was down to the setter to set LIBOR" and that, in his experience "working with Conti and Tony Allen, at times a request would come across the desk, but it wasn't like they were required to facilitate. They would look at the OIS, where brokers thought LIBOR would come out, etc." (*Id.*) Mr. Schluep did not say that Mr. Allen directed him, or encouraged him to commit a crime. Instead, he told the Government that he "didn't think about the difference between the [LIBOR] definition and the input of trader positions" in submissions. (*Id.*) According to Mr. Schluep, "there's this whole gray area of not necessarily thinking about it too hard" and that's where Mr. Schluep said he fell. (*Id.*)

The Government also cites part of an FBI memorandum of a December 10, 2012 interview with Paul Butler, Rabobank's back-up JPY submitter. The Government cites Mr. Butler's statement that Mr. Allen "told him to speak with the Far East guys, named Yagami and Thompson, who were traders handling all JPY-related products, to find out what rates he should submit." (Gov. Br. at 18.) The Government omits the rest of Mr. Butler's testimony to the Government. Mr. Butler went on to state that "when Allen told Butler to check with the Far East on LIBOR rates it meant only to check on what the rates should be, not to find out if Yagami or Thompson had any specific needs related to their positions." Specifically, "Butler doesn't recall Allen telling him to accommodate the requests of the Far East traders." (Ex. 50; Allen Br. 35.)

The record does not support the 4-level "leadership" enhancement the Government seeks.

12

### E.      An Abuse of Trust Enhancement is Inapplicable.

The Government argues that Mr. Allen's sentence should be enhanced by 2-levels because Mr. Allen "abused of position of trust" that was "entrusted to him" by the BBA. (Gov. Br. 20.) At the outset, Mr. Allen acknowledges that there is contradictory precedent in the Second Circuit regarding whether an "abuse of trust" enhancement requires a fiduciary duty between the defendant and the victim. The Government cites *United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999), for the proposition that no fiduciary duty is required. *United States v. Hirsh*, 239 F.3d 221, 227-228 (2d. Cir. 2001) and *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996), however, hold that a fiduciary obligation is required.

Mr. Allen did not have a fiduciary obligation to the BBA. But even if that is not the standard, the abuse of trust enhancement is not warranted here. The Government's allegation against Mr. Allen was that he submitted rates influenced by a desire to help his employer. (Tr. (Gov. Closing) 1590:4-10 ("We are not here asking you to determine if the actual submission, the actual number after the fact was right or wrong."); Tr. (Gov. Closing) 1609:13-17 ("Defendants have been charged with basing their LIBOR submissions, at least in part, on trading positions in order to make money. That's what the government is charging. That's the crime alleged."); Gov. Mot. in Limine, Dkt. No. 122, at 1, 6 ("it makes no difference whether or not [Defendants' submissions]…[were] otherwise within the 'range' of what the defendant thought Rabobank's borrowing costs might have been.").) But, the BBA did not care if Panel Banks made submissions that were influenced by their own interests. For example, an audio file of a BBA FX & MM Committee conference call includes a discussion about two LIBOR submissions, one made by Deutsche Bank and the other made by Royal Bank of Scotland ("RBS") on a day in which those institutions had a very large derivative trade fixing between

13

them.  (Ex. 49.)  As would suit their respective positions in the swap, Deutsche Bank "put down their LIBORs" and RBS "put up their LIBORs." (*Id*.)

After learning of the issue, the BBA's LIBOR Manager, Mr. Ewan, responded, "I don't know whether this was based on the back of any derivative trading going on, [but] I'm happy that the rates are representative, so from that perspective, I'm fine." (*Id*.)  The FX & MM Committee then confirmed that both Deutsche Bank's and RBS's submission were in "accordance with law," since both banks said that their LIBORs reflected their borrowing costs, even though they were also submitted to suit their swap positions.  (*Id*.; *see also* Ex. 52 (October 31, 2008 BBA edits to "Governance" document, describing changes meant to clarify that "communicat[ions] with brokers, other banks, [and] other departments within their own banks" are all "legitimate contacts to aid a contributor in forming his or her rate.").)  Because the BBA accepted the conduct that the jury found Mr. Allen guilty of, Mr. Allen did not betray the BBA's trust and no "abuse of trust" enhancement is warranted here. [6]

### F. The Court Should Credit Probation's Finding that Mr. Allen Cannot Afford a $150,000 Fine.

In addition to a substantial period of incarceration, the Government also asks the Court to impose upon Mr. Allen "a fine of $150,000, the maximum recommended under the guidelines for an offense that yields a guideline level between 29 and 31 levels." (Gov. Br. 24.)

