## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
UNITED STATES OF AMERICA,                   :
                                            :
    v.                                      :
                                            :  Case No. S4 14-CR-272 (JSR)
ANTHONY ALLEN,                              :
PAUL THOMPSON,                              :
TETSUYA MOTOMURA, and                       :
ANTHONY CONTI,                              :
                                            :
Defendants.                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### ANTHONY CONTI'S RESPONSE TO THE
### GOVERNMENT'S SENTENCING SUBMISSION

**TOR EKELAND, P.C.**
Aaron Williamson
Tor Ekeland
195 Plymouth St, Floor 5
Brooklyn, NY 11201
(718) 737-7264

*Attorneys for Defendant Anthony Conti*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

I.  THE DEFENDANTS SHOULD NOT BE SENTENCED ON THE BASIS OF
    THE FAILINGS OF THE FINANCIAL INDUSTRY ......................................................2

    A.  Similar Conduct at Barclays. ...................................................................................2

    B.  Similar Conduct at Royal Bank of Scotland. ...........................................................4

    C.  Similar Conduct at UBS...........................................................................................5

    D.  Similar Conduct at Deutsche Bank. .........................................................................7

    E.  Similar Conduct at Bank of America. ......................................................................9

    F.  Similar Conduct at JP Morgan. ..............................................................................10

    G.  Similar Conduct at Citibank...................................................................................10

II. THE ENHANCEMENTS REQUESTED BY THE GOVERNMENT ARE
    UNWARRANTED ...........................................................................................................11

III. NO FINE IS WARRANTED............................................................................................12

CONCLUSION....................................................................................................................14

# TABLE OF AUTHORITIES

**STATUTES**

18 U.S.C. § 3553(a)(2) .................................................................................................. 12

**OTHER AUTHORITIES**

U.S. Sentencing Guidelines Manual (2014) ................................................................ 12

U.S. Sentencing Guidelines Manual (2015) .......................................................... 11, 12

Defendant Anthony Conti respectfully submits this response to the Government's sentencing submission, dated March 3, 2016.

## INTRODUCTION

The Government's description of Mr. Conti as "a professional banker" is outdated: today he is a professional caterer. Together with his uncle and a small staff, he prepares and delivers school lunches and serves wedding guests. He makes a small fraction of what he did as a money market trader—not enough yet to meet his family's needs—but enjoys the work and has proven a reliable and caring co-worker in spite of everything.

Along with Mr. Conti's career of nearly 30 years, his family has lost the home they loved and nearly all of their savings, none of it the spoils of fraud. Mr. Conti fears his children will never attend university. The Government proposes that, in addition to all of this, the Contis should lose all that they have left—that for the remainder of their primary schooling, Lilly and Mia should be deprived of their father's nightly instruction; that Samuel should not know his father until he is seven years old; that Lisa should bring their children up without Mr. Conti's help or the savings he worked hard to provide.

This devastating punishment is unnecessary. The Government acknowledges that no sentence is necessary to deter Mr. Conti from further offenses. As we detailed in our sentencing submission, the Government's LIBOR-related prosecutions and the consequent industry response are more than sufficient to deter others from similar offenses. And because identical conduct by dozens of individuals at other banks has gone unpunished, imprisonment would create an unwarranted sentencing disparity. Therefore, Mr. Conti respectfully submits that a non-custodial sentence would be just and appropriate.

1

### I. THE DEFENDANTS SHOULD NOT BE SENTENCED ON THE BASIS OF THE FAILINGS OF THE FINANCIAL INDUSTRY.

The Government advocates for a "substantial term of incarceration" and the maximum Guidelines fines for the Defendants because, among other reasons, their offense "involved a select group of individuals entrusted with setting a number that played . . . a fundamental and consequential role in the financial system," and had the effect of "erod[ing] public confidence in the integrity of the financial markets." (Gov. Br. (Allen) (Dkt. 225) at 1, 6.) The Government is not describing Mr. Conti or Mr. Allen in particular here, but rather is referring to all of the Panel Banks together. As the Government's LIBOR prosecutions demonstrate, employees at almost every Panel Bank were involved in making LIBOR submissions intended to benefit their respective institutions. (*Id*.; Allen Exs. 33-39 (Dkt. 227—211-217) (DOJ settlements regarding LIBOR).) The conduct detailed in the resulting settlements is identical to—and in some cases worse than—that of these Defendants.

