UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : |
| v. | : S4:14-cr-00272-JSR |
| | : |
| | : |
| PAUL THOMPSON | : |
| | : |
| Defendant. | : |
| | : |

# UNITED STATES'S SENTENCING MEMORANDUM REGARDING PAUL THOMPSON

ANDREW WEISSMANN
Chief, Fraud Section

CAROL SIPPERLY
Senior Litigation Counsel
BRIAN R. YOUNG
Assistant Chief
U.S. Department of Justice
Criminal Division
1400 New York Ave., N.W.
Washington, D.C. 20005
(202) 616-3114

JEFFREY D. MARTINO
Chief, New York Office

MICHAEL T. KOENIG
Trial Attorney
U.S. Department of Justice
Antitrust Division
450 5th Street, N.W.
Washington, D.C. 20001
(202) 616-2165

**TABLE OF CONTENTS**

I. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ..................................1

II. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT ........................3

III. THE NEED FOR THE SENTENCE IMPOSED (1) TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE; (2) TO AFFORD ADEQUATE DETERRENCE; (3) TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT; AND (4) TO PROVIDE THE DEFENDANT WITH APPROPRIATE EDUCATION OR VOCATIONAL TRAINING.................................4

IV. THE KINDS OF SENTENCES AVAILABLE ................................................................5

V. THE RANGE ESTABLISHED BY THE SENTENCING GUIDELINES .....................5

   A. There is no dispute that Mr. Thompson's base offense level is seven...........................6

   B. Although the loss caused by the scheme is difficult to calculate and is, under the unique circumstances of this case, of limited value in assessing Mr. Thompson's culpability, the government estimates that the defendants intended for their scheme to cause a loss of between $500,000 and $1.5 million under § 2B1.1(b)(1)(H). .................................................................................6

   C. The Court should apply a two-level enhancement under section 2B1.1(b)(2)(A) because the scheme involved ten or more victims. ..............................8

   D. Mr. Thompson is entitled to a three-level reduction for acceptance of responsibility pursuant to sections 3E1.1(a) and (b). ................................................8

VI. THE NEED TO AVOID SENTENCING DISPARITIES AMONG DEFENDANTS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.........................................................................................................................8

VII. THE CALCULATION OF RESTITUTION IS INPRACTICABLE UNDER THE MANDATORY VICTIM RESTITUTION ACT (MVRA) ...................11

Paul Thompson is the third defendant to be sentenced in the United States for his participation in a scheme to manipulate the London Interbank Offered Rate (LIBOR), a profoundly important benchmark to which was tied the value of hundreds of trillions of dollars in mortgage loans, consumer debt, derivative contracts, and other financial instruments.  As set forth herein, Mr. Thompson's crime not only defrauded Rabobank's counterparties on interest rate swap contracts, but also severely damaged LIBOR's credibility and eroded public confidence in the integrity of the financial markets.  Under the United States Sentencing Guidelines, the United States calculates Mr. Thompson's offense level as 20, which yields a sentencing range of 33-41 months in Zone D.  Given the unique circumstances of this case, however, the Sentencing Guidelines are an imperfect tool for evaluating the punishment that Mr. Thompson should receive.

Title 18, United States Code, § 3553(a) provides factors that the Court shall consider in sentencing Mr. Thompson.  These factors are discussed in turn below.

I.      THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Thompson, formerly an Asia-based derivatives trader employed by Rabobank, participated in a scheme with co-defendants Anthony Allen and Anthony Conti (who were convicted at trial in November of 2015); Paul Robson, Takayuki Yagami, and Lee Stewart (who entered guilty pleas); Tetsuya Motomura (a fugitive) and others, to rig LIBOR, the most significant global benchmark for short-term interest rates. During the trial of Messrs. Allen and Conti, the Court heard evidence that Mr. Thompson traded derivative products linked to the U.S. Dollar and Japanese Yen LIBOR and that he asked Rabobank's LIBOR setters to influence their submissions to the British Bankers' Association to suit his positions.  By way of example, the Court received into evidence

1

the following communications in which Mr. Thompson requested LIBOR accommodations:

- GX101D – Mr. Thompson asking Mr. Robson to submit "0.44 if you can keep a straight face."

