UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

     v.

ANTHONY ALLEN, et al.,

          Defendants.

S4 14 Crim. 272 (JSR)

---

## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT PAUL THOMPSON

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

*Counsel for Defendant Paul Thompson*

9296162v.1

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................ ii

Introduction .......................................................................................................... 1

Argument .............................................................................................................. 3

    I.     Section 3553(a): Non-Guidelines Factors ................................................ 3

        A.    History and Characteristics of the Defendant ............................. 4

            1.    Childhood and Education ................................................. 4

            2.    Marriage and Family ........................................................ 5

            3.    Family Health Issues ....................................................... 7

            4.    Extended Family ............................................................ 11

            5.    Professional Life ............................................................ 14

            6.    Other Character Testimonials ........................................ 16

            7.    Extraordinary Acceptance of Responsibility ................. 19

        B.    Nature and Circumstances of the Offense ................................. 19

        C.    Need to Avoid Unwarranted Sentence Disparities ..................... 20

        D.    The Need for the Sentence Imposed--- .................................... 21

            1.    To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense ................................. 21

            2.    To Afford Adequate Deterrence to Criminal Conduct and Protect the Public .................................... 23

            3.    To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner ................. 24

        E.    The Kinds of Sentences Available ........................................... 26

        F.    Application of the Sentencing Guidelines ................................. 29

            1.    The Guidelines Lead to Patently Unreasonable Results ............... 29

            2.    Loss Amount .................................................................. 30

            3.    Number of Victims ......................................................... 34

Conclusion ........................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)............................................................................................35

*Gall v. United States*,
  552 U.S. 38 (2007).........................................................................................4, 30

*Rita v. United States*,
  551 U.S. 338 (2007)..............................................................................................4

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................................29

*United States v. Allen*,
  14-cr-272 (S.D.N.Y.) ....................................................................................20, 29

*United States v. Francis*,
  129 F. Supp. 2d 612 (S.D.N.Y. 2001)................................................................26

*United States v. Saltsman*,
  No. 07-cr-641 (E.D.N.Y. July 28, 2010) ............................................................28

**Statutes**

18 U.S.C. § 3553(a) ........................................................................................3, 4, 21

18 U.S.C. § 3583(a) ................................................................................................28

U.S.S.G. § 2B1.1.............................................................................................30, 33

U.S.S.G. § 5D1.1 ....................................................................................................28

**Other Authorities**

Memorandum from Sally Quillian Yates, Deputy Attorney General,
  U.S. Dep't of Justice, to Acting Director of Federal Bureau of Prisons
  (Aug. 18, 2016) ....................................................................................................25

U.S. Department of Justice, Office of the Inspector General, Review of
  the Federal Bureau of Prisons' Monitoring of Contract Prisons,
  (2016)....................................................................................................................25

ii

Defendant Paul Thompson respectfully submits this Sentencing Memorandum in advance of his upcoming sentencing hearing, which is scheduled for November 9, 2016.  For all the reasons stated, the Court should sentence Mr. Thompson to a non-custodial sentence.

## INTRODUCTION

Mr. Thompson is before this Court for sentencing in connection with his conviction for conspiracy to manipulate LIBOR, a crime for which the Government has been unable to identify any actual loss, victims, or personal benefit received by Mr. Thompson. Nevertheless, Mr. Thompson has demonstrated extraordinary acceptance of responsibility by both consenting to extradition from his home country of Australia to the United States, where he has neither lived nor worked, and pleading guilty to the conspiracy offense.  Mr. Thompson is deserving of the Court's leniency and, we respectfully submit, a non-custodial sentence is warranted under the circumstances.

More than 80 of Mr. Thompson's family, friends and former colleagues from around the world have written passionate letters in support of Mr. Thompson, pleading for the Court's leniency.  The letters universally describe Mr. Thompson as man of great integrity and generosity, who, above all, is devoted to his family.  Unfortunately, that family has faced real tragedies over the last several years.  Redacted

And, amid the stress of this case Redacted                                            , Mrs. Thompson suffered a heart attack last year and is currently under medical supervision to manage her cardiac

9296162v.1

health.  In addition, Mr. Thompson's mother's health is failing and she relies a great deal on Mr. Thompson for her care and support.

Mr. Thompson and his family have already suffered a tremendous amount as a result of this case.  Mr. Thompson has lost his job, his career, his reputation, and, despite decades of sacrifice and hard work, he is unlikely to work in his chosen profession ever again.  Due to the notoriety surrounding this case, Mr. Thompson has been unable to maintain a job and, coupled with his legal bills, his family is suffering financially.  The intense public attention and scrutiny has brought tremendous pressure on Mr. Thompson and his family, and the psychological and emotional toll on all of them has been significant.  In light of the unusual circumstances of this case—the lack of victims, loss, or personal gain to Mr. Thompson, and the fact that this conduct was widespread, condoned and well-known throughout the industry—the punishment Mr. Thompson has already suffered has been harsh.  We respectfully submit that a period of incarceration in the United States would be unnecessarily punitive, particularly given the distance between the United States and Australia and the family circumstances that require his presence at home.

Furthermore, because Mr. Thompson is a foreign national, he will be subject to far harsher prison conditions than a similarly-situated U.S. citizen.  If this Court imposes a sentence of incarceration, Mr. Thompson will be designated to a low-security facility and, most likely, to a private prison, where the conditions are notoriously unsanitary, chaotic and even dangerous.  Additionally, upon completion of his sentence, Mr. Thompson will face detention in an ICE facility until his removal from the United States, which could take up to six months.

With the exception of the actions that form the basis for his guilty plea, Mr. Thompson has led an upstanding and law-abiding life.  Mr. Thompson's involvement in the

2

conspiracy was an aberration that reflected a serious lapse in judgment for which Mr. Thompson has been sufficiently punished.  We respectfully submit that a non-custodial sentence, such as a period of home confinement in Australia, would be most appropriate given the circumstances of this case and Mr. Thompson's life.

## ARGUMENT

### I.    Section 3553(a): Non-Guidelines Factors

Pursuant to the "parsimony" clause of 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute.  The four specific purposes of sentencing identified in § 3553(a)(2) are as follows:

> [T]he need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Court must impose the least severe sentence that will serve these purposes.

In applying § 3553(a)(2) and its parsimony clause, the Court also looks to the other § 3553(a) factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6).  The Court can impose a sentence that complies with the purposes of these factors and should consider the facts presented in the particular case when

3

reaching its decision. *Gall v. United States*, 552 U.S. 38, 50 (2007); *Rita v. United States*, 551 U.S. 338, 351 (2007).

Application of the factors set forth in § 3553(a) suggests that a non-custodial sentence is warranted under the circumstances of this case.

### A.     History and Characteristics of the Defendant

#### 1.     Childhood and Education

Mr. Thompson was born in Fremantle, Australia in 1966.  (Presentence Investigation Report ("PSR" or "Presentence Report") ¶ 82.)  Mr. Thompson's father was and is a farmer and Mr. Thompson was raised on a farm in a remote and rural section of Western Australia.  (Exs. 4 (Valerie Thompson), 27 (Robert Thompson).)  Mr. Thompson grew up in a town of approximately 200 people and his school holidays were spent working with his family on the farm.  (Ex. 3 (Robyn Thompson).)  Paul has two brothers, Stephen and Andrew Thompson, and a sister, Peta Ginbey.  The four siblings were and remain close, despite their various careers, relocations, and family responsibilities.  (Exs. 5 (Stephen Thompson), 6 (Andrew Thompson), 7 (Ginbey).)