---

[6] The Government also makes an argument that is not found in the PSR, namely that Mr. Allen "abused the trust" of his employer, Rabobank, because he "used his employment in furtherance of a scheme that required Rabobank to pay hundreds of millions of dollars in fines and caused considerable damage to the bank's reputation."  (Gov. Br. 21.)  However, Mr. Allen did not "abuse" Rabobank's trust: the conduct was well-known and tacitly approved by Rabobank, including by senior managers and Internal Audit.  (*See* Allen Br. 16-17.)  Rabobank's fines resulted from its institutional failures—including its failure to offer any training regarding LIBOR or any oversight of its LIBOR submissions, its failure to recognize the inherent conflict of interest in placing swap traders at the same trading desk as LIBOR submitters with instructions to corroborate, and its failure to institute any sort of "rules" or instructions to guide submitters during stressed periods in the market.

14

In seeking this penalty, the Government disregards the Probation Office's finding that Mr. Allen "does not have the ability to pay a fine," and its recommendation that any fine "be waived." (PSR at 28.)  Probation made its determination after reviewing Mr. Allen's financial records and its recommendation should be adopted by the Court.

The Government argues that the maximum fine is justified in this case because Mr. Allen "committed a scam designed to enrich [himself] at the expense of others," and therefore, the "equities favor the imposition of a fine." (Gov. Br. 25.)  But, imposing a maximum fine on Mr. Allen—the effect of which will mostly be felt by Mr. Allen's two grade-school daughters—is not "equitable."  The "others" that the Government alleges Mr. Allen "scammed" are 2,742 financial institutions or otherwise sophisticated entities, *see* Gov. Br. 23, which suffered an average of $415 in intended, not even actual, losses.  Mr. Allen has been a stay-at-home dad without an income since 2008 and is responsible for supporting two little girls, providing for their education, housing, clothing and medical care.  Mr. Allen's family will have substantial expenses over the next few years, including medical expenses associated with Mr. Allen's five-year old daughter, Faye, who was born with a cleft lip and palette.  As Mr. Allen's partner, Tracy, explains:

> As her parents, we think Faye is beautiful, but we know that she looks different than the other girls in her school class—she has a visible vertical scar above her lip and her right nostril is slightly collapsed.  She has an extra tooth growing in the roof of her mouth and the tooth that is growing in the gum where the cleft is, is twisted fully round.  All of these things and more will need correcting in the next few years.  She will need a bone graft from her hip when she is 8-9 years old to hold her new permanent tooth in place when it grows.  We are lucky in the UK that her basic surgical requirements will be met by our National Health Service, but it will not cover the surgeries to align her nose, or treat her scars, etc.  Although these surgeries are cosmetic, they are also necessary, because life can be very hard for a little girl with facial deformities, especially in our judgmental society.

(Ex. A-1.) Mr. Allen's finances have been depleted by this case and his daughters are almost certainly going to be pulled out of their school at the end of the term. (*Id*.) Neither Neve nor Faye needs additional disruption in their lives, but the family can no longer afford the school's tuition. (*Id*.) As the Probation Office recognized, a $150,000 fine would be a significant burden on a young family that has already lost much.

## CONCLUSION

For the foregoing reasons, we respectfully repeat our request that the Court impose a non-custodial sentence, which we submit is sufficient but not greater than necessary to satisfy the objectives of sentencing.

Dated:   New York, New York
         March 8, 2016

**WILLKIE FARR & GALLAGHER LLP**

By: /s/ Michael S. Schachter

Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
Phone: (212) 728-8000

*Attorneys for Defendant Anthony Allen*