#### A. Similar Conduct at Barclays.

Conduct similar to Mr. Conti's took place at Barclays. Miles Storey was Barclays's Head of Liquidity and Balance Sheet Management, a senior position that reported directly to Barclays's Group Treasurer. Mr. Storey was also the Chairperson of the BBA's FX & MM Committee. As is generally discussed in the Barclays Deferred Prosecution Agreement ("Barclays DPA"), Mr. Storey called Barclays's LIBOR submitter and told him that although he was "in no way try[ing] to get [the submitter] to change [his] LIBORS," if the LIBOR submitter "was comfortable in not raising them again," that "would be good," from, as Mr. Storey put it, a "presentational point of view." (Allen Ex. 34 (Dkt. 227—212) at ¶¶ 36-41; Ex. A, at 1-2.)

Likewise the Barclays DPA describes an "off the record" conversation between Mr. Storey and the BBA's LIBOR Manager, Mr. Ewan, in which Mr. Storey advised that reports

2

were beginning to "creep out of the woodwork," about the "divergence" between "where people are posting" LIBOR and "where they're actually trading." (Allen Ex. 34 (Dkt. 227—212) at ¶ 43; Ex. B, at 2.) Mr. Storey warned that the FSA might begin to "loo[k] at LIBORs" and if that happened, the Panel Banks' "manipulation, for whatever reason, is going to come out." (Ex. B, at 3.) His proposed solution was that Mr. Ewan send a "confidential" letter to the Panel Banks, so that it would at least seem as though the BBA was doing "something," in a "press release sense." (Allen Ex. 34 (Dkt. 227—212) at ¶ 43; Ex. B, at 6-8.) After the call, Mr. Storey admitted to another senior Barclays manager that he had made the suggestion to Mr. Ewan about sending a letter partly so that no one could say to him, "You're not pulling your weight and you're telling fibs." (Ex. B, at 9, 16.) He and the Barclays senior manager privately acknowledged that they felt as though they were walking "a tightrope," in which "professionalism or correctness" was being weighed against Barclays's "exposure" in the "market." (*Id*. at 17-18.)

On April 16, 2008, the Wall Street Journal published an article confirming that the Panel Banks had "an incentive to provide false rates to profit from derivatives transactions." (Ex. C.) Later that day, Mr. Ewan called Mr. Storey to explain that reporters were asking the BBA questions about Panel Banks "mendaciously and continually manipulating the fixings." (Ex. D at 2.) Mr. Ewan warned, "[T]his isn't going to go away." (*Id*., at 3.) Mr. Storey told Mr. Ewan, "as far as I'm concerned, [Barclays is] clean, but we're dirty-clean rather than clean-clean." (*Id*., at 12.) Mr. Ewan responded, "No one's clean-clean now, are they Miles?" (*Id*. at 12.) Mr. Ewan agreed to contact the "Chairman" or "CEO" of each of the various Panel Banks to have a "soft conversation," alerting the executives to what was "going on," but "leav[ing] it to

3

each individual institution" to "say to the guys on the desk" that LIBOR rates needed to change. (*Id*. at 13-14.)