- GX101F – Mr. Thompson advising Mr. Robson: "[it would] be great if you could keep your 3 mth libor unchanged today if you can get away with it and its ok with your [position]."

- GX126 – Mr. Thompson to Mr. Allen: "I don't want to influence anything but if in doubt don't put em down as im long [about] 2000 futures [equivalent]."

- GX201A – Mr. Thompson to Mr. Robson: "wouldn't mind slightly higher 1m and slightly lower 6m if you have any room over next 5 days.. got a few biggies rolling off."

- GX201B – Mr. Thompson to a LIBOR submitter: "if in doubt can you go higher on 1mand 3m please as both myself and Tokyo are very long these fixings today so every little bit helps."

- GX401 – Mr. Conti advised Mr. Allen that "seems to be 23 the shout mate . . I can go lower if you like?" to which Mr. Thompson responded: "that will do mate, cheers."

- GX1201B – Mr. Thompson advising Mr. Yagami that he asked Mr. Conti to ask a Rabobank submitter to make a high one-month submission: "I'll just say for choice put it higher rather than lower. I just. . . I just don't like to tell them in too black and white but Pookie [Mr. Robson] always understands."

- GX1401 – Mr. Thompson and Mr. Conti agreeing to submit "higher in 1's because we are long the fixing."

In the sentencing submission that it filed for Mr. Allen, the United States argued that the scheme to manipulate LIBOR was aggravated not only because it harmed Rabobank's counterparties but also because the defendants' conduct undermined the public's confidence in the LIBOR benchmark in particular and the financial markets in general. Rather than re-state these arguments here, the government rests on the sentencing submission that it made for Mr. Allen and incorporates the document by reference. *See* Dkt. 225.

## II.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Mr. Thompson was a derivatives trader who worked in Hong Kong and Singapore as Rabobank's Head of Money Market and Derivatives Trading for Northeast Asia. Although not technically a supervisor like Mr. Allen, Mr. Thompson was an experienced swaps trader who acted as something of a mentor to more junior traders like Mr. Yagami. As the bank's senior trader in Northeast Asia, Mr. Thompson was undoubtedly in a position to appreciate the effects that the manipulation scheme would have on Rabobank's counterparties and the financial markets on the whole.

The fact that Mr. Thompson participated in a scheme that involved the systematic and regular manipulation of the most important interest rate benchmark in the world – as opposed to a more circumscribed financial crime that involved a single bad trade on a single day – reveals a selfish worldview that speaks to his personal characteristics. Beyond his participation in the scheme at hand, however, all available evidence suggests that Mr. Thompson is fundamentally a decent person. He meets his obligations to his

3

family and has no known criminal history.  Although he initially refused to surrender voluntarily when first indicted, thereby requiring the United States and Australia to initiate extradition proceedings, Mr. Thompson eventually elected to cease his opposition and consented to extradition in Australia.  The United States concedes that Mr. Thompson's decision to consent to extradition to the United States conserved judicial resources in Australia and the United States.[1]

### III. THE NEED FOR THE SENTENCE IMPOSED (1) TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE; (2) TO AFFORD ADEQUATE DETERRENCE; (3) TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT; AND (4) TO PROVIDE THE DEFENDANT WITH APPROPRIATE EDUCATION OR VOCATIONAL TRAINING

The LIBOR and Foreign Exchange (FX) manipulation scandals have exposed a culture of cheating on the trading desks of many of the world's largest financial institutions that can be checked only by the incarceration of wrongdoers.  To date, eight LIBOR panel banks have entered into resolutions with U.S., U.K., European, and Asian regulators and prosecutors related to their traders' participation in schemes to rig interest rate benchmarks: UBS ($1.52 billion in 2012); Barclays ($453.6 million in 2012); Royal Bank of Scotland ($1.14 billion in 2013); Rabobank ($1.07 billion in 2013); Citigroup