Because his home was more than five hours from the closest major city, Perth, Mr. Thompson left home at the age of twelve to attend boarding school at Wesley College.  (Ex. 3 (Robyn Thompson).)  Although a sacrifice for Mr. Thompson's parents, they wanted their children to get an education, and the nearest secondary school was over 80 miles away and was of poor quality.  (Exs. 4 (Valerie Thompson), 3 (Robyn Thompson).)  Growing up, Mr. Thompson was an enthusiastic and decorated athlete, a passion he has maintained throughout his adult life and passed on to his children.  (Exs. 4 (Valerie Thompson), 10 (Hicks), 41 (Dreghorn).)  Mr. Thompson was respected and well-liked by his peers, a point that is underscored by the

4

letters from several childhood friends who remain close with Mr. Thompson and who attest to

his excellent character.  (Exs. 38 (Murray Willock), 39 (Hyde), 31 (Atkins).)  One classmate

from Wesley described Paul as responsible, generous and popular with his peers.  (Ex. 39

(Hyde).)  Another former classmate and longtime friend noted that Mr. Thompson "worked

harder than any other in his studies" and was highly regarded among his peers for his "integrity

and quality of character."  (Ex. 18 (Watson).)

       Mr. Thompson was always academically inclined and excelled in school from an

early age.  (Exs. 4 (Valerie Thompson), 27 (Robert Thompson), 39 (Hyde), 18 (Watson), 38

(Willock), 41 (Dreghorn).)  In 1986, Mr. Thompson graduated from the University of Western

Australia with a Bachelor of Commerce degree.  (PSR ¶ 93.)  In 1990, Mr. Thompson became a

"chartered accountant," the equivalent in Australia of a certified public accountant.  (*Id.* ¶ 95.)

## 2.   Marriage and Family

       Mr. Thompson married his wife Robyn in 1997.  (*Id.* ¶ 84.)  The Thompsons have

three children: Samuel (17), Nicholas (16), and Charlotte (13).  (*Id.*)  The Thompsons live with

Nicholas and Charlotte in their home in Western Australia, and Samuel is in his first year at the

Australian National University in Canberra, Australia.  (Ex. 3 (Robyn Thompson).)  Despite the

significant challenges they have faced, including the intense pressure and scrutiny surrounding

this matter, the Thompsons and their children remain a loving and tight-knit unit.  (Exs. 3

(Robyn Thompson), 7 (Ginbey), 28 (Gittens).)

       Mr. Thompson's steadfast devotion to his family is a running theme in the letters

submitted to the Court.  Friends universally describe Mr. Thompson as a dedicated father whose

entire world revolves around his family.  (Exs. 65 (Hargreaves), 40 (Morcombe), 28 (Gittens), 72

(Glossoti), 88 (Jones).)  The letters are unanimous and effusive in this regard, describing him as:

5

- a "loving family man, totally dedicated to Robyn and their three kids," (Ex. 14 (Teagle)),

- a "wonderful husband and father," (Ex. 45 (Hooper)),

- a man who "cherishes" his children and is "fully engaged in their lives," (Ex. 48 (Shillington)),

- a "very dedicated family man who puts his wife and children first," (Ex. 16 (Hedley)),

- a "doting and loving" husband and father, (Ex. 8 (Annette McPartland)),

- a "terrific husband and father who would do anything for his family," (Ex. 13 (Morris)),

- a "deeply devoted and loving family man," (Ex. 57 (Keliher)), and

- "an exceptional father who is involved in every aspect of his children's lives" (Ex. 70 (Rahman)).

Mr. Thompson has devoted substantial time to his children's extracurricular activities, including coaching his son's Australian Rules Football (AFL) team and helping to manage his daughter's Surf Life-Saving Club Age Group.  (Exs. 52 (Rogers), 48 (Shillington), 30 (Lindsay), 45 (Hooper), 7 (Ginbey), 19 and 20 (Bantock), 32 (Caporn).)  Friends describe how Mr. Thompson is "on the sidelines of every game" to cheer on Nick and his team, and how he volunteered every week to drive boys to and from games who had no other way to get there. (Ex. 30 (Lindsay).)  A close family friend writes that Mr. Thompson is "very active in the children's lives, actively encouraging their sporting endeavors and contributing to the sporting clubs to which they are members."  (Ex. 46 (Bolton).)  Another family friend whose son plays on Nicholas's AFL team notes that Mr. Thompson has generously volunteered countless hours to coaching and assisting the AFL team at every game, despite other personal and professional obligations.  (Ex. 79 (Jemma Hector).).  And a fellow parent and manager of Charlotte's Surf

6

Life-Savings Club describes how Mr. Thompson volunteers considerable time to managing the club's activities and ensuring the safety of the children involved.  (Ex. 32 (Caporn).)  The letters in support of Mr. Thompson paint a picture of a father who has made a serious commitment to his children's activities and lives, and someone who has generously devoted his time to support the other children and families in his community.

Mr. Thompson's wife, Robyn, writes that family has "always been his priority," and that, not one for grand romantic gestures, Mr. Thompson's "love is evident in his consistent devotion and attention" to his family's happiness and needs.  (Ex. 3 (Robyn Thompson).)  Mr. Thompson's three children are equally tied to him.  (Exs. 4 (Valerie Thompson), 10 (Hicks), 44 (Andrew Lange).)  A close family friend writes, "In the times we have spent together with his children, the love and affection they have for him is visible and real.  His children look up to and adore him, and he cherishes them."  (Ex. 48 (Shillington).)  Redacted

### 3.   Family Health Issues

Redacted

Redacted

Redacted

9296162v.1

Redacted

Mr. Thompson's youngest child and only daughter, Charlotte (Lottie), is a well-adjusted girl who, despite all she has been through, maintains a positive attitude. (Exs. 35 (Kiepe), 3 (Robyn Thompson).) Nevertheless, these are delicate years for a teenage girl and she is extraordinarily close with her father, whom she adores and respects, and who has been deeply involved in her academic and athletic endeavors. (Exs. 3 (Robyn Thompson), 4 (Valerie Thompson), 10 (Hicks), 38 (Murray Willock).) The principal of Charlotte's school, who has considerable experience working with adolescent girls, writes that Mr. Thompson's consistent presence and involvement in Charlotte's life is critical to their relationship and to Charlotte's development. (Ex. 35 (Kiepe).)

To make matters worse, amid the stress of this case and the relentless negative publicity, Mrs. Thompson suffered a heart attack and was hospitalized in July 2015. (Exs. 3 (Robyn Thompson), 25 (Robyn Thompson Medical Records).) Mrs. Thompson now takes daily medication to manage her cardiac health. (Ex. 3 (Robyn Thompson).) Mr. and Mrs. Thompson enjoy an extraordinarily happy and close marriage of 20 years and the two are true partners in life, in particular when it comes to caring for their family. There is genuine concern among the family that the stress of Paul's incarceration and absence would be especially challenging for his wife, Redacted

Mr. Thompson is also a primary caregiver for his mother, Valerie Thompson, who has suffered numerous and serious health issues over the past few years.  In 1989, the elder Mrs. Thompson suffered from a brain tumor that caused the loss of her left eye.  (Ex. 4 (Valerie Thompson).)  In 2012, she suffered from a gastrointestinal cancer and had to undergo major surgery and three years of chemotherapy treatment.  (*Id.*)  In 2013, she underwent hip replacement surgery.  (*Id.*)  And in September of this year, she had her thyroid removed as there was concern about potentially cancerous thyroid tumors.  (*Id.*)  Because Mr. Thompson's parents separated a few years ago, she is especially reliant on her children—and in particular her son Paul—for her care and support.  (*Id.*, Exs. 7 (Ginbey), 28 (Gittens).)  For example, after his mother had her thyroid removed, she stayed with Mr. Thompson and his family during her recovery, and it was Mr. Thompson who took her to and from her doctor's appointments.  (Ex. 3 (Robyn Thompson).)  Mr. Thompson's extended absence and distance from Australia would be particularly difficult for his elderly mother given the precarious state of her health and the central role that Mr. Thompson plays in her physical and emotional care.