Mr. Storey was being honest when he admitted that the LIBOR submitters at Barclays were "dirty-clean." For example, on March 13, 2006, a Barclays swap trader wrote to Barclays's LIBOR-submitter, "The big day has[] arrived...As always, any help [would] be greatly appreciated. What do you think you'll go for 3m?" (Allen Ex. 34 (Dkt. 227—212) at ¶ 13.) Barclays's LIBOR submitter responded, "I am going 90 altho[ugh] 91 is what I should be posting." (*Id*.) The swap trader responded, "[W]hen I retire and write a book about this business your name will be in golden letters," to which the LIBOR submitter exclaimed, "I would prefer this not be in any books!" (*Id*.) When a different swap trader asked Barclays's LIBOR submitter in December 2006 for "3m Libor at 5.365 or lower" until the end of the year, the LIBOR-submitter created an electronic calendar entry with the title, "SET 3 MONTH US$ LIBOR LOW!!!!!!" that was scheduled to begin on December 22, 2006 and continue until January 1, 2007. (*Id*. at ¶ 15.) After Barclays' LIBOR submitter was persuaded by a swap trader to set LIBOR lower than he had originally intended, the swap trader wrote, "Dude I owe you big time! Come over one day after work and I'm opening a bottle of Bollinger! Thanks for the libor." (*Id*. at ¶ 26.) No one at Barclays is facing criminal charges.

### B. Similar Conduct at Royal Bank of Scotland.

Conduct similar to Mr. Conti's took place at Royal Bank of Scotland ("RBS"). Numerous managers—Paul Walker, RBS's Global Head of Money Markets, and Kevin Liddy, RBS's Head of Short-Term Interest Rates Trading, as well as Mark Thomasson, RBS's Head of Sterling Money Markets—participated in conversations about "keep[ing] [LIBOR] down" because of "big fixes in London." (Ex. E; *see also* Ex. F (RBS's Global Head of Money Markets: "might try for 10 15 20 got a lot of fixes next few days.").) When an RBS derivative

4

trader in New York asked Mr. Walker why RBS's LIBOR was so "low," Mr. Walker admitted that he had "all money in" on his "fixings" that day. (Ex. G.) On August 22, 2007, a RBS manager asked RBS's LIBOR submitter, "Hi Mate, where are u calling the 6m and 3s Libor today?" (Allen Ex. 36 (Dkt. 227—214) at ¶41.) The LIBOR submitter admitted that he had "put in 1.05 and 1.15," which he acknowledged was "too high," but he'd "wanted high fixes" for his trading book. (*Id.*) When the same submitter later sent the RBS manager saying, "let me know if you have any preferecves [sic]" on LIBOR, the manager responded, "thx will do." (*Id.*) A few months later, the same manager gave a direction to RBS's LIBOR-submitter: "we want lower libors." (*Id.* at ¶ 42.) When the LIBOR submitter agreed, the manager responded, "great…set it nice and low." (*Id.*) No one at RBS has been criminally charged.

      **C.**    <u>**Similar Conduct at UBS.**</u>

Conduct similar to Mr. Conti's took place at UBS. For example, a UBS supervisor began sending instructions to UBS's LIBOR submitters in 2002, directing them to make Yen LIBOR submissions that would benefit his personal trading book. (Allen Ex. 35 (Dkt. 227—213) at ¶ 23.) In 2005, UBS's Head of Short Term Interest Rate Trading, Yvan Ducrot, agreed with UBS's LIBOR submitters that it was UBS's "natural right to reflect our interest in the LIBOR fixing process," and that "any other bank will do the same." (Allen Ex. 35 (Dkt. 227—213) at ¶ 74; Ex. H.) In 2007, Gaspare Lasala, UBS's Head of Liquidity Management, acknowledged that, ordinarily, UBS's first "priority" in making LIBOR submissions was its "fixing risk and PNL [profit and loss]." (Allen Ex. 35 (Dkt. 227—213) ¶ 105; Ex. I.) When the Wall Street Journal's May 29, 2006 article regarding LIBOR's falsity was published, *see* Ex. J, UBS's LIBOR submitter warned Mr. Lasala that the article was "gonna be a problem for us," since there were "days where [UBS]'s CD [commercial deposits] and CP [commercial paper] didn't match our libor fixes." (Ex. K.)