---

[1] It should be noted, however, that Mr. Thompson's decision to contest extradition initially distinguishes him from Messrs. Allen and Conti.  Whereas Messrs. Allen and Conti agreed to appear voluntarily before the United States initiated extradition, Mr. Thompson at first declined to appear voluntarily, which required the United States and Australia to initiate extradition proceedings.  Having been arrested in Australia pursuant to the United States's request for extradition, Mr. Thompson consented to extradition only after it became clear that his efforts to resist would be unlikely to succeed.  In any event, the United States acknowledges that Mr. Thompson's consent to extradition, although somewhat delayed, ultimately conserved judicial resources.

($108.4 million civil settlement in 2013); Deutsche Bank A.G. ($2.5 billion in 2013 and 2015); Societe Generale ($604.7 million civil settlement in 2013); and Lloyds Bank ($370 million in 2014). In May of 2015, Citicorp, JP Morgan Chase, Barclays, and the Royal Bank of Scotland, pled guilty to conspiring to manipulate the price of U.S. Dollars and Euros exchanged in the FX spot market and paid criminal fines totaling more than $6 billion. Notably, UBS and Barclays admitted that their traders participated in this conspiracy to rig the FX spot during the pendency of the non-prosecution agreements that resolved allegations of LIBOR rigging. While corporate resolutions play a constructive role in combating financial crime, the recidivism of UBS and Barclays following their LIBOR resolutions teaches that there is no substitute for individual accountability. A non-custodial sentence would defeat the objectives of general deterrence and individual accountability by sending the signal that dishonest traders can escape the consequences of their actions merely by pleading guilty in the somewhat unlikely event that they are caught.[2]

## IV. THE KINDS OF SENTENCES AVAILABLE

Conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 carries a maximum sentence of 30 years' incarceration; a period of supervised release of up to three years; a fine of $250,000; and a special assessment of $100.

## V. THE RANGE ESTABLISHED BY THE SENTENCING GUIDELINES

The United States submits that Mr. Thompson's adjusted offense level is 20, representing seven levels for a base offense under § 2B1.1(b)(1); fourteen levels for loss

---

[2] Mr. Thompson's case is distinguishable from those of Messrs. Robson, Yagami, and Stewart, who cooperated with the government's investigation and for whom the government intends to file U.S.S.G. § 5K1.1 motions.

under § 2B1.1(b)(1)(H); two levels for number of victims under U.S.S.G. § 2B1.1(b)(2)(A)(i); and a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b).

**A. There is no dispute that Mr. Thompson's base offense level is seven**.

Because wire fraud affecting a financial institution carries with it a 30-year term of incarceration, the defendant's base offense level is seven under § 2B1.1(b)(1).

**B. Although the loss caused by the scheme is difficult to calculate and is, under the unique circumstances of this case, of limited value in assessing Mr. Thompson's culpability, the government estimates that the defendants intended for their scheme to cause a loss of between $500,000 and $1.5 million under § 2B1.1(b)(1)(H).**

The plea agreement specifies that the United States has the right to seek a 14-level loss enhancement and that the defendant may oppose the application of this enhancement. The United States established its loss estimate for co-defendants Anthony Allen and Anthony Conti through the submission of a declaration[3] by Federal Bureau of Investigation (FBI) analyst Kyle Dornbos and the Court ruled that this evidence was sufficient to support a loss of between $500,000 and $1,500,000.  *See United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (district courts need not calculate loss with precision but need only make a reasonable estimate).  Rather than reproduce the arguments that it previously made in support of the proposition that the conspiracy caused a loss of approximately $1.1 million to Rabobank's counterparties, the United States rests on the points raised in part V(B) of the sentencing memorandum it submitted in support of Mr. Allen's sentencing.  *See* Dkt. 225.