In light of the serious and ongoing health issues facing Mr. Thompson's immediate family, his incarceration thousands of miles from home would work a hardship on his family that makes the prospect of imprisonment more damaging than it might be in the ordinary case.  These unique family circumstances and the distance from Australia warrant a downward variance from the Guidelines range and, more specifically, a non-custodial sentence.

### 4.      Extended Family

Mr. Thompson's devotion to family includes his extended family.  As detailed in many of the letters, several of Mr. Thompson's siblings Redacted                have suffered serious illnesses and financial hardship.  Throughout, Mr. Thompson has been a selfless and

generous uncle and brother, offering constant emotional and financial support.  When Mr.

Thompson's younger brother, Andrew, and his wife decided to move back to Perth Redacted

they were unable to afford a home.  (Ex. 6 (Andrew and Beryl

Thompson).)  Mr. Thompson loaned them the money to buy a home in Perth for their family.

(*Id.*)  Andrew Thompson and his wife write that, without his assistance, they would not have

been able to buy the house that has been their home for the last ten years.  (*Id.*)

Redacted

Hannah recently

started her own small beauty salon and Mr. Thompson supported his niece by becoming a regular

client of the salon.  (*Id.*)  Mr. Thompson also has a special connection with Andrew Thompson's

other daughter, Emma, who is Mr. Thompson's goddaughter and who frequently looks to Mr.

Thompson for mentoring and advice.  Redacted

Mr. Thompson's only sister, Peta Ginbey, was diagnosed with generalized

epilepsy several years ago and, as a result, lost her driver's license for several months.  (Ex. 7

(Ginbey).)  Despite living three hours from her brother, Mrs. Ginbey relied on Mr. Thompson to

drive her around, including to her neurology appointments.  (*Id.*)  Mrs. Ginbey also describes the

"unbelievable bond" her children have with their uncle.  (*Id.*)  Redacted

And when Mrs. Ginbey and her husband were unable to afford the deposit for their first home in 2001, Mr. Thompson lent them $80,000 AUD (approximately $60,000 USD) in order to enable them to purchase their home.  (*Id.*)  Mrs. Ginbey writes that her brother "has never made us feel self-conscious about accepting this generosity."  (*Id.*)

The two daughters of Mr. Thompson's older brother, Stephen, attend boarding school in Perth, far from their parents.  (Ex. 5 (Stephen Thompson).)  As their parents live a considerable distance from the school, Mr. Thompson takes care of his nieces in any way he can, often taking them to medical appointments or sporting events.  (*Id.*)  Redacted

Mr. Thompson's brother-in-law, Darren McPartland, writes that when Paul is with Darren's children they "light up," as he "gives them time, listens to them, and has fun with them."  (Ex. 9 (Darren McPartland).)  Mr. McPartland tells of how, upon returning to Western Australia as a widower, Mr. Thompson generously offered him his home for a couple of years while the Thompson family was overseas.  (*Id.*)

As the letters in support of Mr. Thompson make clear, he is a deeply devoted family man whose love and support has sustained his extended family through some of their darkest times.  To this day, Mr. Thompson's family relies on him heavily.  Mr. Thompson's daily acts of generosity and selflessness were done without any expectation of receiving anything in return.  It is these everyday, private acts of kindness that reveal a person's true character.

9296162v.1

### 5.      Professional Life

After graduating from the University of Western Australia, Mr. Thompson was employed for four years as an auditor by Arthur Andersen & Co. in Perth.  (PSR ¶ 103.)  After a brief stint of overseas travel, Mr. Thompson took a job as an accountant at Lloyds Bank in London, England, in 1991, where he became a derivatives trader in 1994.  (*Id*. ¶ 104.)  Mr. Thompson remained at Lloyds Bank until 1998, at which time he accepted a job as a derivatives trader at Commerzbank in London.  (*Id.* ¶ 101.)

Mr. Thompson left Commerzbank in 1999 for a position as an Assistant Director of Interest Rate Derivatives at Rabobank in Tokyo, Japan.  (*Id.* ¶ 100.)  In 2003, he moved to Rabobank's Singapore office and took the position of Senior Derivatives Trader, where he was primarily involved in trading interest rate derivatives involving, among other currencies, the Japanese yen.  (*Id.*)

In 2006, Mr. Thompson again moved within Rabobank to its Hong Kong office, where he continued as a Senior Derivatives Trader.  (*Id.*)  From October 2007 until November 2010, Mr. Thompson was the Executive Director, Head of Asian Currency Trading.  (*Id.* ¶ 33.) This was the first time that Mr. Thompson had any direct reports at Rabobank.  Mr. Thompson in turn reported to Anthony Allen, Rabobank's Global Head of Liquidity and Finance, from October 2007 until Mr. Allen left the bank.  By early 2008, Mr. Thompson had ceased any trading involving the Japanese yen.  In November 2010, Mr. Thompson was promoted to Head of Liquidity and Finance for Asia, responsible for Rabobank's money market trading in the region.  (*Id.*)  Mr. Thompson was terminated by Rabobank in 2012 due to the LIBOR investigation.

14

The Thompson family then returned to Perth in order to send their children to high school in Australia.  (Ex. 4 (Valerie Thompson).)  Mr. Thompson began working for a residential property management company, TM Residential, as a leasing consultant.  (PSR ¶ 99.)  Due to the negative publicity surrounding this case, Mr. Thompson eventually resigned from his position at TM Residential for fear that the attention would have negative consequences for the company.  (Exs. 3 (Robyn Thompson), 76 (McNeilly).)

Colleagues, friends and family consistently describe Mr. Thompson as an incredibly hard and conscientious worker.  A former colleague from Lloyds writes that Mr. Thompson "stood out as the hardest working person I'd ever know [and] that fact stands true today."  (Ex. 14 (Teagle).)  Another colleague from Lloyds describes Mr. Thompson as "honest, utterly dependable and extremely hard working."  (Ex. 16 (Hedley); *see also* Ex. 54 (Palmer).)

Mr. Thompson's wife notes that, when he worked at Lloyds Bank in London, he was at work from 3:30 am until past 5:00 pm every day for five years.  (Ex. 3 (Robyn Thompson).)  These grueling hours at Lloyds and later Commerzbank led him to accept a job with Rabobank in Tokyo, where his schedule would more closely match the Asian market.  (*Id.*)  Mr. Thompson willingly moved his family to different countries as Rabobank required it, and always worked long hours, including weekends.  (*Id.*)

A former trader at Rabobank who worked with Mr. Thompson in Hong Kong describes him as "one of the most respected colleagues," who, despite being in a senior position, "was still the hardest working person who was always the first to arrive and the last to leave." (Ex. 64 (Deng).)  The former head of the Money Market Desk in Rabobank's Singapore office notes that Mr. Thompson was "particularly hardworking and would stay long hours in the office."  (Ex. 60 (Lee).)  The former Head of Financial Market Research for Asia Pacific in

15

Rabobank's Hong Kong office, Adrian Foster, describes Mr. Thompson as a "thoroughly decent person" who "always acted in a fair-minded and constructive, rather than a selfish way."  (Ex. 67 (Foster).)  Mr. Foster recalls that Mr. Thompson was one of the only senior members of the sales and trading staff who offered to contribute more resources to the research department, which benefitted the company overall, but would make Mr. Thompson's own desk appear less profitable, potentially undercutting his bonus.  (*Id.*)  Other Rabobank colleagues echo these sentiments, describing Mr. Thompson as a "professional individual with high integrity," (Ex. 61 (Ang)) and a strong "passion for his work and loyalty towards the firm,"  (Ex. 68 (Klardie)).