On December 11, 2007, Michael Pieri, UBS's Head of Global Rates, emailed his co-Head, Sascha Prinz, to encourage him to "exert" "pressure" on the bank's LIBOR-setters to increase their submissions until they fell "into the middle" of the pack, a movement "worth 500k." (Allen Ex. 35 (Dkt. 227—213) ¶ 132; Ex. L.) Mr. Pieri said that it was "best for the bank" if LIBOR was set to help the department with the "bigger" position. (*Id.*) Mr. Prinz confirmed that he would speak to the LIBOR-submitters. (*Id.*)

Tom Hayes worked at UBS for the beginning part of his career, before moving to Citibank in late 2009, and certain individuals in UBS's management were supportive of his attempts to manipulate LIBOR to benefit his trading book. (Allen Ex. 35 (Dkt. 227—213) at ¶37-39.) For example, Mr. Pieri sent the following email to UBS's global head of derivatives, complaining that the LIBOR submissions were harming Mr. Hayes's bottom line and asking for assistance:

> We have a large tibor/libor position which loses if libors move higher. 4[million dollars per basis point]. . . .Group treasury has informed [LIBOR submitters] to put all fixings in the middle of the pack. This has resulted in UBS personally contributing to a ½ bp higher fixing today.

(Allen Ex. 35 (Dkt. 227—213) ¶ 133.) In addition, on July 3, 2009, Mr. Pieri emailed Mr. Ducrot, UBS's Head of Short Term Interest Rate Trading, to explain that "Tom [is] an important part of UBS" because he has "strong connections to LIBOR setters in London," and accordingly, possessed "information [that was] invaluable for the derivatives books." (Allen Ex. 35 (Dkt. 227—213) ¶ 71; Ex. M.)

UBS's LIBOR rates were submitted by its swap traders until September of 2009, when UBS's cash traders finally took over the submissions. (Allen Ex. 35 (Dkt. 227—213) at ¶ 19.) Even then, however, the swap traders filled out a spreadsheet for the cash traders with their estimated rates and the cash traders took that information into account when making LIBOR

6

submissions. (*Id.*) When UBS's attorneys began investigating potential LIBOR manipulation at UBS, supervisors at the bank "instructed" the LIBOR-submitters "to lie when interviewed," including instructions to "falsely claim that the UBS Yen trading desks did not have any derivative positions with exposure to Yen LIBOR," to avoid mentioning Tom Hayes, to "falsely indicate the YEN LIBOR submission process did not take into account trading positions," to "falsely claim that [the submitters] never moved the Yen LIBOR submissions to benefit the Yen trading desks," and to "falsely claim that when contributing Yen LIBOR submissions, UBS tried to be 'as close to the market as possible.'" (*Id.* at ¶ 39.) No one at UBS—except for Tom Hayes—has been criminally prosecuted.

### D.   Similar Conduct at Deutsche Bank.

Conduct identical to Mr. Conti's took place at Deutsche Bank. For example, Deutsche Bank's LIBOR submissions were set by one of the bank's managers, who also had responsibility for "one of the bank's largest" derivative trading books. (Allen Ex. 33 (Dkt. 227-211) at ¶¶ 19, 21.) This manager reached out to Deutsche Bank's swap traders to solicit LIBOR requests. For example, on September 26, 2005, the Deutsche Bank manager in charge of LIBOR sent an instant message to one of the bank's swap traders, asking "libors any requests?" to which the swap trader replied, "HIGH FREES, LOW 1MUNF." (*Id.* at ¶ 28.)