---

[3] The declaration was marked as Exhibit 226 and filed as Dkt. 225.

6

Mr. Thompson should be held to account for all of the loss caused by the conspirators – not just losses resulting from trades recorded in his own book – because he participated in a conspiracy. Because section 2B1.1 defines loss as a characteristic of the "offense," and the "offense" is a conspiracy, Mr. Thompson's loss should be calculated with reference to the harm caused by the entire scheme. Where the defendant was convicted of a "jointly undertaken criminal activity," such as a conspiracy, specific offense characteristics should be determined on the basis of "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

The evidence received at Mr. Allen's trial establishes that Mr. Thompson understood that he was not a lone actor but was in fact part of a scheme. For example, in asking Mr. Robson for a LIBOR accommodation on February 9, 2007, Mr. Thompson recognized that both his position and that of Mr. Yagami (whom he referred to as "Tokyo") would benefit from a higher fixing on the one-month and three-month tenors: "if in doubt can you go higher on 1mand 3m please as both myself and Tokyo are very long these fixings today so every little bit helps." GX201B. Similarly, in the chat marked as GX101F, Mr. Thompson acknowledged that Mr. Robson was considering his own positions when making LIBOR submissions: "[it would] be great if you could keep your 3 mth libor unchanged today if you can get away with it and its ok with your posy [position]." Moreover, the jury heard evidence that one of the objects of the overall conspiracy was to improve the financial condition of the bank and enlarge the "bonus pool," which would have inured to Mr. Thompson's benefit. Tr. 407 (Robson testifying).

7

Because Mr. Thompson entered into the scheme knowing of the involvement of other traders, he should be held responsible for the losses caused by the entire conspiracy.

    C. **The Court should apply a two-level enhancement under section 2B1.1(b)(2)(A) because the scheme involved ten or more victims.**

The United States submits that Mr. Thompson should be given a two-level enhancement because the scheme involved ten or move victims and rests on the points raised in section V(C) of the sentencing memorandum that it submitted for Mr. Allen.

    D. **Mr. Thompson is entitled to a three-level reduction for acceptance of responsibility pursuant to sections 3E1.1(a) and (b).**

The United States hereby moves for a three-level departure for timely acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b).

    VI. **THE NEED TO AVOID SENTENCING DISPARITIES AMONG DEFENDANTS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT**

Mr. Thompson will be the eighth person worldwide to be sentenced for participating in a LIBOR manipulation scheme and the second person to be sentenced after a guilty plea.  The table below summarizes the dispositions against these defendants, all of whom were convicted after trial, except for Peter Johnson, who entered a plea of guilty.  Because defendants convicted of economic crimes in the United Kingdom are required to serve half of their sentences in custody, with the remainder in a parole arrangement that approximates supervised release in our system, the table below depicts the months that defendants sentenced by British courts are likely to spend in custody (that is, assuming no violations after release "on license").  The sentencing remarks by the judges who sentenced Mr. Hayes and the Barclays defendants are attached as Exhibits

222 and 223, respectively. Mr. Hayes's sentence was reduced on appeal. *See R. v. Hayes*, [2015] ECWA Crim. 1944, Court of Criminal Appeal (Dec. 21, 2015) (re-sentencing the defendant to eleven years).

| **Defendant** | **Bank** | **Position** | **Custodial Sentence** | **Court** |
|---|---|---|---|---|
| Anthony Allen | Rabobank | Head of Liquidity | 24 months | U.S. District Court for the Southern District of New York |
| Anthony Conti | Rabobank | LIBOR Submitter | 12 months and 1 day | U.S. District Court for the Southern District of New York |
| Tom Hayes | UBS and Citigroup | Swaps Trader | 66 months | Southwark Crown Court |
| Jay Merchant | Barclays | Swaps Trader | 39 months | Southwark Crown Court |
| Jonathan Matthew | Barclays | LIBOR Submitter | 24 months | Southwark Crown Court |
| Peter Johnson | Barclays | Supervisory LIBOR Submitter | 24 months | Southwark Crown Court |
| Alex Pabon | Barclays | Swaps Trader | 16.5 months | Southwark Crown Court |