The owner of TM Residential, where Mr. Thompson worked for several years after returning to Perth, revealed that Mr. Thompson worked 4 to 5 days a week for no pay for the first three months in order to obtain the necessary experience.  (Ex. 76 (McNeilly).)  She writes of Mr. Thompson: "His work ethic is beyond outstanding with long days and nights typical of his week.  Nothing is left to chance. . .  and no stone left unturned in his quest to do the best for his clients.  I seriously have not worked with anyone else in my entire career with a work ethic like Paul Thompson."  (*Id.*)  Similarly, a friend and former colleague at TM Residential writes that Mr. Thompson was "the first one in the office in the morning and was the last to leave at the end of the day.  His work ethic was amazing."  (Ex. 79 (Jemma Hector).)  Another former TM colleague describes Mr. Thompson as "one of the most trustworthy, hardworking individuals I have had the pleasure of working with across my career."  (Ex. 77 (Heath).)

### 6.      Other Character Testimonials

In addition to all of the qualities described above, the letters from Mr. Thompson's friends and family universally describe a man who is generous and selfless with others, even when he stands to gain nothing.  A close friend noted his admiration for Mr.

Thompson's "unquestioning generosity," and recalled that when he was experiencing financial difficulties, Mr. Thompson lent him the money to make his rental payments.  (Ex. 53 (Lynch).) A former Rabobank employee who reported to Mr. Thompson in 2010 recalled that, when she had to take five months' bed rest during a complicated pregnancy, Mr. Thompson was understanding and supportive.  (Ex. 62 (Gu).)  Mr. Thompson stepped in and did most of her work during that time and, despite the heavy load, he never complained and instead assured her that she need not worry about work and should focus only on her health.  (*Id.*)  She writes that Mr. Thompson is "full of compassion, caring, considerate and reliable."  (*Id.*)

A longtime friend of Mr. Thompson's recently experienced a devastating fire that destroyed his family's business and property.  (Ex. 18 (Watson).)  He writes: "Both Paul and Robyn have spent more time here than our other friends to help with the rebuilding process, despite their own massive issues that have been faced this year.  This is so typical of their selfless support to others, less fortunate, within their community."  (*Id.*)  Another close friend describes Mr. Thompson as a caring and giving friend, who always "puts other people's needs and wants first."  (Ex. 41 (Dreghorn).)

A friend since childhood noted: "One of Paul's defining traits is his willingness to make sacrifices for family and friends," and described how, throughout their youth, Mr. Thompson made his home available to his friends whenever they needed it.  (Ex. 39 (Hyde).) Another longtime friend notes that, although Mr. Thompson is a serious triathlete and competitor, he was the type of friend who would wait by the roadside with you if you punctured a tire during a bike ride or would take it easy if you were having a hard day and needed to talk with someone.  (Ex. 71 (Langford).)

Close friends and neighbors whose son played football with Nicholas note that Mr. Thompson was always among the first parents to volunteer his time to the team and that, even when Nicholas was injured and could not play, Mr. Thompson still came to every game to support the team and help out.  (Ex. 30 (Lindsay).)  They describe Mr. Thompson as a considerate neighbor who volunteers to bring in their mail and take out their trash whenever they are away, noting that "nothing is ever too much trouble" for Mr. Thompson and his wife.  (*Id.*)  Another fellow parent notes that Paul acted as a mentor to several children on the team from the remote indigenous community who boarded at the local high school, often giving them rides to and from football games.  (Exs. 19 and 20 (Bantock).)

These letters also make clear that Mr. Thompson is a humble and unpretentious man; not one for ostentatious gestures or a flashy lifestyle, but a grounded, decent person who displays consistent, everyday kindness to those around him.  (Ex. 3 (Robyn Thompson), 38 (Murray Willock).)  A longtime family friend writes that

> [I]n Paul you will simply find a humble, hardworking, responsible, loving family man. . . . Paul's working life was dedicated to providing for his family and making sure they were secure.  You will not find any of the excesses so often associated with the banking industry, no ostentatious homes, no fancy cars, boats, clothing, wine, and jewelry – what you see is what you get.  Good down to earth people.

(Ex. 14 (Teagle).)

Finally, the letters from Mr. Thompson's family and friends describe a man of great integrity who is honest, trustworthy and dependable.  (Exs. 3 (Robyn Thompson), 51 (Tomasi), 88 (Jones), 40 (Morcombe), 16 (Hedley), 45 (Hooper), 22 (Ciccarelli), 36 (Scott), 37 (Ford).)  One longtime friend notes that he never heard anyone question Mr. Thompson's ethics and that, in fact, he could not "recall any time I have heard a bad word said against him in any

18

context." (Ex. 71 (Langford).)  Similarly, another close friend states that Mr. Thompson has always exhibited strong moral character and integrity.  (Ex. 49 (Robson).)  Setting aside the serious conduct that forms the basis for Mr. Thompson's guilty plea in this case, he has led a completely clean and law-abiding life.  (Ex. 3 (Robyn Thompson).)  This significant lapse in judgment is an aberration in an otherwise upstanding and honorable life.

### 7.    Extraordinary Acceptance of Responsibility

Finally, Mr. Thompson is entitled to a downward variance in light of his extraordinary acceptance of responsibility in this case.  Mr. Thompson, an Australian citizen who has never lived or worked in the United States, consented to his extradition from Australia, saving the Government from the time and expense of litigating that issue.  Furthermore, Mr. Thompson has pled guilty to Count One of the Indictment, again saving the Government from the expensive and lengthy process of trying Mr. Thompson.  He did so notwithstanding that at this very moment there is pending an appeal that questions whether the government's Indictment even charges a crime.  Mr. Thompson's consent to extradition and waiver of his right to trial merit a non-Guidelines sentence.

### B.    Nature and Circumstances of the Offense

The nature and circumstances of this offense are unusual when compared to the typical fraud case prosecuted in this Courthouse.  Perhaps most significantly, the Government is unable to identify any actual loss or harm, victims, or personal benefit gained by Mr. Thompson as a result of the conspiracy.  Indeed, most of the counterparties on the other side of the relevant transactions were themselves engaged in the very same conduct for which Mr. Thompson pleaded guilty.  And this is a function of another aspect of this case that distinguishes it from the usual fraud case: this conduct occurred out in the open, was widespread throughout the industry,

and has been known to management and regulators (including personnel at central banks in the United States and United Kingdom) for years. (*See* Ex. 93 at 2.)

It is also noteworthy that the Government has been unable to identify a false LIBOR submission in this scheme. Indeed, the Government's theory at Allen and Conti's trial was *not* that the LIBOR submissions requested failed to reflect the true cost of funds to Rabobank, but rather that the submissions were made without regard to whether they reflected the true cost of funds. (*See* Ex. 94, Trial Tr. at 1589–90, 1609, *United States v. Allen*, No. 14-cr-272 (S.D.N.Y. Nov. 3, 2015).) This, in and of itself, is unusual in a white-collar fraud case.