On February 24, 2006, the same manager emailed a junior LIBOR-submitter at the bank with the instruction, "Push for 60," which was consistent with broker estimates he had received. (*Id.* at ¶ 29.) The manager copied one of the bank's swap traders on this communication and the trader replied to the group, "or even 58[,] if you can[,] Coffee on me." The submitter responded to both the trader and his manager, "Will work on it all morning." (*Id.*) One month later, another swap trader reached out to the manager in charge of the bank's LIBOR submissions, saying, "I WOULD NEED A HIGH 3 MTS LIBOR TODAY, BUT I THINK YOU

7

DO TOO!!" to which the manager replied, "35?" and the swap trader agreed, "YEP PSE." (*Id*. at ¶ 30.)

Similarly, on May 17, 2006, a New-York based trader reached out to the Deutsche Bank manager in charge of LIBOR, stating, "If you can help we can use a high 3M fix tom." (*Id*. at ¶ 34.) The manager replied that he was "off" for the day but he copied a more junior LIBOR submitter on his reply, and asked him to "take a look at 3s libor in the morning" for the New York trader. (*Id*.) The junior LIBOR submitter responded, "Will do chaps," and followed up with the New-York trader the next day, "I went in at 19+ for the 3m LIBOR, as you'll see it almost manage to reach 19." (*Id*.)

A Deutsche Bank manager in charge of the bank's New York-based cash traders "actively encouraged" the traders who worked for him to make "requests of the bank's USD LIBOR submitters in London." (*Id*. at ¶ 32.) On November 29, 2005, the manager in charge of LIBOR submissions told the New York-based manager that the submissions that day had taken his interests into account, "looking like 29 in 1 mth libor – we went in 295 for u." The New York-based manager also reached out to more junior LIBOR submitters at the bank directly. On August 12, 2007, he wrote to the bank's LIBOR-submitter, "If possible, we need in NY 1mo libor as low as possible next few days…tons of pays coming up overall…thanks!" (*Id*.) Three days later, after the LIBOR submitter confirmed to the manager that he was keeping 1M USD LIBOR submissions low, the manager replied, "you are the man!" (*Id*.)

"Senior" management at Deutsche Bank was also aware that requests for LIBOR submissions were being made. For example, the London head of the bank's Global Finance and FX Forwards department was "present on occasions" when LIBOR-submitters at the bank received "requests to manipulate [the bank's] USD LIBOR submission." (*Id*. at ¶ 98.) On

8

October 10, 2008, a mid-level manager at the bank emailed the London Head of Global Finance to say, "How are you?  I talked to [a trader] about the fixings for next week.  Did he passed it to you?"  (*Id*. at ¶ 99.)  The Global Head was also included on an email from a Euribor submitter which stated, "HAVE YOU SEEN THE 3MK FIXING TODAY?  THAT WAS AN EXCELLED CONCERTED ACTION FFT/LDN.  CHEERS."  (*Id*. at ¶ 99.)  Finally, the Global Head encouraged one of Deutsche Bank's traders, in his performance review, to "increase relationship with FFT MM to control the short date settings with cash and derivatives."  (*Id*. at ¶ 99.)

### E. Similar Conduct at Bank of America.

Conduct identical to Mr. Conti's took place at Bank of America ("BOA").  For example, Bank of America's Treasurer, Daniel Knight, admitted to the BBA that the bank "generate[d] their LIBOR rates off the derivatives market."  (Ex. N (Hayes Tr., June 5, 2015, Day 8 at 114:15, 114:21 – 115:4.).)  Mr. Knight told the BBA that Bank of America submitted LIBOR rates 4 basis points *above* where it could raise interbank funds and that it did so to generate better returns for itself.  (*Id.* at 114:15, 114:21 – 115:4.)  In a Bloomberg chat, a BOA derivatives trader made a LIBOR fixing request, and a BOA LIBOR submitter stated that the submitters would "fix [their submission] as high as poss" to accommodate the trader's interest.  (Ex. O.)  The trader came back the next day and told the submitter that she "did beautifully ydy" and asked if he could "request a repeat performance" for that day.  The submitter replied: "of course." (Ex. P.)  On another occasion, a BOA LIBOR submitter offered to "nudge" the bank's JPY LIBOR submissions "up" in response to an expressed interest from a BOA derivatives trader, who responded, "no need, unchanged is brilliant."  (Ex. Q.)  Indeed, David Henness, the supervisor at Bank of America who was in charge of the bank's Japanese Yen derivatives, and a witness on the Government's trial list, supervised traders who made LIBOR requests to Bank of

9

America's LIBOR-submitters. (Ex. R).) No one from Bank of America has been criminally charged.