Of all defendants sentenced for crimes related to LIBOR, Mr. Thompson is most similarly situated to Mr. Conti. This is because both defendants were relatively senior (although not management level) traders at Rabobank and were both part of the same conspiracy.[4] That Mr. Thompson accepted responsibility for his crimes and plead guilty

---

[4] While Mr. Thompson and Mr. Conti had different functions – the former a trader and the latter a submitter – this distinction is not particularly important for the purposes of sentencing. Indeed, the jury heard evidence that Mr. Conti, in addition to his responsibilities as a cash trader, engaged in a limited number of proprietary swaps trades and made LIBOR submissions calculated to improve his own positions. *See, e.g.* GX1401.

9

distinguishes him from Mr. Conti.[5]  As compared to the Barclays traders, Mr. Thompson's conduct is most similar to that of Jay Merchant, a senior trader who schemed with LIBOR submitters to make submissions calculated to benefit his trading positions.  Unlike Mr. Merchant, however, Mr. Thompson entered a plea of guilty (Mr. Merchant went to trial).

Mr. Thompson is less culpable than Mr. Allen for two reasons.  First, Mr. Allen exercised managerial responsibility, which he abused by putting in place a policy of LIBOR manipulation.  Second, Mr. Allen not only refused to accept responsibility, but went so far as to take the stand to offer absurd and perjurious explanations of evidence which clearly proved his participation in the fraudulent scheme.  Mr. Hayes's case is also distinguishable because he engaged in manipulation more frequently than Mr. Thompson, generally took larger positions than Rabobank's traders, and enlisted the help of cash brokers to move the rate.  Moreover, Justice Cooke, who sentenced Mr. Hayes, was offended by Mr. Hayes's efforts to manipulate the U.K.'s justice system to ensure that he would be charged in the British courts.  GX222 at ¶¶ 4 and 5.  While the government concedes that a sentence within Mr. Thompson's guideline range of 33-41 months would result in a disparity between other similarly situated defendants, the fact that every defendant sentenced for LIBOR manipulation to date has received a term of incarceration of at least a year reflects the gravity of the crime.

---

[5] It must be noted that Mr. Thompson fought extradition for a year and pled guilty only after the government had convicted his co-defendants at trial.

10

## VII. THE CALCULATION OF RESTITUTION IS INPRACTICABLE UNDER THE MANDATORY VICTIM RESTITUTION ACT (MVRA)

The United States does not seek restitution from Mr. Thompson. Restitution for wire fraud and conspiracy is mandatory under the MVRA where an "identifiable victim" has suffered a "pecuniary loss." *See* 18 U.S.C. § 3663A(c)(B). The MVRA does not apply, however, to cases in which "the court finds, from facts on the record, that (A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3). In sentencing Messrs. Allen and Conti, this Court ruled that restitution was impracticable under both prongs. The restitution considerations and factors that the Court identified when sentencing Messrs. Allen and Conti apply with equal force to Mr. Thompson's case.

Dated: Washington, DC
November 2, 2016

| | |
|---|---|
| ANDREW WEISSMANN<br>Chief, Fraud Section | JEFFREY D. MARTINO<br>Chief, New York Office |
| /s Brian R. Young<br>CAROL SIPPERLY<br>Senior Litigation Counsel<br>BRIAN R. YOUNG<br>Assistant Chief<br>U.S. Department of Justice<br>Criminal Division<br>1400 New York Ave., N.W.<br>Washington, D.C. 20005<br>(202) 616-3114 | /s Michael T. Koenig<br>MICHAEL T. KOENIG<br>Trial Attorney<br>U.S. Department of Justice<br>Antitrust Division<br>450 5th Street, N.W.<br>Washington, D.C. 20001<br>(202) 616-2165 |