Finally, it is an atypical aspect of this case that Mr. Thompson has had virtually no contact with the United States in either his personal or professional life. While Mr. Thompson obviously does not contest the Court's jurisdiction, his lack of contact with the United States is a factor worth considering as the Court crafts an appropriate sentence for a violation of this Country's laws.

## C.  Need to Avoid Unwarranted Sentence Disparities

The sentences imposed by this Court on other members of the conspiracy further support the imposition of a non-custodial sentence. Mr. Thompson's codefendants, Anthony Allen and Anthony Conti, received 24 months and 12 months, respectively, based on downward variances from the Guidelines.[1] Unlike Mr. Thompson, who accepted responsibility for his actions by pleading guilty, Mr. Allen and Mr. Conti elected to proceed to trial and put the Government to its burden of proof. They persist in their denial of responsibility in an appeal that questions whether they committed a crime and whether this Court presided over a fair trial.

---

[1]  Mr. Allen's Guidelines range was 87 to 108 months' imprisonment, and Mr. Conti's Guidelines range was 57 to 71 months' imprisonment. (Sentencing Tr. at 18, 60, *United States v. Allen*, 14-cr-272 (S.D.N.Y. March 10, 2016).)

9296162v.1

Furthermore, Mr. Allen was a supervisor and received a role adjustment based on this fact.  Mr. Thompson is less culpable than either Mr. Allen or Mr. Conti, both of whom were familiar with BBA rules on LIBOR submissions and who were entrusted by Rabobank with knowing whether a particular proposed submission was inappropriate.  An unwarranted disparity would result if Mr. Thompson, despite his acceptance of responsibility and lesser culpability, received a similar sentence, let alone a longer sentence, than was imposed on either of his codefendants.

There is also substantial evidence that LIBOR submitters at almost every institution involved were engaged in conduct very similar to—if not more egregious than—that of Mr. Thompson, and yet only two outside of Rabobank have even been indicted thus far in the United States, let alone prosecuted or sentenced to time in prison.  (*See* Ex. 95 (Exhibit 11 to Allen Sentencing Br.).)  It would create an unwarranted and dramatic disparity if Mr. Thompson, who has already suffered tremendously and who can never work in his chosen profession again, is also sentenced to a prison term thousands of miles from his family, while others guilty of the same or worse conduct go unpunished.

> **D.** **The Need for the Sentence Imposed---**
>
> **1.** **To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A non-custodial sentence will adequately reflect the seriousness of Mr. Thompson's offense, promote respect for the law, and provide more than just punishment for his offense.  The parsimony clause instructs that the sentence imposed should be "sufficient, but not greater than necessary" to promote the objectives of § 3553(a).  In other words, the punishment should fit the crime.  While in no way minimizing the wrongful nature of what Mr. Thompson

did, it is relevant that not a single victim has stepped forward to assert that they suffered an actual loss as a result of Mr. Thompson's actions requiring restitution.

As noted, Mr. Thompson has already paid a steep price for his conduct. He has worked tirelessly for decades to build his career and professional reputation but is unlikely to ever work in finance again. Indeed, due to the notoriety surrounding this case, Mr. Thompson even had to resign from his position with a property management company and is currently not working. As the sole breadwinner, this has been a tremendous financial hit for the Thompson family, particularly as their savings has been depleted by the costs of legal representation.

The public attention and scrutiny surrounding this case has been incredibly trying for the Thompson family. (Ex. 86 (Hasluck).) Mr. Thompson and his wife are private and modest people and respected members of their community. As a result of the charges in this case, the Thompsons have had to endure regular hounding by photographers and journalists. Mrs. Thompson writes of this difficult time:

> We have not been able to attend to our emotions in private. My photo, together with identifying photos of our house, all taken secretly, were on the front page of our national financial newspaper the next day [following Mr. Thompson's indictment]. . . . The publicity has felt brutal and relentless and has caused great distress to our teenage children. The press periodically knock on our door, telephone and leave notes in our letterbox. We have been followed and we each have experienced being surrounded by a dozen reporters and television cameramen. . . . It has been an immensely difficult time and there was a point where I thought the only way of escape would be to go to sleep and not wake up.

(Ex. 3 (Robyn Thompson).)

The letters from Mr. Thompson's friends, family, and doctor describe the severe emotional and psychological toll this case has taken on Mr. Thompson. (Ex. 38 (Murray Willock), 10 (Hicks), 33 (Beaumaris Medical Practice).) One longtime friend notes that this

matter has weighed heavily on Mr. Thompson and that he seems like a "shadow of his former self." (Ex. 47 (Sinclair).) Mr. Thompson's doctor noted that he displayed symptoms of "moderate to severe Clinical Depression" as a result of the stress of this case and that he prescribed Mr. Thompson an antidepressant, which he continues to take daily. (Ex. 33 (Beaumaris Medical Practice).)

Mr. Thompson has lost his job, his career, and his excellent reputation. He and his family have suffered tremendous shame and heartache as this ordeal has played out in the public eye. And perhaps most painfully, Mr. Thompson is racked with the guilt of knowing how this case has deeply affected his wife and vulnerable young children. (Ex. 3 (Robyn Thompson).) In light of the punishment Mr. Thompson has already endured, it would be unduly harsh to sentence him to a term of imprisonment, in a private prison and thousands of miles from family and friends.

### 2. To Afford Adequate Deterrence to Criminal Conduct and Protect the Public

With regard to general deterrence, as previously detailed, the suffering and humiliation that Mr. Thompson and his family have endured would give anyone serious pause before engaging in similar behavior. Furthermore, two more culpable individuals were already sentenced in connection with LIBOR manipulation and no further deterrence would be gained from sentencing Mr. Thompson even to a short period of incarceration.

There is no need for specific deterrence or protection of the public in Mr. Thompson's case. There is absolutely zero risk that Mr. Thompson will commit a similar offense in the future: not only is Mr. Thompson deeply remorseful for his actions, but he will likely never again work in finance.

### 3.     To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

If Mr. Thompson were a U.S. citizen, he would likely be designated by the Federal Bureau of Prisons ("BOP") to a minimum-security camp due to his status as a nonviolent offender with no previous criminal history.  But because Mr. Thompson is a foreign national and is subject to an immigration detainer upon finishing his sentence, he does not qualify for a minimum-security camp.  Mr. Thompson will therefore be assigned to a low-security facility, where security is much tighter and the conditions far harsher.  Unlike at minimum-security camp, inmates at a low-security facility are subject to controlled movements on the hour, at least five daily inmate "counts" – including during the middle of the night – random pat-downs, and strip searches whenever the inmate is removed from the facility for a visit or medical appointment.  Furthermore, unscheduled lockdowns can continue for days, leaving inmates trapped in their cells without recreation, visitation or telephone calls.

Low-security facilities are notoriously crowded, chaotic and unsanitary.  Furthermore, inmates at these facilities have often been convicted of violent crimes that carry long sentences and pose a much higher security risk.  Visitors to these facilities must pass through an intense and intimidating degree of security and their visits are often in crowded and noisy rooms with other inmates.