### F.   Similar Conduct at JP Morgan.

Conduct similar to Mr. Conti's took place at JP Morgan ("JPM"). Jamie Patterson, JP Morgan's Head of Global Funding, and Frederic Mouchel, the bank's European Treasurer, had at least one conversation about keeping JP Morgan's LIBOR submissions at levels that would not lead to "any questions." (Ex. S.) Mr. Patterson instructed Mr. Mouchel to have the bank's LIBOR submitters set rates "as low as anybody, as long as it's not a ridiculous level." (*Id.*) On another occasion, Mr. Patterson instructed the bank's LIBOR submitters to "tighten up a little going forward" to "help" the "USD loan desk" at the bank. (Ex. T.) At one point in 2008, Mr. Mouchel confessed to Mr. Patterson that he thought JPM's submissions were "wrong." (Ex. U.) A few months later, Mr. Mouchel and John Needham, JPM's U.S. Treasurer, exchanged an email in which Mr. Mouchel admitted that his reluctance to "push" JPM's LIBOR rates "lower" arose out of his concern that doing so would "penalize [sic] the loan business" at the bank. (Ex. V.) No one at JP Morgan has been charged with any wrongdoing.

### G.   Similar Conduct at Citibank.

Conduct identical to Mr. Conti's took place at Citibank. Andrew Thursfield managed Citibank's cash traders. He received multiple requests from Citibank's swap traders for favorable rates, including one request on September 13, 2007 in which the swap trader asked, "assuming you don't need a high setting for your book…I would appreciate it if we could be aggressive with our setting (ie 60 or lower)." (Ex. W.) Mr. Thursfield responded, "will continue to push them down." (*Id.*) When a swap trader pushed Mr. Thursfield for "3mt Libor below 65," Mr. Thursfield said that Citibank would "continue to pressure the brokers to talk it down and generally press lower than all others." (Ex. X.) On May 6, 2008, Mr. Thursfield admitted to

10

Nick Farrell, Citibank's Head of Global Risk, that Citibank had "never paid in the market close to the LIBOR levels we have posted." (Ex. Y.) No one at Citibank has been criminally charged.

That this conduct was so widespread among otherwise law-abiding, professional people, suggests that the BBA's governance of the rate may have contributed to the industry-wide problems identified in the Government's submission. Indeed, the recent acquittal of the LIBOR brokers in the United Kingdom suggests that the public perceives that institutional failures contributed to the problems with LIBOR. As has been reported, the jurors in that case, who acquitted all six defendants, believed the brokers were being punished for a "broken system." (*See* Allen Ex. 15 (Dkt. 227—191) ("*LIBOR Trial*," the Independent, Feb. 10, 2016).)

Mr. Conti and Mr. Allen should not bear the Government's retribution for the conduct of at least 125 different people, from at least 10 different financial institutions, the vast majority of whom have not been charged with any wrongdoing and will never be. (Allen Exs. 10, 11 (Dkt. 227—186-187).) Because so many people engaged in conduct indistinguishable from the Defendants' and yet will not face imprisonment, a substantial sentence of incarceration here would create an unwarranted sentencing disparity.