Perhaps even more disconcerting to a first-time and nonviolent offender like Mr. Thompson is the fact that, as a foreign national, he will most likely be designated to one of the BOP's privately contracted facilities, which were specifically designed to house convicted aliens.  The conditions at these private facilities are notoriously brutal and rife with neglect and abuse.  An August 2016 report issued by the Department of Justice's Office of the Inspector General

24

found that private prisons failed to provide adequate safety and security for inmates and had

higher rates of assault than other BOP institutions.  U.S. DEPARTMENT OF JUSTICE, OFFICE OF THE

INSPECTOR GENERAL, REVIEW OF THE FEDERAL BUREAU OF PRISONS' MONITORING OF CONTRACT

PRISONS, at 14-24 (2016).

      The food, sanitation and medical treatment at private prisons is widely recognized

to be a disgrace.  Private facilities are patrolled by guards with less experience and who are

known to respond to complaints of abuse or neglect with hostility or even punishment.  Inmate

frustration with the conditions and lack of medical attention at some of these facilities has led to

riots and violence at several institutions, including the death of a corrections officer.  *See id.* at 2.

Furthermore, these private prisons house an even greater variety of inmates than low-security

facilities, including inmates serving up to 20 years in prison with a history of violence.  This

environment is an incredibly frightening and dangerous one for someone like Mr. Thompson,

who has no criminal history and no experience with the penal system.

      The quality of these private prisons is so poor that the Department of Justice

recently announced its intention to end the use of private prisons by declining to renew their

contracts as they approach their expiration.  *See* Memorandum from Sally Quillian Yates,

Deputy Attorney General, U.S. Dep't of Justice, to Acting Director of Federal Bureau of Prisons

(Aug. 18, 2016) (acknowledging that private prisons have been shown to "compare poorly" to

other BOP facilities and have failed to "maintain the same level of safety and security").

      Despite this finding by the Department of Justice, the decision is not effective

immediately but instead will be phased in over time.  In the meantime, the BOP intends to

continue to designate foreign nationals to admittedly unacceptable facilities.  As a result, if Mr.

Thompson is sentenced to time in prison, he is likely to serve that sentence in a facility that the

BOP and DOJ have already determined is neither adequate nor safe. *See, e.g.*, *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (granting a downward departure from the sentencing guidelines where defendant had been subjected to substandard pretrial prison conditions).

Moreover, Mr. Thompson's recent Prostate Specific Antigen ("PSA") tests reveal that his PSA levels – a measure used to detect prostate cancer – have increased at an alarming rate over the last several months.  (Ex. 33 (Beaumaris Family Practice).)  As a result, Mr. Thompson was recently referred to a urologist who will conduct further testing to screen for the presence of any cancer.  (*Id.*)  At a minimum, Mr. Thompson's condition will require regular monitoring and testing, medical services he is unlikely to receive in the types of private facilities where foreign nationals are typically housed.

Lastly, because Mr. Thompson is a foreign national, a U.S. Immigration and Customs Enforcement ("ICE") detainer will be placed on him if he is incarcerated in the U.S. ICE is responsible for identifying and removing any criminal aliens incarcerated in the U.S. and, once Mr. Thompson's sentence is complete, he would be transported to an ICE detention center where he would await deportation.  The removal process is known to be bureaucratic and slow and Mr. Thompson could face up to six additional months in ICE custody before returning home.

### E.    The Kinds of Sentences Available

The Court has discretion to impose a non-custodial sentence.  As a citizen of Australia whose family is facing serious health issues that require his active involvement and care, we respectfully submit that a period of home detention or supervision in Australia would be an appropriate sentence for Mr. Thompson.  A custodial sentence in the United States risks harm to innocent people—Mr. Thompson's family—that is not justified in a case such as this.

26

In any event, if the Court determines that Mr. Thompson should face imprisonment as a component of his sentence, Mr. Thompson already has spent time in custody during the course of this prosecution.  First, he spent 6 days in an Australian detention facility following his arrest there in October 2015, after which he was released on bail based on a finding of exceptional circumstances.[2]  Later, after the Australian authorities signed his warrant of extradition, he was again taken into custody (by mandatory operation of Australian law) for an additional 14 days.  He then was transported to New York under an escort by federal agents, after which he spent one day in the Metropolitan Correctional Center before being released on bail by this Court on July 6, 2016.  He has already felt the sting of separation from home and family and the sound of a prison door locking shut.  No further incarceration is required.

Nonetheless, if the Court is inclined to impose a more severe sentence, the Court could impose a period of home detention, community confinement, or community service as a condition of supervised release.  We respectfully submit that any of the following possibilities would be more appropriate than incarceration:

- A period of home detention or supervision monitored by a private security firm, whose fees and costs will be paid for by Mr. Thompson.  The security firm would enforce the conditions imposed by this Court and report regularly to the appropriate U.S. authorities on Mr. Thompson's compliance.  Mr. Thompson will consent to extradition and agree to forfeit his posted bond in the event that he is found to have violated any of the conditions imposed by this Court.  Attached as Exhibit 91 is a more detailed proposal from Steven Lawrence, a partner with Resilience Solutions in Australia, a company with the capacity to handle the monitoring of Mr. Thompson's home detention. Home detention in Australia would serve the deterrent and punitive functions of sentencing, but allow Mr. Thompson to be close to and care for his family.

---

[2]   Ex. 90 at 18, Tr. of Proceedings before Magistrate G. Lawrence, Oct. 28, 2015.

- A period of community confinement in a "halfway house" as a condition of supervised release.[3]  A period of community confinement, although less preferable than home detention or supervision in Australia where he can be close to and help care for his family, would at least avoid some of the extremely harsh conditions that a nonviolent offender like Mr. Thompson would face in the types of facilities used to detain foreign nationals.

- A period of community service in Australia as a condition of supervised release.  Mr. Thompson's sentencing could be an opportunity for him to give back to the community in a meaningful way by working with at-risk children and families in Australia, putting to good use his years of caretaking with his own family and community.  For example, Youth Focus (www.youthfocus.com.au) is a nonprofit focused on preventing suicide by at-risk youth, and the Fathering Project (http://thefatheringproject.org/) connects volunteers like Mr. Thompson with fathers and families to help build familial bonds and provide fathers with parental skills and guidance.[4]

In light of the harsh prison conditions and prolonged ICE detention that Mr.

Thompson is likely to confront if incarcerated in the United States, the serious health issues his

---

[3]   Having served time in federal custody, Mr. Thompson is eligible for a sentence of time served, to be followed by a term of supervised release.  *See* 18 U.S.C. § 3583(a).  Although the Probation Office correctly notes in the PSR that U.S.S.G. § 5D1.1 provides that a court "should not ordinarily impose a term of supervised release" where the defendant is a deportable alien, for the reasons discussed in this brief, this is not the ordinary case and the Court is no more bound by U.S.S.G. § 5D1.1 than it is bound by other aspects of the advisory Sentencing Guidelines.  In addition, the rationale behind this policy has nothing to do with a defendant like Mr. Thompson, who has never attempted to live or work in the United States and who has every wish to return to his home country as soon as possible after any sentence concludes.  *See* U.S. SENTENCING GUIDELINES MANUAL § 5D1.1 cmt. n.5 (2015).