## II.     THE ENHANCEMENTS REQUESTED BY THE GOVERNMENT ARE UNWARRANTED.

The Government argues that Mr. Conti's conduct justifies enhancements for loss under U.S.S.G. § 2B1.1(b)(1); for a scheme involving ten or more victims under § 2B1.1(b)(2)(A); and for an abuse of trust under § 3B1.3. (Gov. Br. (Dkt. 226) at 2.) Mr. Conti renews his objections to these enhancements for the reasons set out in his sentencing submission and joins Mr. Allen's response to the government's arguments. (*See* Allen Response (Dkt. 232) at 6-9, 13-14.)

### III.     NO FINE IS WARRANTED.

The Government argues, contrary to the recommendation of the Probation Office, *see* PSR at 29, that the Court should impose the maximum fine recommended by the Guidelines, $100,000. (*See* Gov. Br. (Dkt. 226) at 3; U.S.S.G. § 5E1.2(c)(3) (2014).) Because the requested fine is unnecessary to promote the purposes of sentencing described by 18 U.S.C. § 3553(a)(2) and would leave Mr. Conti's four dependents financially bereft, it is unwarranted.

The Sentencing Guidelines require that, "[i]n determining the amount of the fine, the court shall consider" several factors, including the § 3553(a)(2) factors, the defendant's ability to pay, "the burden that the fine places on the defendant and his dependents relative to alternative punishments," any collateral consequences of conviction, and "any other pertinent equitable considerations." (U.S.S.G. § 5E1.2(d).) Each of these factors militates against imposing the requested fine.

Mr. Conti's sentencing submission sets out the reasons why, given the consequences he has already suffered as a result of the offense, a custodial sentence would be "greater than necessary" to satisfy § 3553(a)(2). (*See* Conti Br. (Dkt. 229) at 2-26.) For the same reasons, no fine is necessary to sufficiently redress the offense. The collateral consequences alone have been devastating—along with his career in banking, Mr. Conti has lost as much as 80% of his earning potential. (*Compare* PSR ¶ 99 *with* PSR ¶ 96.)

Most importantly, the requested fine would wipe out the Contis' savings and leave them destitute. The PSR reflects that, as of two months ago, Mr. Conti possessed $103,000 in liquid assets.[1] (*See* PSR ¶ 102.) His family's modest monthly expenses, totaling $6,629,

---

[1]     While the PSR puts Mr. Conti's total assets at $654,833, the remainder of these assets comprise retirement funds, illiquid assets, an outstanding loan to Mr. Conti's mother-in-law, and Mr. Conti's unsaleable interest in his uncle's catering business.

12

exceeded his income by $2,129 per month. (*Id.*) To make up the shortfall, Mr. Conti has had to spend down the family's savings. (*Id.* ¶ 103.)

        Mr. Conti is the sole source of support for his family. His wife has not worked since 2003. (*Id.* ¶ 80.) Though she and Mr. Conti together own an interest in the family catering business where Mr. Conti now works, that interest is not a viable source of passive income—even working full-time for the company, Mr. Conti makes only $4,500 per month. (*See id.* ¶ 96.) If Mr. Conti is detained, Mrs. Conti will be solely responsible for the care of their three children, aged 20 months to 10 years old. Even if she could somehow manage to work full-time and draw the same salary, it would scarce cover the consequent childcare costs.

        The $103,000 remaining in the Contis' checking account is therefore all that remains to sustain Mrs. Conti and her children during any term of imprisonment imposed by the Court. To award it instead to the Government would work an unjustified hardship upon a family already under tremendous financial strain.

## CONCLUSION

For the foregoing reasons, Mr. Conti respectfully renews his request that the Court determine that a non-custodial sentence is sufficient to satisfying the objectives of sentencing.

Dated:   New York, New York
         March 8, 2016


**TOR EKELAND, P.C.**

By: /s/ Aaron Williamson
Aaron Williamson
Tor Ekeland
195 Plymouth St, Floor 5
Brooklyn, NY 11201
(718) 737-7264

*Attorneys for Defendant Anthony Conti*