[4]   By way of example, in July 2010, Judge Nicholas G. Garaufis of the Eastern District of New York sentenced defendant Zev Saltsman, who pled guilty to securities fraud and whose offense level under the Guidelines was 18, to a probationary sentence of three years and 2000 hours of community service to be performed in his home country of Israel.  (Ex. 92, at 41-42, Sentencing Tr., *United States v. Saltsman*, No. 07-cr-641 (E.D.N.Y. July 28, 2010).)  In determining sentence, the court considered significant the fact that the defendant accepted responsibility by pleading guilty and consenting to extradition to the U.S.; the distance between the U.S. and Israel, where his family and children reside; the considerable stress of separating the defendant from his children; the shame and suffering the defendant had already endured; the defendant's lack of criminal history; and the low risk of recidivism.  (*Id.* at 37-42.)  The same factors that animated Judge Garaufis's sentencing decision are present here.

family is facing, the vast distance between Perth and the United States and the challenges that would pose for contact with his family, and the fact that Mr. Thompson has already suffered tremendously as a result of his actions, any one of the non-custodial sentences described above would be more appropriate and just than would any term of incarceration, even a short one.

### F.   Application of the Sentencing Guidelines

The Sentencing Guidelines range recommended by the Government is based on unreliable and inaccurate loss calculations and victim numbers that are not a reasonable basis for determining Mr. Thompson's offense level.

### 1.   The Guidelines Lead to Patently Unreasonable Results

As an initial matter, to the extent the Court is inclined to accept the Government's Guidelines calculation, which we contest below, we respectfully submit that the Sentencing Guidelines should have little impact on the sentence imposed in this case.  This is one of those situations in which the Guidelines' disproportionate emphasis on the intended loss amount leads to a result that is "patently unreasonable."  *See United States v. Adelson*, 441 F. Supp. 2d 506, 506, 509 (S.D.N.Y. 2006).

This Court has already acknowledged that, at least with respect to codefendants Allen and Conti, the Guidelines "don't really fit this situation very well."  (Sentencing Tr. at 15, *United States v. Allen*, 14-cr-272 (S.D.N.Y., March 10, 2016).)  For these reasons, this Court concluded that the sentence imposed on those co-defendants would "not be materially affected by the guidelines."  (*Id.* at 4.)

The government has been unable to demonstrate any actual harm as a result of the charged offense, a rarity in cases of white-collar fraud.  Nor can the government link Mr. Thompson's conduct to any specific financial benefit that he received.  The benefits from the

LIBOR scheme—if any exist at all—would have been enjoyed by Rabobank, which already has

paid a $1 billion fine.  The Guidelines must be calculated and considered, *see Gall*, 552 U.S. at

49, but in light of the circumstances present here, they should be accorded little weight.

### 2.    Loss Amount

Unlike in most cases in which a serious fraud is alleged, the Government has

conceded that it cannot provide an actual loss amount.  (Ex. 2, ¶ 2.)  This is in part because the

government did not and cannot prove that the submissions made by Rabobank traders did not

reflect the true cost of funds.  Therefore, the government is limited to a sentence based on

intended loss.  *See* U.S.S.G. § 2B1.1, comment. (n.3(A)) ("[L]oss is the greater of actual loss or

intended loss.").  Under the Guidelines, intended loss is defined to mean "(I) the pecuniary harm

that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that

would have been impossible or unlikely to occur[.]"  *Id.*

While the Court "need only make a reasonable estimation of loss," the method of

loss calculation recommended by the Government is not reliable or reasonable.  The Government

has acknowledged the following limitations in its loss estimate methodology:

- The Government lacked sufficient data to determine each counterparty's
  sensitivity to LIBOR on a particular day.  This is significant because those
  counterparties typically took countervailing swap positions (*i.e.*, hedges) that
  offset or eliminated the potential loss associated with its swaps with
  Rabobank.  (Ex. 2, ¶ 4.)  Traders also used interest rate futures trading as a
  means of hedging a countervailing position taken in an interest rate swap
  based on LIBOR.  Typically, a move in LIBOR was balanced by an offsetting
  move in interest rate futures, leaving the trader with at most a minimal gain or
  loss for that day.  Again, there is good reason to think that Rabobank's
  counterparties sustained no net loss as a result of the alleged LIBOR
  manipulation.

- The government's method of estimation—based on an assumption of an intent
  to move the market by 1/8 of a basis point—is not based on an academic or
  established authority.  (Ex. 2, ¶ 6.)  It was invented for the purposes of the

30

sentencing proceedings in this case.

- Although there is no evidence showing that every request for a submission was accommodated, the government's methodology assumes that all LIBOR requests were accommodated or that Mr. Thompson expected that they would be accommodated.  (Ex. 2, ¶ 17.)

- At trial, Takayuki Yagami testified that he sometimes sent LIBOR requests that were based on his honest opinion of market conditions.  To the extent that a request for a LIBOR submission was based only on Mr. Thompson's honest estimate of the Yen cash market, drawn from his experience in that market, the government still assumes an intended loss for those submissions.  The same is true for analogous requests for submissions made by other traders.

- The government's loss calculation takes into account trades with institutions about which it has no information concerning whether they are distinct companies from Rabobank.  Trades that were internal to Rabobank and not made with any counterparty cannot have an intended loss, as Rabobank was both winner and loser—for the same amount—such trades.  (Ex. 2, ¶ 13.)

- The government's methodology assumes that Rabobank's LIBOR submissions were ordinarily averaged into the LIBOR determination for that day.  But the government was aware that in 11 of the 16 months between September 2007 and December 2008, Rabobank's submission was excluded from the calculation of the 3M USD LIBOR fix over 50% of the time.  The intended loss amount is not reduced based on this fact.  (Ex. 2, ¶ 26.)

- The Government's calculation of intended loss is based on inferences drawn from short emails and chats, many of which do not appear to relate to any effort at LIBOR manipulation.  (*See*, *e.g.*, Ex. 96.[5])

---

[5]   This email between Paul Thompson and Anthony Conti on October 3, 2008 involves Conti and Thompson discussing a USD LIBOR position just two weeks after the Lehman bankruptcy and at the depth of the global financial crisis.  Thompson asks Conti if he has "any clues how far 3m libor will continue going up" and asks whether it might hit 5% before the Federal Reserve Board proposes an interest rate cut.  Conti cannot answer—"how longs a piece of string"—because no one knows where the market will move during the coming weeks until the Federal Reserve Board acts.  However, Conti is doing well since he is lending for longer terms like one month at a high rate due to market turmoil, while Rabobank is having no problems borrowing at a low rate due to its AAA rating.  The spread is much larger than normal due to the artificially high rates caused by market panic.  Conti then writes back that he is "trying to drag them back down but I literally haven't seen any offer past 1 month since Lehman's went[.]"  Conti's reference to not seeing an offer makes clear that he is discussing a trade, not a Libor submission.  Thompson says that it "looks like [Conti is]

Given these defects, the correct loss amount in this sentencing should be zero. This would result in a 14-level reduction of Mr. Thompson's offense level from the calculations set forth in by the Government and the Presentence Report and a resulting range of 0 to 6 months' imprisonment.

Even assuming that the government's intended loss amount methodology is reasonable and accepted by the Court, the Government still incorrectly holds Mr. Thompson responsible for intended loss that he did not "purposely [seek] to inflict." The losses that Mr. Thompson's co-defendants intended to cause do not count; intended loss is attributable to Mr. Thompson only if he purposely sought to inflict harm on his counterparties.

Guidelines Amendment 792 explains that the relevant language in the commentary to Section 2B1.1 that refers to "harm that *the defendant purposely sought to inflict*" is a modification of a prior text which had referred to the "pecuniary harm that was *intended to result from the offense*." (emphases supplied). The Sentencing Commission stated that this change away from the passive voice to the active voice was meant to clarify that a subjective, not an objective, inquiry was required. The amendment "reflects the Commission's continued belief that intended loss is an important factor in economic crime offenses, but also recognizes that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability." *Id*.

---

more than covering me mate." In other words, Thompson is losing on a small position, but Conti is trading larger volumes at a significant profit, and so Thompson's losses will be covered many times over by Conti's trades. Conti replies that "hans with the dollar fido money will be taking up the slack next few weeks." Hans is a money market trader who is also doing well given that Rabobank has liquidity and can lend at a high rate. There is no reference here to LIBOR manipulation, and yet this innocent conversation about market conditions during the financial crisis is treated under the government's methodology as the basis for increasing the intended loss amount in this matter.

9296162v.1

In other words, the government must prove that Thompson himself intended to cause a particular loss to victims.  It is not enough that others in the conspiracy intended to cause such a loss.  Here, the intended losses identified by the government fall into two categories:  (A) those in which a request for a particular LIBOR submission was made by Mr. Thompson, and (B) those in which such a request was made by someone else at Rabobank.  The government seeks to hold Mr. Thompson responsible for category (B) even though there is no evidence that he intended to cause any losses in connection with requests for submissions made by other traders, that he spoke to most of those other traders about these requests for submission, or even had any knowledge of those traders' requests for submission.  The loss amount for which Mr. Thompson is responsible should be not greater than the total amount of intended losses attributable to Mr. Thompson's trades, which is stipulated to be $273,301.  (Ex. 2, ¶ 11.)  This loss amount would result in a two-level reduction from the calculations set forth in the Presentence Report to a range of 27-33 months' imprisonment.

Other reductions in intended loss amount can be made to take into consideration the other identified problems with the government's methodology.  For example:

- Removing from the government's analysis the loss associated with the eight "victims" that were themselves implicated in LIBOR investigation results in an intended loss of $164,770, which reduces the offense level by 4 levels from that set forth in the Presentence Report, for a Guidelines range of 21-27 months' imprisonment.  U.S.S.G. § 2B1.1(b)(1).  (Ex. 2, ¶ 11.)

- Removing from the government's analysis the unidentified/internal counterparties results in an intended loss of $240,359, which likewise causes a 4-level reduction in the offense level.  (Ex. 2, ¶ 14.)

- Removing from the government's analysis both of the above categories results in an intended loss of $131,828, which leads to a 6-level reduction from the range in the Presentence Report and a reduction in the Guidelines range to 15-21 months' imprisonment.  (Ex. 2, ¶ 16.)

33

- Removing from the government's analysis non-accommodated/inconclusive requests[6] results in an intended loss of $150,987, which reduces the level by 4 levels from the analysis in the Presentence Report and a reduction in the range to 21-27 months' imprisonment.  (Ex. 2, ¶ 20.)

In short, any effort to correct the questionable assumptions made in the Government's methodology would result in a lower Guidelines range than that set forth in the Presentence Report.

### 3.      Number of Victims

Mr. Thompson should not receive a two-level increase based on the number of victims of the offense.  *First*, the Government cannot prove that there are any actual loss victims of the offense since it can prove no actual loss numbers.

*Second*, the computation defects with respect to loss amount also impact the counting of victims.  If a counterparty could not have lost money on its trade with Rabobank because the move in LIBOR also led the counterparty to have an offsetting gain on another trade, that counterparty should not be identified as a victim.

*Third*, at least eight of the victims identified by the government are themselves financial institutions who have been implicated in the LIBOR investigation conducted by the government or by law enforcement authorities in the European Union.[7]  These institutions were

---

[6]    These are requests where it is unclear that anyone accommodated the asserted requests made by the traders.

[7]    On the Department of Justice's website, the Department identifies UBS, RBS, Deutsche Bank and Lloyds (along with Rabobank) as entities that engaged in LIBOR manipulation.  *See* U.S. Department of Justice, "LIBOR and FX," found at https://www.justice.gov/criminal-fraud/libor-and-fx (last visited September 12, 2016).  Barclays entered into a non-prosecution agreement with the Department of Justice for LIBOR misconduct.  *See* U.S. Department of Justice, "Barclays Bank PLC Admits Misconduct Related To Submissions for the London Interbank Offered Rate," June 27, 2012, found at https://www.justice.gov/opa/pr/barclays-bank-plc-admits-misconduct-related-submissions-london-interbank-offered-rate-and (last visited September 12, 2016).  Citibank

34

seeking to impact the setting of LIBOR by making submissions designed to benefit their trading positions. Under the doctrine of *in pari delicto*, when there is a case of mutual wrongdoing, it is inappropriate to hold either party responsible. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). That doctrine should apply with equal force here. It is illogical to label Barclays or Deutsche Bank as "victims" of Rabobank while the Government has already determined that Rabobank was a "victim" of Barclays and Deutsche Bank. A perpetrator of LIBOR manipulation is not a victim of LIBOR manipulation.

Eliminating this inappropriate offense-level adjustment would result in a 2-level reduction from the range in the Presentence Report. Along with a 2-level reduction based on loss amount, Mr. Thompson's resulting range would be 21 to 27 months' imprisonment. In addition, removing from the Presentence Report's analysis those losses (i) associated with the eight "victims," (ii) trades made with unidentified/internal counterparties, and (iii) non-accommodated/inconclusive requests results in an intended loss of $76,552. (Ex. 2, ¶ 21.) This

---

and its affiliates likewise entered into a settlement with the Commodity Futures Trading Commission relating to LIBOR misconduct. *See* U.S. C.F.T.C., "CFTC Orders Citibank, N.A. And Japanese Affiliates to Pay $175 Million Penalty For Attempted Manipulation of Yen LIBOR and Euroyen TIBOR, and False Reporting of Euroyen TIBOR and U.S. Dollar Libor," May 25, 2016, found at http://www.cftc.gov/PressRoom/PressReleases/pr7372-16 (last visited September 12, 2016). J.P.Morgan also settled a LIBOR investigation with the European Union's antitrust unit in 2013. *See* Gaspard Sebag & Suzi Ring, "J.P. Morgan Says Libor Probes Ended in U.S., U.K. After EU Penalty," Aug. 4, 2016, found at http://www.bloomberg.com/news/articles/2016-08-04/jpmorgan-says-libor-probes-ended-in-u-s-u-k-after-eu-penalty (last visited September 13, 2016) ("JPMorgan paid 80 million euros ($89 million) to the European Union's antitrust unit in 2013 as part of a multi-firm settlement in relation to Yen Libor."). Société Générale also settled a LIBOR investigation with the European Union in 2013. *See* European Commission Press Release, "Antitrust: Commission fines banks 1.49 billion Euros for participating in cartels in the interest rate derivatives industry," Dec. 4, 2013, found at http://europa.eu/rapid/press-release_IP-13-1208_en.htm (last visited September 13, 2016).

in turn would reduce the offense level by 8 levels from the Guidelines calculation in the

Presentence Report, resulting in a range of 12-18 months' imprisonment.[8]

## **CONCLUSION**

For these reasons, Mr. Thompson respectfully requests the imposition of a non-

custodial sentence.

Dated:          New York, New York
                November 2, 2016
                                        Respectfully submitted,


                              By:     /s/ Harry Sandick_____
                                      Harry Sandick
                                      Elena Steiger Reich
                                      PATTERSON BELKNAP WEBB & TYLER LLP
                                      1133 Avenue of the Americas
                                      New York, NY 10036
                                      druzumna@pbwt.com
                                      esteigerreich@pbwt.com
                                      (T) 212 336-2000
                                      (F) 212-336-1205

                                      *Counsel for Defendant Paul Thompson*

---

[8]     At an offense level of 15, Thompson would only receive a 2-level reduction for acceptance of responsibility.